**Temistocles RAMIREZ de ARELLANO, et al., Appellants,**

v.

**Caspar W. WEINBERGER, Secretary of Defense, et al.**

**No. 83–1950.**

United States Court of Appeals, District of Columbia Circuit.

Argued 25 April 1984.

Decided 5 October 1984.

As Amended Oct. 5, 1984.

Mark R. Joelson, Washington, D.C., with whom Jerry D. Anker, Greer S. Goldman, Mark N. Bravin and Don Wallace, Jr., Washington, D.C., were on the brief, for appellants. Donald H. Green and John F. Daly, Washington, D.C., also entered appearances for appellants.

John M. Rogers, Atty., Dept. of Justice, Washington, D.C., with whom Richard K. Willard, Acting Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., William Kanter, Atty., Dept. of Justice, and Steven Asher, Atty., Dept. of State, Washington, D.C., were on the brief, for appellees. Michael Hertz, Marc Johnston, Attys., Dept. of Justice, R. Craig Lawrence and Stuart H. Newberger, Asst. U.S. Attys., Washington, D.C., also entered appearances for appellees.

Before ROBINSON, Chief Judge, and WRIGHT, TAMM, WILKEY, MIKVA, EDWARDS, GINSBURG, BORK, SCALIA and STARR, Circuit Judges.

Opinion for the court filed by Circuit Judge WILKEY.

Dissenting opinion filed by Circuit Judge TAMM.

Dissenting opinion filed by Circuit Judge SCALIA, in which Circuit Judges BORK and STARR concur.

Dissenting opinion filed by Circuit Judge STARR, in which Circuit Judge SCALIA concurs.

OUTLINE

| | | Page |
|---|---|---|
| I. | BACKGROUND | 1506 |
| | A. The Plaintiffs' Set of Facts | 1506 |
| | B. Procedural History | 1508 |
| | C. Subsequent Developments | 1509 |
| II. | THE PLAINTIFFS' CLAIMS | 1510 |
| III. | JUSTICIABILITY | 1511 |
| IV. | STANDING | 1515 |
| V. | RELIEF FOR THE STATED CLAIMS | 1521 |
| | A. Equitable Discretion of the District Court | 1521 |
| | 1. Adequacy of the remedy at law | 1522 |
| | 2. Balancing the equities and prudential considerations | 1528 |
| | a. Location of the land | 1529 |
| | b. Honduran law | 1530 |
| | c. Separation of powers | 1530 |
| | d. Compliance and monitoring | 1531 |
| | B. Declaratory Relief | 1532 |
| | C. Relief for the Due Process Claims | 1533 |
| VI. | ACT OF STATE | 1533 |
| | A. The Factual Basis for Applying the Act of State Doctrine on This Appeal | 1534 |
| | | Page |
| | B. Legal Obstacles to the Application of the Act of State Doctrine | 1539 |
| VII. | CONCLUSION | 1543 |

WILKEY, Circuit Judge:

This case involves an alleged occupation, amounting to an effective seizure and destruction, of a United States citizen's privately owned cattle ranch in Honduras by officials of the United States government. Temistocles Ramirez de Arellano (Ramirez), a United States citizen, claims that the Secretaries of State and Defense are operating a large military facility for training Salvadoran soldiers on his private ranch without permission or lawful authority, in violation of the Constitution. Ramirez alleges, in essence, that a United States sponsored and controlled military center is occupying his land, destroying his life's work, and exposing his family and employees to life threatening conditions. The complaint filed in the United States District Court for the District of Columbia requests declaratory and injunctive relief for the alleged occupation and destruction of private property without constitutional or statutory authority and for a deprivation of the use and enjoyment of property without due process of law. The district court dismissed the complaint prior to any discovery or findings of fact on the ground that the dispute was a nonjusticiable political question.[1] We reverse.

The plaintiffs' claims present varied and complex issues of core constitutional concern. We emphasize, however, that we are not now being asked to enter judgment on the merits for one of the parties. Because the case is before us on an appeal of the district court's dismissal of the complaint at the threshold of litigation, we need only determine whether the plaintiffs have stated a justiciable claim for relief which falls within the jurisdiction of the district court. In so doing, we address the assortment of ingenious but spurious arguments which the defendants have conceived and advanced in an effort to wipe out the plaintiffs' case. We find the dismissal of the complaint was precipitous.

---

1. 568 F.Supp. 1236 (D.D.C.1983).

 We proceed under the settled rule for assessing the propriety of dismissal under Rule 12(b) of the Federal Rules of Civil Procedure. Many potentially dispositive facts are intensely disputed by the parties, such as the role of the Honduran armed forces and the United States military in operating the Regional Military Training Center (RMTC), and the extent of land occupied and used for the military base. Because there has been neither fact-finding by the district court nor stipulation of undisputed facts by the parties, we must accept as true all of the material allegations in the plaintiffs' complaint. Dismissal for failure to state a claim for relief is proper only when "it appears *beyond doubt* that the plaintiff can prove *no set of facts* in support of his claim which would entitle him to relief."[2] All factual doubts must be resolved and all inferences made in favor of the plaintiffs.[3] Defendants' factual allegations, if in agreement with plaintiffs', only reinforce plaintiffs' case; if in disagreement, they must be ignored. Thus, at this stage of the proceedings, the only relevant factual allegations are the plaintiffs'.

## I. BACKGROUND

### A. *The Plaintiffs' Set of Facts*

The plaintiffs' set of facts are detailed in the verified complaint filed by Ramirez and six corporate plaintiffs, in eleven sworn declarations filed with the district court, and in numerous newspaper reports appended to the plaintiffs' pleadings and memoranda. Assuming, as we must, the truth of the plaintiffs' material allegations, the facts are as follows.

Plaintiff Ramirez is a citizen of the United States. He is the sole beneficial owner,

the general manager, and the chief executive officer of a large agricultural-industrial complex in the northern region of Honduras. Plaintiff Ramirez is a businessman and was a founding member of the Lion's Club of Trujillo, Honduras, as well as the founder of the Association for the Defense of the Free Enterprise System in San Juan, Puerto Rico. Ramirez has engaged in numerous civic and community services in Puerto Rico and in Central America, including assisting the United States government in a meat distribution program for Puerto Rico. Ramirez conducts his business operations through six corporations which he owns and controls. Two of these corporate plaintiffs are United States nationals and four are incorporated in Honduras. Together they form a chain of title through which plaintiff Ramirez holds his interest in the land and property at issue.[4]

Plaintiff Ramirez acquired his large tract of land in Honduras more than 20 years ago, when it was raw, undeveloped jungle. Since then he has transformed the land into a 14,000-acre cattle ranch, meat-packing operation and shrimp-packing plant. According to Ramirez's sworn declaration filed with the court, he "supervised the clearing of this land, planting feed grass, constructing fences, farmroads, cattle pens, cattle treatment facilities, warehouses and numerous other buildings, water ponds and reservoirs, and housing for [his] employees and their families."[5] The business operation employs approximately 500 workers and is the single largest employer in the Department of Colon, Honduras. The plaintiffs' initial total investment in the property has increased from approximately $700,000 to more than $13,000,000.[6]

---

**2.** *Schuler v. United States,* 617 F.2d 605, 608 (D.C.Cir.1979) (*quoting Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)) (emphasis added).

**3.** *Shear v. National Rifle Ass'n,* 606 F.2d 1251, 1253 (D.C.Cir.1979); *Schuler v. United States,* 617 F.2d at 608 (D.C.Cir.1979).

**4.** Complaint ¶¶ 4–9, Appendix ("A.") at 5–7; Ramirez Declaration ¶¶ 1–5, A. at 19–22. The com-

plaint states that Ramirez owns two United States corporations which in turn own four Honduran corporations. "The six corporate plaintiffs ... are and at all material times have been owned and controlled by Mr. Ramirez." Complaint ¶ 5, A. at 6.

**5.** Ramirez Declaration ¶ 4, A. at 22.

**6.** Complaint ¶¶ 4–9, A. at 5–7; Ramirez Declaration ¶¶ 1–5, A. at 19–22.

Still assuming the truth of the plaintiffs' factual allegations, the plaintiffs' property was occupied by the defendants without permission in 1983. In March of that year, the United States Department of Defense decided to establish a Regional Military Training Center for the United States to train soldiers from the army of El Salvador. Because of Congress's unwillingness to increase the number of military advisers in El Salvador itself, the Defense Department decided not to locate the military training center there.[7] Instead, after reportedly considering several other countries, the Defense Department chose Honduras as the location for the RMTC. Newspaper articles in the United States at the time reported that the Honduran government was resisting the Defense Department's placement of the military center in Honduras and that a United States Army spokesman said that Honduras did not have anywhere to locate the training center.[8]

Nonetheless, officials of the United States Department of Defense began a survey of land in the vicinity of Ramirez's property, and in April of 1983 they picked a specific site in Honduras for the Regional Military Training Center. Unknown to Ramirez, the chosen site was his cattle ranch. Officers of the Army Corps of Engineers immediately started planning the construction of a 1,000-man tent camp and training facility on the plaintiffs' property, and by May 1983, they had drawn up blueprints for the military center.[9]

In this same month, plaintiff Ramirez discovered the United States plans. The First Secretary of the United States Embassy in Honduras was visiting Ramirez's home and "casually mentioned that a training base for Salvadoran soldiers was going to be built in the area."[10] When Ramirez asked its location, the official pointed to property across the bay. Ramirez instantly realized that the official was pointing to his privately owned cattle ranch and he immediately informed his guest and other officials of the United States Embassy that the intended site for the RMTC was his land.

Construction of the military camp proceeded apace. Work crews from Litton Industries, under the supervision of the United States Army Corps of Engineers, began bulldozing the ranch in early June 1983. The crews constructed a 1,000-man tent camp for housing Salvadoran soldiers as well as an unspecified number of buildings on the ranch. The Army Corps of Engineers also built an ammunition storage facility and a firing range on the private land. In addition, plans were drawn up for mortar and other long distance firing ranges on the plaintiffs' property.[11]

Next, according to the plaintiffs' allegations, United States military training personnel moved in. Over 100 United States Army Special Forces Soldiers began training over 1,000 soldiers on the plaintiffs' pastures, conducting training exercises all over the ranch using live ammunition.

As a result of the construction and the military operations, plaintiffs allege that they have suffered numerous injuries. Prime grazing land and fences have been bulldozed. The flow of water to the plaintiffs' meat-packing plant has been interrupted by the soldiers' diversion of substantial quantities of water for their own use. Cattle have been shot by stray bullets. "Large numbers of armed soldiers and trainees roaming around [the] ranch and the area of [the] meat-packing plant"

7. *See* Plaintiffs' Memorandum of Points and Authorities, filed 13 July 1983, Attachment #1, Boston Globe, 27 Mar. 1983, at 1, A. at 15; *id.,* Attachment #3, Miami Herald, 12 Apr. 1983, at 17–A, A. at 17.

8. *See id.,* Attachment #3, Miami Herald, 12 Apr. 1983, at 17–A ("Honduras balks at hosting Salvador army training"), A. at 17; *id.,* Attachment #2, N.Y. Times, 20 Mar. 1983, at A19, A. at 16.

9. Ramirez Declaration ¶ 24, A. at 31; Ramirez Supplemental Declaration ¶ 3, A. at 66.

10. Ramirez Declaration ¶ 10, A. at 23.

11. *Id.* ¶¶ 19, 31, A. at 28, 32–34; Ramirez Supplemental Declaration ¶¶ 22, 29, A. at 73–74, 76.

have frightened Ramirez's family and his employees.[12] Ranch employees, fearing for their lives, have refused to tend cattle near the military operations, causing the livestock to become undernourished. The foreman of one section of the ranch declared:

My family, I and the workers are living in constant fear because of so much military activity carried out in the pastures of Taya Crique to the south of the highway. At this point, we do not know what to do in such circumstances since we are afraid to remain here and also because we fear to encounter armed soldiers in the pastures where we must work.[13]

Over half of the ranch's 14,000 acres and nearly 90% of the year-round grazing land has been seized by soldiers of the Regional Military Training Center.[14] The operations are destroying the plaintiffs' investment and Ramirez's life's work.

The plaintiffs claim that the land on which their operations are based is irreplaceable. Land in other areas of Honduras is either too arid, too mountainous or too inaccessible for the integrated agro-industrial enterprise. The only other land in Honduras suitable for cattle ranching is neighboring property, which is privately owned.[15]

The plaintiffs allege that in May 1983, the *Washington Post* reported an announcement by officials of the Departments of State and Defense pertaining to the establishment of the RMTC. One month later, the National Congress of Honduras entered a decree which authorized "the admission of military instructors and students, coming from friendly countries" to the Military Training Center.[16] According to Ramirez, however, "the site for the

RMTC was neither presented to, nor decided by the Honduran legislature." [17] In the summer of 1983, Honduran military officials discussed expropriation of a small portion of the ranch with Ramirez, but this discussion, Ramirez alleges, only pertained to a 1,500–2,000 acre section of the ranch called the "Designated Area." These discussions did not result in any expropriation of the Designated Area[18] and the training activities spilled over onto the majority of the ranch's acreage.

Meanwhile, according to the complaint, plaintiff Ramirez made numerous efforts to resolve his dispute with officials of the United States Embassy in Honduras and the Departments of State and Defense in Washington, D.C., but these efforts were unproductive or rebuffed.[19] The plaintiffs have not received any compensation for the seizure nor has any hearing on the dispute been held. The plaintiffs do not know from day to day what is going to happen on their ranch.

### B. *Procedural History*

In July 1983 plaintiff Ramirez and the six corporate plaintiffs which he wholly owns and controls sued Caspar W. Weinberger, Secretary of Defense, George P. Shultz, Secretary of State, and Lt. Gen. Joseph K. Bratton, Chief of Engineers for the United States Army Corps of Engineers, in the United States District Court for the District of Columbia. The plaintiffs' complaint charges the named officials of the United States with causing the construction and operation of a large military training camp on the plaintiffs' private property in Honduras. It alleges that the defendants' occupation and destruction of the plaintiffs' property is unconstitutional

---

**12.** Ramirez Declaration ¶ 33, A. at 34.

**13.** Reyes Declaration ¶ 4, A. at 94–95.

**14.** Complaint ¶ 11, A. at 8; Ramirez Third Supplemental Declaration ¶ 2, A. at 115.

**15.** Ramirez Declaration ¶ 6, A. at 22–23.

**16.** Ramirez Supplemental Declaration, Attachment # 1; Brief of Appellees, Addendum A.

**17.** Ramirez Supplemental Declaration ¶ 2, A. at 65.

**18.** Complaint ¶ 11, A. at 8–10; Ramirez Declaration ¶¶ 13, 16–18, A. at 25–28.

**19.** Ramirez Declaration ¶ 36, A. at 36–37.

because it is not authorized by any federal statute or provision of the Constitution. It further charges that the defendants deprived the plaintiffs of the use and enjoyment of their property without due process of law. The complaint seeks declaratory and injunctive relief and such other relief as the court deems just and proper.[20]

Shortly after the complaint was filed, the parties met in an effort to stipulate material facts. When they failed to reach an agreement, plaintiffs sought the permission of the district court to begin discovery of the facts. The district court denied their request.[21]

On 20 July 1983, the United States defendants moved to dismiss the complaint on the grounds that the action presented a nonjusticiable political question and that the plaintiffs had failed to state a claim for relief. No answer to the complaint was filed, but the defendants' motion to dismiss was supported by five declarations *disputing* the plaintiffs' factual claims and *contending* that the RMTC was actually a project of the Honduran government. The plaintiffs opposed the motion to dismiss and submitted additional declarations of fact and other exhibits. On 24 August 1983, the district court dismissed the complaint, holding that the case presented a nonjusticiable political question. The district court indicated that summary judgment was not appropriate at that time, *because crucial material facts were in dispute.* Accordingly it dismissed the complaint under Rule 12(b) of the Federal Rules of Civil Procedure.[22] This appeal ensued.

## C. *Subsequent Developments*

On appeal before a panel of this court, the defendants informed the court that the

President of the Republic of Honduras had issued an "expropriation decree" in November 1983 pertaining to the plaintiffs' land.[23] The decree identifies certain land in the Department of Colon, Honduras on which the Regional Military Training Center is located, and states that the described property "shall be expropriated." It provides that "established legal procedures shall apply to the appraisal of the property and to the payment of compensation." The decree is signed by the Secretary of State for National Defense and Public Security of Honduras and is dated 4 November 1983.[24]

In response to this submission to the court by the defendants, the plaintiffs submitted a letter to the court stating that the signing of such an expropriation decree merely begins the process of expropriation in Honduras and is not itself an act of expropriation or a claim of title. The plaintiffs directed the court's attention to the *uncontroverted* legal opinions they had already submitted to the district court, which advise that a Presidential decree of expropriation in Honduras is only the first step in a process which may or may not result in expropriation.[25]

The plaintiffs also submitted to the court a copy of a letter dated 18 November 1983 from Ramirez to the United States Ambassador to Honduras. This letter describes alleged, subsequent developments on the ranch which are similar to those outlined in the verified complaint. The letter reads:

Dear Mr. Ambassador:

With the utmost urgency I am informing you by hand courier that United States Armed Personnel with Tanks have invaded our Plant Premises at Puerto Castilla this afternoon . . . .

---

**20.** A. at 5–14.

**21.** *See* Transcript of 15 July 1983 at 4–11, 36.

**22.** *See* Transcript of 26 July 1983 at 9, 11–12 (The Court said: "Summary judgment is a technique to resolve disputes as a matter of law when there is no dispute as to a material fact, and it is quite obvious here, I think both parties would agree, that there are some essential disputes as to the material facts in the case."); 568 F.Supp. at 1237 n. 1.

**23.** *See* Brief of Appellees, Addendum C.

**24.** *Id.* at c–5, c–7, c–8.

**25.** *See* Reply Brief of Appellants, Appendix A. We note that foreign law is a question of fact.

At 15.40 hours CST when I am dictating this letter we have reports that there are four Tanks inside with supporting infantrymen. The Tank Commander came to our Office Gate inside the yard and demanded the keys to the gates of all other areas. He was told to leave and that no keys were to be given to him. He then gave order to his company to proceed and go thru our property. At this time we have no reports from our ranch. Inasmuch as the U.S. Government had been forewarned and foretold not to go into my properties and its Diplomatic and Military Representatives had assured no U.S. Troops would violate my rights and property I hereby advise you that we hold all those responsible Legally and Morally Liable.

Sincerely

/s/

Temistocles Ramirez de Arellano [26]

## II. THE PLAINTIFFS' CLAIMS

The plaintiffs' set of facts gives rise to cognizable causes of action against the named defendants. Count I of the plaintiffs' complaint charges that the defendants' establishment of the Regional Military Training Camp on plaintiffs' land, the occupation and destruction of the plaintiffs' property, and the deprivation of the plaintiffs' use and enjoyment of the property "are beyond defendants' express or implied authority under the laws and treaties of the United States and the United States Constitution." [27]

■ This count states a claim. It is settled law that the Executive's power to take the private property of United States citizens must stem from an act of Congress or from the Constitution itself.[28] When there is no authorization by an act of Congress or the Constitution for the Executive to take private property, an effective taking by the Executive is unlawful because it usurps Congress's constitutionally granted powers of lawmaking and appropriation. *Youngstown Sheet & Tube Co. v. Sawyer* [29] is a leading authority for the cause of action stated in plaintiffs' first count. There the Supreme Court adjudicated a challenge to the Executive's power to seize privately owned steel mills during the Korean conflict. The Court held that the President's seizure of the steel mills was unconstitutional because no statute authorized the taking and authority to take the mills was not implicit in the powers granted to the Executive by the Constitution,

26. *Id.*

27. Complaint ¶ 16, A. at 11.

28. *See Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *Hooe v. United States,* 218 U.S. 322, 31 S.Ct. 85, 54 L.Ed. 1055 (1910); *The Paquete Habana,* 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900).

29. 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). The purported distinctions of *Youngstown Sheet & Tube* offered by the dissenters merely serve to emphasize the applicability of that case to this. We suggest that the Supreme Court did not regard the foreign affairs component of seizing domestic steelmills as "nil"; the motive and justification for the presidential action was alleged to be a major war going on in Korea. In both *Youngstown* and the case today the "primary" effect of the seizure (Dissenting Opinion of Tamm, J., at 1549) is on the property of United States citizens—foreign affairs powers have only been cited secondarily as a supposed justification for the domestic actions.

Further, whether the underlying activity enjoined is in Youngstown, Ohio and every other distant point in the United States where a seized mill was located, or at no greater distance to the South in a neighboring country, the location of the enjoined activity misses the mark. As the injunction running to the Secretary of Commerce in *Youngstown* illustrates, when the enjoined defendant is a responsible government officer residing in the nation's capital, who by virtue of his oath of office is sworn to uphold the Constitution and laws of the United States, and who therefore must be presumed to be ready to comply with this court's orders (as Government counsel conceded readily at oral argument before the original panel that defendants were willing and bound to do), questions of evaluating and guaranteeing compliance are not insurmountable.

Finally, the availability of monetary compensation is always a factor in considering injunctive relief; not only is its availability doubtful here, but the plaintiffs' description of the situation may suggest that mere monetary relief would be insufficient under any concept of justice. See infra notes 124 & 134.

despite the exigent circumstances. It upheld a federal district court's injunction prohibiting Executive officials from seizing the mills.[30]

In the instant case, plaintiffs claim that no statute or constitutional provision authorizes the United States defendants to take the plaintiffs' private property for a military training center. While we express no view on the merits of the plaintiffs' first count, the plaintiffs have succeeded in stating a claim against the defendants for an unauthorized and unconstitutional deprivation of the use and enjoyment of their property. This claim is adjudicable in the federal district court.

■ Count II contends that the defendants' deprivation of the plaintiffs' use and enjoyment of their property without notice or a hearing violates the due process clause of the fifth amendment. Plaintiffs rely on *Mullane v. Central Hanover Bank & Trust Co.*[31] as support for the proposition that the deprivation of a property interest must be preceded by notice and must be accompanied by an appropriate hearing, except in extraordinary circumstances. Plaintiffs claim that the defendants have given the plaintiffs no notice of their intentions with respect to the plaintiffs' property and that no hearing has been held on the property dispute. This count also states a claim within the jurisdiction of the federal district court sufficient to withstand dismissal for failure to state a claim.[32]

### III. JUSTICIABILITY

Having found that the plaintiffs' set of facts gives rise to the causes of action stated in the complaint, we examine the applicability of the political question doctrine to this case. The district court dismissed the complaint on the ground that the case presented a nonjusticiable political question. It determined that the case was a direct challenge to the propriety of the United States military presence in Central America, and having so characterized the complaint, it held that the dispute was nonjusticiable. The district court found that the case presented all of the three criteria identified by the Supreme Court in *Baker v. Carr*[33] for nonjusticiable political questions. The panel opinion by Judge Scalia (later vacated for en banc) found unanimously that the trial court was in error in relying on this ground. On this point our en banc disposition is in accord with the panel opinion.

■ The factors for identifying political questions were recently summarized by Justice Powell in his concurrence in *Goldwater v. Carter*. The doctrine incorporates three inquiries:

(i) Does the issue involve resolution of questions committed by the text of the Constitution to a coordinate branch of Government? (ii) Would resolution of the question demand that a court move beyond areas of judicial expertise? (iii) Do prudential considerations counsel against judicial intervention?[34]

The first of these formulations requires the court to determine whether the text of the Constitution implicitly or explicitly commits the stated claim to the political branches. According to the Supreme Court, this necessitates a close textual analysis of specific provisions of the Constitution. The Supreme Court determined, for example, that certain suits brought pursuant to the Constitution's guarantee of a republican form

---

**30.** *Id.* Similarly, in *The Paquete Habana,* 175 U.S. 677, 710–11, 20 S.Ct. 290, 303, 44 L.Ed. 320 (1900), the Supreme Court held that the wartime capture of foreign fishing vessels off the coast of Cuba by U.S. officials was unlawful because such seizures had not been authorized by Congress.

**31.** 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950); *see also Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

**32.** The third count charges the defendants with violating the Law of Nations and is brought under the Alien Tort Claims Act, 28 U.S.C. § 1350 (1982).

**33.** 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

**34.** 444 U.S. 996, 998, 100 S.Ct. 533, 534, 62 L.Ed.2d 428 (1979) (Powell, J., concurring).

of government in article IV are nonjusticiable political questions textually committed for resolution to Congress, not the Judiciary, because the Constitution gives Congress the exclusive power to determine whether a particular state government should be recognized.[35] In addition, certain disputes over internal procedures in Congress may be textually committed for resolution to Congress by article I, section 5, clause 2, which provides that "[e]ach House may determine the Rules of its Proceedings."[36]

In the area of foreign affairs, some broad challenges to the Executive's conducting of foreign relations have been found nonjusticiable because formulation of foreign policy is constitutionally committed to the political branches. In *Johnson v. Eisentrager*, for example, the Supreme Court refused to adjudicate claims by enemy aliens who were convicted of violating laws of war in China after Germany had surrendered. The aliens' claims were found to be committed to resolution by the political branches because they fundamentally challenged the propriety of United States military activities in China. There, the Court stated: "[I]t is not the function of the Judiciary to entertain private litigation ... which challenges the legality, the wisdom, or the propriety of the Commander-in-Chief in sending our armed forces abroad or to any particular region."[37]

Not every issue related to foreign relations, however, is constitutionally committed for resolution by the Executive. *Baker v. Carr* states that "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance."[38] Issues which are not at base sweeping challenges to the Executive's foreign policy typically are adjudicated by the courts because they do not involve judicial usurpation of the Executive's constitutional powers to manage foreign affairs.

■ A careful analysis of the plaintiffs' case shows that their claims are not exclusively committed for resolution to the political branches. Unlike the claim addressed by the Court in *Johnson v. Eisentrager*, the plaintiffs do not seek to adjudicate the lawfulness of the United States military presence abroad. Instead, they seek adjudication of the narrow issue whether the United States defendants may run military exercises throughout the plaintiff's private pastures when their land has not been lawfully expropriated. They do not challenge the United States military presence in Honduras or in Central America, nor do they object to United States sponsorship of a Regional Military Training Center in Honduras. Plaintiffs' claim, properly understood, is narrowly focused on the lawfulness of the United States defendants' occupation and use of the plaintiffs' cattle ranch.

This is a paradigmatic issue for resolution by the Judiciary. The federal courts historically have resolved disputes over land, even when the United States military is occupying the property at issue.[39] Furthermore, certain disputes over property rights to land located abroad are appropriately resolved by the federal courts,[40] as are property disputes involving the Executive Branch and foreign affairs. In *Youngstown*, for example, the Supreme Court adjudicated the claim that the President had unlawfully seized most of the nation's steel mills, even though the case arose in the context of the nation's military involvement in Korea.[41] The issues in the

---

**35.** See, e.g., *Luther v. Borden,* 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849).

**36.** See, e.g., *Metzenbaum v. FERC,* 675 F.2d 1282, 1287 (D.C.Cir.1982).

**37.** 339 U.S. 763, 789, 70 S.Ct. 936, 949, 94 L.Ed. 1255 (1950).

**38.** 369 U.S. at 211, 82 S.Ct. at 707.

**39.** See, e.g., *Meigs v. McClung's Lessee,* 13 U.S. (9 Cranch) 11, 3 L.Ed. 639 (1815).

**40.** See, e.g., *United States v. Caltex (Philippines), Inc.,* 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157 (1952).

**41.** 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

instant case are well within the traditional bounds of justiciability by the federal Judiciary.

Secondly, it cannot be said on review of this dismissal that resolution of the case will require the court to move outside of its areas of expertise. On the basis of the complaint and affidavits, it appears that adjudication of the defendants' constitutional authority to occupy and use the plaintiffs' property will necessitate interpretations of the Constitution and of federal statutes—which are quintessential tasks of the federal Judiciary.[42] The complaint does not reveal that expertise beyond the capacity of the Judiciary is essential to a resolution of the claims.

The district court found, however, that adjudication of the plaintiffs' claims would be unmanageable because reaching "the heart of this matter would necessarily involve sensitive and confidential communications between the highest members of the Executive branch and officials of a foreign power that are not judicially discoverable."[43] We disagree. It is premature to conclude that essential evidence is undiscoverable merely on the basis of the complaint and related declarations in this case. Evidentiary privileges turn on facts, such as the harm that might flow from disclosure of particular communications,[44] which are not yet part of the record in the instant case. In *Attorney General v. The Irish People, Inc.*, this court held that dismissal of a complaint is not proper "when information which '*might*' be relevant to a ... claim is unavailable for discovery."[45] That case applies squarely to the instant appeal. If it turns out that essential evidence is undiscoverable due to Executive privilege,

the district court can take appropriate action at that time. Speculation about Executive privilege in this case cannot justify squelching the plaintiffs' complaint prior to any factfinding.

Finally, the district court erred by holding that prudential considerations compel dismissal of the complaint. *Baker v. Carr* identifies four circumstances in which prudential considerations may bar adjudication of a claim. These are:

> [T]he impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.[46]

None of these circumstances is necessarily presented by the plaintiffs' complaint and related declarations.

The plaintiffs do not seek judicial monitoring of foreign policy in Central America nor do they challenge United States relations with any foreign country. The case does not raise the specter of judicial control and management of United States foreign policy. As such, the issues in the instant case are qualitatively different from those posed in several recent cases which were dismissed as nonjusticiable political questions. In *Dickson v. Ford* the Fifth Circuit upheld the dismissal of a taxpayer's challenge to military and economic assistance to Israel.[47] Likewise, in *Crockett v. Reagan* a panel of this circuit upheld the dis-

**42.** See Powell v. McCormack, 395 U.S. 486, 548–49, 89 S.Ct. 1944, 1978, 23 L.Ed.2d 491 (1969) (requirements of nonjusticiability not met when court is called upon merely to interpret the Constitution); Consumer Energy Council of America v. FERC, 673 F.2d 425, 452 (D.C.Cir.1982), affirmed mem. sub nom. Process Gas Consumers Group v. Consumers Energy Council of America, —— U.S. ——, 103 S.Ct. 3556, 77 L.Ed.2d 1402 (1983).

**43.** 568 F.Supp. at 1239 (footnote omitted).

**44.** See Halkin v. Helms, 690 F.2d 977, 990 (D.C.Cir.1982).

**45.** 684 F.2d 928, 951 (D.C.Cir.1982), cert. denied, 459 U.S. 1172, 103 S.Ct. 817, 74 L.Ed.2d 1015 (1983).

**46.** 369 U.S. at 217, 82 S.Ct. at 710.

**47.** 521 F.2d 234 (5th Cir.1975), cert. denied, 424 U.S. 954, 96 S.Ct. 1428, 47 L.Ed.2d 360 (1976).

missal of a suit brought by members of Congress challenging the legality of United States military aid to El Salvador.[48] If adjudicated, those broadside attacks on fundamental foreign policy decisions might have resulted in conflicting pronouncements from the Judiciary and the political branches over the basic tenets of United States relations with foreign states.

By contrast, those factors which have permitted adjudication in other cases implicating foreign affairs are present here. Private United States litigants seek a determination of the lawfulness of the Executive's deprivation of their private property.[49] The prudential, separation-of-powers concerns presented by the instant case are certainly not greater than those underlying the wartime seizure of an entire industry by the Executive in *Youngstown*. Ramirez's dispute with the United States military over land in Honduras does not require unquestioning adherence to a political decision by the Executive. The complaint does not present any of the criteria used by the Supreme Court to identify nonjusticiable political questions.

The political question doctrine is a tempting refuge from the adjudication of difficult constitutional claims. Its shifting contours and uncertain underpinnings make it susceptible to indiscriminate and overbroad application to claims properly before the federal courts. Recent cases raise doubts about the contours and vitality of the political question doctrine, which continues to be the subject of scathing scholarly attack.[50] We need not, however, announce the demise of the political question doctrine by our holding in this case. Despite confusion over whether a retreat to the political question doctrine is proper in particular cases,[51] it is clear that the doctrine is, at best, a narrow one. *Baker v. Carr* admonishes that "[t]he doctrine ... is one of 'political question,' not one of 'political cases.' "[52] For similar reasons we fundamentally disagree with Judge Tamm's dissenting suggestion that granting these plaintiffs their day in court will "intolerably" impinge and intrude upon the Executive's conducting of foreign affairs. This dissent relies heavily on *United States v. Curtiss-Wright Export Corp.*,[53] to establish the existence of a "realm" of Executive power in the foreign relations area which courts should not curtail. But this same decision reviewed, *on the merits*, a constitutional challenge to certain laws granting foreign affairs power to the President.[54] The possibility that the laws would not withstand constitutional scrutiny, with the concomitant embarrass-

---

**48.** 720 F.2d 1355 (D.C.Cir.1983) (per curiam), *cert. denied*, —— U.S. ——, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984).

**49.** *See Goldwater v. Carter*, 444 U.S. 996, 1004, 100 S.Ct. 533, 537, 82 L.Ed.2d 839 (1979) (Rehnquist, J., concurring) (Justice Rehnquist noted that the claim in *Youngstown* was *not* a nonjusticiable political question because "[i]n *Youngstown*, private litigants brought a suit contesting the President's authority under his war powers to seize the Nation's steel industry.").

**50.** *See Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 796–98 (D.C.Cir.1984) (Edwards, J., concurring); *id.* at 803 n. 8 (Bork, J., concurring) ("That the contours of the doctrine are murky and unsettled is shown by the lack of consensus about its meaning among the members of the Supreme Court...."); *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1173–74 (D.C.Cir.1982), *cert. denied*, —— U.S. ——, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983); McGowan, *Congressmen in Court: The New Plaintiffs*, 15 Ga.L.Rev. 241, 256–60 (1981). Professor Louis Henkin suggest-

ed in his influential article debunking the political question doctrine that the leading cases foreswearing judicial review on the ground that the issue posed was a political question might instead be understood as determinations that the challenged actions were in fact constitutional. *See* Henkin, *Is There A "Political Question" Doctrine?*, 85 YALE L.J. 597 (1976).

**51.** *See, e.g., Goldwater v. Carter*, 444 U.S. 996, 100 S.Ct. 533, 82 L.Ed.2d 839 (1979).

**52.** 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962).

**53.** 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936).

**54.** After reviewing the series of statutes relevant to the exercise of Executive power, the Supreme Court concluded that "this court may not, and should not hesitate to declare acts of Congress, however many times repeated, to be unconstitutional if beyond all rational doubt it finds them to be so." *Id.* at 327, 57 S.Ct. at 224.

ment to the President who had relied on those laws in prohibiting arms sales to specific foreign countries, did not deter the Court from finding the controversy to be justiciable.

The Executive's power to conduct foreign relations free from the unwarranted supervision of the Judiciary cannot give the Executive *carte blanche* to trample the most fundamental liberty and property rights of this country's citizenry. The Executive's foreign relations prerogatives are subject to constitutional limitation;[55] no agreement with a foreign country can confer upon the Executive Branch any power greater than those bounded by the Constitution.[56] We recognize that review by the Judiciary may not always be appropriate. But unlike *Curtiss-Wright*,[57] the government has not relied on a specific legislative grant of authority to conduct the challenged activities. Moreover, this is not a case like *Chicago & Southern Airlines, Inc. v. Waterman Steamship Corp.*,[58] in which the plaintiffs, who were denied review of an Executive order, were at least granted some process through which their contention could be heard *prior* to the Executive decision. Indeed, if the dissent's approach were adopted by all judicial forums, then no ordinary process at all could be offered.[59] We must be most reluctant to withhold judicial scrutiny in these circumstances.

Every act taken by the Executive having an effect beyond this country's borders may be described as political, with a potential or actual impact on our foreign rela-

tions. Affirmance of this dismissal on the ground that plaintiffs' claims are political questions or an improper challenge to foreign affairs powers would mean that virtually *anything* done by United States officials to United States citizens on foreign soil is nonjusticiable. This is not the law. A proper application of the political question doctrine to the plaintiffs' case shows that dismissal on this ground was erroneous.

## IV. STANDING

After prompting by the vacated panel opinion in this case, the defendants for the first time pressed the argument that Ramirez, a United States citizen, and his two wholly owned United States corporations lack standing to sue the defendants for the constitutional violations alleged here. The theory is that because plaintiff Ramirez and his two wholly owned United States corporations own and control the land in question by means of legal title held by their wholly owned Honduran corporations, the three United States plaintiffs do not have a constitutionally protected property interest in the land and property for the purposes of the asserted claims.

This proposition embodies a most extreme form of fanciful thinking. It is bizarre to posit that the claimed seizure and destruction of the United States plaintiffs' multi-million dollar investment, businesses, property, assets, and land is not an injury to a protected property interest. The suggestion that a United States citizen who is

**55.** *Id.* at 319, 57 S.Ct. at 220.

**56.** *Reid v. Covert*, 354 U.S. 1, 16, 77 S.Ct. 1222, 1230, 1 L.Ed.2d 1148 (1957).

**57.** 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936).

**58.** 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948).

**59.** The theory proposed by the dissent is equally applicable to other forums. Thus it is seriously doubtful whether any judicial remedy for the asserted taking would be available. *See, e.g., Langenegger v. United States*, 5 Cl.Ct. 229 (1984)

(denying review on alternative theory of impermissible inquiry into foreign affairs when plaintiff's claim was unavoidably predicated upon a challenge to the intrusive manner in which the United States conducted its foreign policy). Judge Tamm's apparent assumption that a remedy would exist in the Claims Court under the Tucker Act may be incorrect. Dissenting Opinion of Tamm, J., at 1550. Of course, the possibility of a private bill of relief may theoretically be available. *But see* P. BATOR, P. MISHKIN, D. SHAPIRO & H. WECHSLER, HART & WECHSLER'S FEDERAL COURTS IN THE FEDERAL SYSTEM 1326–31 (2d ed. 1973) (original purpose of Tucker Act to end the plague of private relief bills dogging Congress).

the sole beneficial owner of viable business operations does not have constitutional rights against United States government officials' threatened complete destruction of corporate assets is preposterous. If adopted by this court, the proposition would obliterate the constitutional property rights of many United States citizens abroad and would make a mockery of decades of United States policy on transnational investments.

■ The debate over standing is easily obfuscated by couching the issue in terms of whether this court should permit Ramirez to bring a suit "derivatively" or whether we should "lift the corporate veil."[60] As Justice (then Judge) Cardozo admonished, "Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it."[61] The ability of the United States plaintiffs to sue does *not* turn on whether certain rights which may belong *only* to the Honduran corporation may be asserted "derivatively" by the sole United States shareholders or on whether we should "lift the corporate veil." The "standing" inquiry may be conducted along two different branches: first, whether

there is a cognizable property interest under the United States Constitution *directly* assertable by a United States citizen-shareholder; and second, whether (a) there is a cognizable property interest directly belonging to the corporation, and (b) if so, the scope of a shareholder's right to assert that interest *derivatively*. The crucial issue here is whether the United States plaintiffs have constitutional rights *of their own*, which exist by virtue of their exclusive beneficial ownership, control, and possession of the properties and businesses allegedly seized.[62] Properly understood, the question is whether the United States plaintiffs—Ramirez and his two wholly owned United States corporations—have a judicially cognizable interest in the affected property sufficient to enable them to sue for an unconstitutional deprivation of the use and enjoyment of that private property. Because we hold that the United States plaintiffs have a protected property interest for the purposes of the claims asserted here and that they have standing to sue, we do not reach the question whether the alien Honduran corporations also have constitutional rights to judicial relief for the violations alleged here.[63]

**60.** Further obfuscation is supplied by Judge Scalia's dissent, which concedes in his first paragraph on standing that Ramirez as an individual "has a cognizable property interest in that land, which interest, since he is an American citizen, is protected by the Constitution." Dissenting Opinion of Scalia, J., at 1556. The dissent then spends six more pages trying to place the interest of the wholly owned corporations exclusively under Honduran law. If the 100% owner, Ramirez, has an interest protected by the United States Constitution as Judge Scalia concedes, that is enough to compel the United States District Court to go forward, as we make clear in text at notes 55–56. Judge Scalia has conceded the only issue on this point we reach and decide.

**61.** *Berkey v. Third Ave. Railway Co.,* 244 N.Y. 84, 155 N.E. 58, 61 (1926).

**62.** As such, cases involving corporate shareholders' attempts to sue for a violation of a constitutional right which attaches only to individuals when the challenged action affected only the corporation are inapposite. *See, e.g., Reamer v. Beall,* 506 F.2d 1345 (4th Cir.1974), *cert. denied,* 420 U.S. 955, 95 S.Ct. 1338, 43 L.Ed.2d 431 (1975); *United States v. Richardson,* 469 F.2d

349 (10th Cir.1972). The approach taken in the instant case is consistent with the holdings of those cases by its focus on the nature of a United States shareholder's personal interests and injuries and his own constitutional rights in determining whether the shareholder has a right to sue.

**63.** *Cf. Cardenas v. Smith,* 733 F.2d 909 (D.C.Cir. 1984). Neither do we find it necessary now to resolve the issue whether the Honduran corporations may state a valid alternate claim under the Alien Tort Claims Act, 28 U.S.C. § 1350 (1982); *see* Verified Complaint for Declaratory and Injunctive Relief, Count III, A. at 5.

Judge Scalia, in dissent, mixes the two branches of standing together. As an initial matter, on the second branch he would hold that the foreign corporations have "no rights under the United States Constitution with regard to activity taking place in Honduras." Dissenting Opinion of Scalia, J., at 1556. Logically, therefore, he would also assert that no derivative corporate rights in the assets based on the United States Constitution may be passed on to United States shareholders. The remainder of the opinion, however, then attempts to define

We analyze this issue, as we must, on the basis of the facts alleged by the plaintiffs. According to the plaintiffs' complaint, the operation is the enterprise of one man—a United States citizen. Title to the property is held by three companies incorporated in Honduras, which are wholly owned jointly by plaintiff Ramirez and by two United States corporations which plaintiff Ramirez wholly owns and controls. The sole and ultimate individual investor, beneficial owner and shareholder in the chain of companies is plaintiff Ramirez.[64]

The essence of standing is whether the asserted claims—here, of an unconstitutional, unauthorized occupation and use of private property and of a deprivation of property without due process of law—entitle persons in the position of the plaintiffs to judicial relief.[65] The question may be phrased either in terms of whether the plaintiffs have standing to sue or in terms of whether the plaintiffs have properly stated a cause of action for the allegedly unconstitutional acts.[66] Either way, the inquiry must focus on whether the plaintiffs have a cognizable property interest in the assets in Honduras for the purposes of the constitutional violations claimed here.

We turn first to an assessment of the nature of the United States citizens' inter-

---

the *direct* constitutional rights of the United States citizen-shareholder by reference to the procedural and substantive rights of shareholders under Honduran law. In effect, the dissent permits the "efficiencies" and technicalities of Honduran corporation law (which are policies designed to regulate the affairs between Honduran corporations, the shareholders and creditors under Honduran law—not United States law) to define the substantive scope of United States constitutional safeguards running directly to United States citizens (which safeguards, in turn, control the lawfulness of coercive power exercised upon the citizenry by the Government).

It seems to us that these two considerations are wholly unrelated; and that, at least when the issue of asserting a third party's rights does not cast doubt on the existence of a justiciable case-or-controversy—as might occur when a shareholder is attempting to assert derivative rights which can undisputably be raised by a corporation—it is improper to analyze the existence of a cognizable constitutional right as the dissent suggests. *See infra* note 79.

The dissent does not doubt that an individual United States citizen could assert the constitutional rights the plaintiffs now press. What the dissent attempts to create is a system in which a United States citizen loses all United States rights in wholly owned assets when those assets are held through a foreign corporation—perhaps even when the assets are located in the United States, since it is solely the "law of incorporation" (Dissenting Opinion of Scalia, J., at 1558) which is said to define the United States constitutional rights. This is unsound and fundamentally unjust. For instance, many foreign countries forbid direct ownership of real property by aliens, effectively forcing a United States national to adopt a foreign business entity to hold the investment. But the adoption of a foreign business entity should not be held to strip the United States citizen of rights he or she would otherwise have *vis-a-vis the United States*

government in United States courts since stripping those rights would not serve any valid policy underlying the foreign rules of incorporation. *Cf.* Restatement (Revised) of the Foreign Relations Law of the United States § 216, reporters' note 3: "A state cannot, by requiring a foreign enterprise to incorporate locally, compel the corporation to surrender in advance its right to protection by the state of the parent corporation or of the parent's shareholders." (Tent. Draft No. 2, 1981).

Moreover, the corollary to Judge Scalia's position is not true: a United States citizen cannot escape the prescriptive reach of United States law solely by choosing to do business through a foreign corporation. In many contexts the United States government has asserted control over foreign corporations owned predominately by United States shareholders. *See* Restatement (Second) of the Foreign Relations Law of the United States § 27, comment d (1965):

> When the nationality of a corporation is different from the nationality of the persons (individual or corporate) who own or control it, the state of the nationality of such persons has jurisdiction to prescribe, and to enforce in its territory, rules of law governing their conduct. It is thus in a position to control the conduct of the corporation even though it does not have jurisdiction to prescribe rules directly applicable to the corporation.

*See also id.* reporters' note. Constitutional rights and duties are closely related in scope; if the Constitution permits such a broad exercise of prescriptive power, then the protective reach of the Constitution should extend equally far.

**64.** *See supra* note 4.

**65.** *See Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

**66.** *See Cardenas v. Smith,* 733 F.2d at 915 (D.C. Cir.1984); Currie, *Misunderstanding Standing,* 1981 S.Ct.Rev. 41, 43.

ests in the property. The fact that the United States plaintiffs do not directly hold legal title to the real property does not deprive them of a property interest in the assets nor does it defeat their constitutional claims. Ramirez has a protected property interest in the allegedly occupied property both by virtue of his status as sole shareholder of the corporations and by virtue of his possession of the land for more than twenty years.

First, as shareholders, the United States plaintiffs have a concrete and protected interest in the property allegedly occupied and used by the United States defendants. The United States plaintiffs' status as sole and ultimate shareholders of the corporations which have title to the land and property gives rise to interests which are protected from unconstitutional activity of the type alleged here. It is settled law that ownership of stock constitutes a specific interest in the corporation's property.

> Shares of stock do ... represent an interest in the corporate property. Thus, it has been said that stockholders are the equitable owners of the property and assets of the corporation, and that they have a proprietary interest in the corporation, and a qualified beneficial interest which is an indirect or collateral interest in the corporate property. It has been held that the stockholder's interest is an "ownership interest" within the meaning of an insurance policy on the corporate property, and that his interest is an insurable one.[67]

Likewise, this circuit acknowledged in *Nielsen v. Secretary of the Treasury* that shareholders have a property interest in assets of a corporation. There the court agreed with the apparent shareholders that the blocking of a corporation's assets in the United States could constitute a deprivation of the shareholders' property.[68]

The Supreme Court has accepted this proposition that a shareholder may have a property interest in the assets of a corporation which can support the shareholder's standing to sue over an injury to the corporation's assets. In *Regional Rail Reorganization Act Cases*, the Court implicitly held that the sole shareholder of a corporation has a constitutionally protected property interest in corporate assets.[69] Not a single Justice dissented from the Court's finding that the sole shareholder of Penn Central Transportation Co. had a sufficient interest in Penn Central's assets to be a proper party in a challenge to an alleged taking of the railroad company's property without just compensation. The facts of ownership in the instant case are functionally equivalent: a sole ultimate shareholder is suing for unlawful destruction of the corporate assets. Likewise, in *Kaufman v. Societe Internationale Pour Participations Industrielles et Commerciales*, the Supreme Court permitted United States shareholders to intervene in a suit seeking recovery of corporate property confiscated by the United States under the Trading with the Enemy Act. Rejecting the dissent's contention that the United States shareholders had no present interest in the physical property of the corporation, the Court held that "when the Government seizes assets of a corporation organized under the laws of a neutral country, the rights of innocent stockholders to an interest in the assets proportionate to their stock holdings must be fully protected."[70] The corporate ownership of the land and property in the instant case does not deprive the sole beneficial owners—United States citizens—of a property interest for the purposes of the claims asserted here.

---

67. 11 W. FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 5100 (1971 ed.) (footnotes omitted); *see also* H. HENN & J. ALEXANDER, LAWS OF CORPORATIONS 1052 (3d ed. 1983) ("Actions to enjoin a ... sale of corporate assets have been permitted as direct actions. They are hardly actions to procure a judgment in favor of the corporation." (footnotes omitted)).

68. 424 F.2d 833, 843 (D.C.Cir.1970).

69. 419 U.S. 102, 117, 95 S.Ct. 335, 345, 42 L.Ed.2d 320 (1974).

70. 343 U.S. 156, 159–60, 72 S.Ct. 611, 612–613, 96 L.Ed. 853 (1952).

The Supreme Court has consistently refused to allow mere corporate formalities to dictate whether the suing party in fact has a valid claim and a personal stake in the outcome of the case. In *Bangor Punta Operations, Inc. v. Bangor & Aroostook Railroad,* the Supreme Court squarely rejected the argument that the Court may *not* "look behind the corporate entity to the true substance of the claims and the actual beneficiaries" when it evaluates a party's standing to sue.[71] In that case, the Court determined that a corporation *should not be treated as a distinct and separate entity* for standing purposes when 99% of the corporation's stock was owned by a single shareholder. Because the facts of that case showed that the shareholder both owned and controlled the corporation, the Court found that the shareholder would be the actual beneficiary of any recovery by the corporation. Thus, the Court disregarded the corporate form of ownership in determining whether the suit could proceed. Similarly, in the recent case of *First National City Bank v. Banco Para El Comercio Exterior de Cuba,* the Court refused to give conclusive status to the act of incorporation in determining the status of the corporate party before the Court.[72] There the Court stated that "an incorporated entity ... is not to be regarded as legally separate from its owners in all circumstances." [73] Applying that approach to the instant case, it is clear that Ramirez, the sole individual owner and controller of the corporations, has a property interest in the corporate assets that is real and protected for the purposes of the claims alleged in the instant case.[74]

Secondly, in addition to his beneficial property interest as a shareholder, Ramirez has a cognizable possessory interest in the property allegedly seized, by virtue of his continuous possession of his ranch for more than twenty years. The Supreme Court stated in *Board of Regents v. Roth* that the Court "has ... made clear that the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money." [75] In *Fuentes v. Shevin* the Court applied that principle and held that a purchaser of household goods under a conditional sales contract had a possessory interest in the goods sufficient to give rise to a constitutional claim for a violation of due process when a noteholder attempted repossession.[76] Despite the purchaser's lack of legal title, the Court held that the purchaser had a cognizable property interest in the continued use and possession of the goods.

The facts alleged by Ramirez in his complaint give rise to an analogous possessory

---

**71.** 417 U.S. 703, 713, 94 S.Ct. 2578, 2584, 41 L.Ed.2d 418 (1974).

**72.** 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983).

**73.** *Id.* at 2601 (footnotes omitted).

**74.** We need not consider under what circumstances a shareholder should be deemed to have ceded his right to sue to the corporation by virtue of local law. It is sufficient to note that a shareholder will not be deemed to have ceded constitutional claims to an alien corporation which itself may be precluded from bringing suit on behalf of its shareholders. Furthermore, this is not a case in which the rights of other shareholders might be adversely affected by permitting a single shareholder to sue, because Ramirez has alleged that he is the sole ultimate beneficial owner.

**75.** 408 U.S. 564, 571–72, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972). Judge Scalia's dissent agrees that Ramirez has standing to vindicate

his possessory interest in the ranch as a resident under Honduran law. (Dissenting Opinion of Scalia, J., at 1556). We question the internal consistency of that concession with those portions of the dissent which assert, incorrectly, that Honduran law must define the scope of Ramirez's United States constitutional rights since the dissent has disclaimed any real knowledge of Honduran law and has explained the existence of the "lawful possessory interest under Honduran law" only by citing a decision by the United States Supreme Court. Be that as it may, it seems that the concession of standing must be read to encompass all properties here in dispute, especially since the dissent has not cited to anything which would indicate that Ramirez's own possessory interest is not owned through a corporate intermediary, as is the rest of the ranch.

**76.** 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

interest. According to the complaint, Ramirez has personally controlled and managed his Honduran property for over 20 years, during which time he developed the land from raw jungle into viable business operations. He has spent much of his life on the land allegedly seized. Prior to the defendants' alleged invasion of this cattle ranch, Ramirez had full control and possession of the ranch's pastures and business operations. Now he claims to have been ejected from portions of the land he once possessed. Ramirez's possessory interest is constitutionally protected for the purposes of the claims stated here.[77]

For decades United States investors abroad have utilized the privilege of incorporation in the host country in order to put themselves on a parity with indigenous corporations and other foreign investors in regard to taxation, labor law, and other matters. It has hitherto never been suggested that the constitutional rights of United States citizen-investors, in this case against unconstitutional seizures by United States officials, were in any way lessened by the mere utilization of such corporate vehicles. Furthermore, the defendants' contention is contrary to the policy which the United States maintains world-wide with respect to the confiscation abroad of assets owned directly or indirectly by United States citizens; the United States insists upon full compensation by the confiscating nation as a condition of United States foreign assistance.[78] *It is astonishing for the United States defendants to argue that confiscation of corporate assets is a deprivation of United States investors' property when executed by a foreign government but that it is an unrecognizable injury to United States shareholders when it is carried out by the United States itself.* It is hard to imagine a more disingenuous contention.[79]

---

**77.** That constitutional provisions protecting property extend to property interests not secured by actual legal title was likewise made clear in *Armstrong v. United States*, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960). In that case, the Court held that the plaintiffs had a property interest protected by the fifth amendment's just compensation clause when the value of liens which they held on boats and materials was destroyed by the government. And in *Mennonite Board of Missions v. Adams*, 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983), the Court held that a mortgagee possesses a "substantial property interest" in the mortgaged property which is protected by the due process clause.

**78.** *See, e.g.,* 22 U.S.C. § 2370(e)(1) (1982); *infra* notes 169, 170.

**79.** Judge Scalia's dissent adopts the defendants' argument and supports it by two evasive theories designed to avoid United States jurisdiction at all costs. The first is the argument refuted in the text above, that because Ramirez and his two solely owned Puerto Rican corporations have chosen to use wholly owned Honduran corporate vehicles in the ownership and operation of the Ramirez enterprise in Honduras, then *American citizen* Ramirez as a sole owner stockholder is relegated to the *law of Honduras* to determine what rights he can assert in a *United States Court* for *violations* allegedly *carried out solely by American officials,* military and civilian. We are familiar with the assertion that a party may properly be required to assert its United States constitutional rights in state rather than federal courts, since state courts are fully integrated in our nation's uniquely federal judicial system and are usually subject to review by the Supreme Court. But heretofore we never thought that a United States party could be banished to the final and unreviewable forum of a foreign nation for a conclusive adjudication of that party's rights under United States law.

As indicated in the text above, to allow this argument to prevail would undermine the legal position of American multi-national corporations around the world, as well as that of the United States government when it comes to their defense. For if the corporate form adopted can negate an American investor's rights against *American* officials, *a fortiori* the adoption of a local corporate form might be interpreted to negate his rights under international or local law against the actions of local officials.

The second evasive theory is the repeated assertion throughout the dissent that this whole training operation is a Honduran affair, that complaint should be made to the Honduran government, and that United States citizen Ramirez's rights must be determined by Honduran law. This is answered by the FACTS—*undeniable* as alleged by the plaintiffs after this Rule 12(b)(6) disposition by the trial court—that plaintiffs have alleged no wrongful acts by Honduran officials under any law but have alleged wrongful acts by United States officials in violation of the United States Constitution, and that plaintiffs have named no Honduran officials but have named three United States officials within a five-mile radius of this courthouse as defendants. The plaintiffs' case against the United

## V. RELIEF FOR THE STATED CLAIMS

Plaintiffs' complaint is also attacked on the ground that relief for the stated claims is not available in the district court. The defendants contend that even if the plaintiffs prevailed on the merits of their constitutional claims, the district court would abuse its equitable discretion if it ordered *any* form of declaratory or injunctive relief. Accordingly, the defendants argue that dismissal of the complaint should be upheld on the ground that the plaintiffs have failed to state a claim for relief. Appropriate remedies for the plaintiffs' claims, however, must be determined in the first instance by the district court, on the basis of particular findings of fact as well as the nature of any proved unlawful conduct. The doctrine of equitable discretion does not compel dismissal of the plaintiffs' complaint at the outset of litigation. The plaintiffs have stated a claim for relief sufficient to withstand dismissal under Rule 12(b)(6), and that is all that is now required.

We emphasize again that the procedural posture of this case prevents us from relying on the defendants' version of disputed facts. The defendants have repeatedly argued their version of the facts in their effort to show that relief cannot be granted for the stated claims. They have contended, for example, that the military incursions onto the plaintiffs' land were conducted by the Honduran military, that the RMTC is principally a Honduran project, and that this is "essentially a dispute between the plaintiffs and the Honduran government."[80] We decline to dismiss the plaintiffs' complaint on the basis of deliberate distortions of the plaintiffs' case. While we express no view on the weight or substance of the plaintiffs' factual case as it might be developed, we roundly reject the defendants' efforts to involve this court in improper fact-finding of controverted material issues on appeal of a dismissal under Rule 12(b)(6).

### A. *Equitable Discretion of the District Court*

The doctrine of equitable discretion might permit the district court to grant some form of injunctive relief for the stated claims. A trial court's equitable remedial powers are great.[81] The Supreme Court has stated that "in shaping equity decrees, the trial court is vested with broad discretionary power."[82] The duty of the trial court is to decree relief that corrects the condition offending the Constitution or U.S. laws.[83] In exercising its broad equitable powers, a trial court must balance the nature of the proved violation against the

---

States defendants must be tested by United States law in a United States court.

All we decide here are the rights of a United States citizen, Ramirez, and his 100% owned corporations. We do not pronounce on the rights of a United States citizen owning .0001% of the shares in a Honduran corporation. Most of Judge Scalia's standing discussion, resting on his analysis of shareholders' rights, is thus beside the point.

We do note, however, that his analysis would apparently permit the United States Executive Branch literally to do *anything* to the property and livelihood of a United States citizen overseas, if the United States citizen were conducting his business operations in the form of a foreign subsidiary corporation, without any recourse whatsoever to a United States District Court to protect his rights. United States constitutional rights are not so fragile.

80. Counsel for the Appellees, oral argument, 25 Apr. 1984; *see also* Brief of Appellees at 5–8.

81. *See, e.g., Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971). Courts are, of course, more reluctant to utilize their equitable powers for *interim* orders—when the plaintiffs have not yet proved their claims—than they are to grant equitable *remedies* for the correction of proved unlawful conduct. In *Adams v. Vance*, 570 F.2d 950 (D.C.Cir.1978), for example, the court required the plaintiffs to make an extraordinarily strong showing in order to justify a highly intrusive *preliminary* injunction against the Executive, when no constitutional violation had yet been proved.

82. *Lemon v. Kurtzman*, 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973).

83. *See Swann v. Charlotte-Mecklenburg Board of Educ.*, 402 U.S. 1, 15–16, 91 S.Ct. 1267, 1275–1276, 28 L.Ed.2d 554 (1971).

affected public and private interests.[84] An equitable remedy is proper (1) when the plaintiff lacks an adequate remedy at law and (2) when a balancing of the rights and interests involved as well as other prudential considerations permit injunctive or declaratory relief.[85] Plaintiffs' complaint shows that their stated claims may be irremediable at law and that a balancing of the equities may favor relief. We cannot now conduct the balancing for the district court nor specify which remedies would be most appropriate for the stated claims. We simply demonstrate that the scales are not firmly and conclusively tipped for the defendants on the plaintiffs' set of facts.

### 1. Adequacy of the Remedy at Law

If the district court determined that the actions of the federal defendants were unlawful because they were not authorized by an act of Congress or the Constitution, the allegations in plaintiff Ramirez's complaint suggest that monetary relief for the continuing occupation and effective seizure of the plaintiffs' property might be unavailable or inadequate.

First, monetary relief from the United States for the stated claims may not be available to the plaintiffs. The Tucker Act provides that the Claims Court shall have jurisdiction over claims against the U.S. government in excess of $10,000 founded upon contracts, or the Constitution or statutes of the United States.[86] It is unclear, however, whether the Tucker Act would permit the plaintiffs to recover damages, because the Supreme Court has held that monetary relief for *unauthorized* Executive seizures is not available in the Claims Court. In *Regional Rail Reorganization Act Cases*, the Court stated:

> "The taking of private property by an officer of the United States for public use, without being authorized, expressly or by necessary implication, to do so by some act of Congress, is not the act of the Government," and hence recovery is not available in the Court of Claims.[87]

Likewise, in *Hooe v. United States*, the Supreme Court held that the Court of Claims did not have jurisdiction to award damages for the unauthorized seizure of plaintiffs' basement by U.S. officers. Justice Harlan, writing for the Court, rejected the plaintiffs' argument that they were entitled to just compensation for a taking in the Court of Claims. He concluded that because the officers acted without legal or constitutional authority their actions did not create a claim against the government for relief in the Court of Claims.[88]

 It is important to remember that the plaintiffs do not challenge the defendants' actions merely because just compensation has not been paid; *plaintiffs deny the existence of any constitutional or statutory power* of the defendants to seize their private ranch. While courts may properly find that the only relief for an authorized taking of private property is compensation in accordance with the just compensation requirement of the fifth amendment, injunctive relief *is* available when the owner proves that government officials lack lawful authority to expropriate his property. In the latter situation, the landowner is entitled to equitable relief

---

84. *See Hecht Co. v. Bowles,* 321 U.S. 321, 329–30, 64 S.Ct. 587, 591–592, 88 L.Ed. 754 (1944) (a court of equity has flexibility to mold decrees to the particulars of each case).

85. *See Developments in the Law—Injunctions,* 78 Harv.L.Rev 996–1054 (1965); *cf.* Restatement (Second) of Torts § 936 (1977).

86. *See* 28 U.S.C. §§ 1346, 1491 (1982).

87. 419 U.S. 102, 127 n. 16, 95 S.Ct. 335, 350 n. 16, 42 L.Ed.2d 320 (1974) (quoting *Hooe v. United States,* 218 U.S. 322, 336, 31 S.Ct. 85, 89, 54 L.Ed. 1055 (1910)).

88. 218 U.S. 322, 31 S.Ct. 85, 54 L.Ed. 1055 (1910). In *United States v. North American Transp. Co.,* 253 U.S. 330, 334, 40 S.Ct. 518, 520, 64 L.Ed. 935 (1920); Justice Brandeis held for the Court that the actions of a federal official who took land for military purposes were unauthorized and therefore created no liability for compensation by the government in the Court of Claims; *see also Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585, 72 S.Ct. 863, 865, 96 L.Ed. 1153 (1952); sources cited *supra* note 87; *cf. The Paquete Habana,* 175 U.S. 677, 710–11, 20 S.Ct. 290, 303, 44 L.Ed. 320 (1900).

and need not rely on the asserted availability of a damages remedy.[89] When government officials seize private property without constitutional or statutory authority, the trial court must apply general equitable principles to determine whether injunctive relief is proper.[90] This involves determining whether monetary relief is adequate and whether a balancing of the equities favors relief.

Whether an action of Executive officials is sufficiently authorized by congressional or constitutional provision to permit a claim for relief under the Tucker Act depends upon the nature of the facts of the particular case and the scope of the defendants' lawful powers. Not all illegal acts of government officials are considered unauthorized for the purpose of determining the government's liability to pay compensation under the Tucker Act. The question in each case is whether the defendants' actions are substantially in compliance with the powers granted to them by congressional statute or constitutional provision. Recovery under the Tucker Act has been permitted when a taking by an officer is the natural consequence of congressionally approved measures or the result of an exercise of discretion granted to an official for the implementation of a congressional statute.[91]

However, when an officer acts wholly outside the scope of the powers granted to him by statute or constitutional provision, the official's actions have been considered to be unauthorized for the purposes of a damages remedy under the Tucker Act.[92] In *Southern California Financial Corporation v. United States*,[93] for example, officers of the United States Air Force used approximately 120 acres of the plaintiff's land as a buffer-zone for an Air Force base's ammunition dump and bomb storage area. An appellate panel of the Court of Claims found that the defendant Air Force officials were not authorized, explicitly or implicitly, to take the plaintiff's property and that therefore plaintiffs could not invoke the jurisdiction of the Claims Court. In denying the plaintiff's claim for monetary relief on the ground that the military officials' taking of the plaintiff's property was unauthorized and that therefore a Tucker Act remedy did not lie, the unanimous appellate panel of the Court of Claims stated:

> Ordinarily, whenever there is no authority for a taking or intrusion, the claimant, although unable to obtain compensation, can seek an injunction or a declaratory judgment against the unauthorized governmental activities.[94]

Thus, if the plaintiffs prove that the acts of the defendants in regard to their property are unauthorized by law, it is not clear whether they could obtain monetary relief

**89.** *See Land v. Dollar*, 330 U.S. 731, 738, 67 S.Ct. 1009, 1012, 91 L.Ed. 1209 (1947).

**90.** *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 595–96, 72 S.Ct. 863, 889–890, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring).

**91.** For example, in *United States v. Causby*, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946) the Supreme Court held that a Tucker Act claim had been stated when the Civil Aeronautics Board, acting within the scope of authority granted to it by Congress, prescribed an air traffic route that was found to result in the taking of an easement over the plaintiff's land. Although Congress itself had not expressly put that particular airspace into the public domain, the taking was held to be authorized by Congress because it was within the discretion of the Civil Aeronautics Board, under the congressional statute, to prescribe an air traffic route like the one at issue. *Portsmouth Harbor Land & Hotel Co. v. United States*, 260 U.S. 327, 43 S.Ct. 135, 67 L.Ed. 287 (1922), also supports this principle. The Court stated that because the military officials were authorized to build the fort in question and to staff it with guns and men, it would be reluctant to find lack of authority for the firing of the cannons which resulted in the property damage. Nonetheless, it remanded the case to the Court of Claims for a determination whether there was in fact authority on the part of the military officials so to fire the cannons sufficient to bind the government to pay for the property taken.

**92.** *See sources* cited *supra* notes 87 & 88.

**93.** 634 F.2d 521, 225 Ct.Cl. 104 (1980), *cert. denied*, 451 U.S. 937, 101 S.Ct. 2016, 68 L.Ed.2d 324 (1981).

**94.** *Id.* at 526 n. 8.

in the Claims Court under the Tucker Act. Whether or not a Tucker Act claim will lie depends upon facts not yet ascertained and the nature of the congressional and constitutional grants of power to these defendants to make military acquisitions.[95] The defendants' allegedly unauthorized destruction of plaintiffs' $13 million investment may or may not be in substantial compliance with the defendants' lawful powers, and it is impossible for this court at this stage of the case to determine that it is.[96]

More importantly, however, even if the district court finds that the defendants acted wrongfully (although pursuant to constitutional and statutory authority to take property in a foreign country), triggering the availability of monetary relief in the Claims Court for unauthorized seizures of private property by United States officials, injunctive relief might still be a proper remedy for the stated claims. Injunctive relief *is* available when the owner proves that government officials acted wrongfully in expropriating his property, and money damages would not justly redress the plaintiff's injury, despite an assertion that the Tucker Act would provide compensation.

The dissenting interpretation of the Tucker Act offered by Judge Scalia has been repeatedly rejected by this court. In *Dronenburg v. Zech*,[97] a member of the armed forces sought to overturn his discharge by challenging the constitutionality of the regulations under which he had been discharged. The government argued that the action was essentially one for money damages (*i.e.*, back pay) which was precluded by the assertedly exclusive Tucker Act remedy in the Claims Court. In an opinion by Judge Bork, joined unreservedly by Judge Scalia, the court squarely rejected this contention, holding that "[t]he United

---

**95.** Judge Scalia's dissent is largely in agreement with these principles; it relies on *Larson v. Domestic & Foreign Corp.*, 337 U.S. 682, 696–705, 69 S.Ct. 1457, 1464–1469, 93 L.Ed. 1628 (1949), which held that a challenge to the actions of a government officer asserting either (1) that the actions were "not within the officer's statutory powers," or (2) that those statutory "powers, or their exercise in the particular case, are constitutionally void" need not be brought under the Tucker Act. 337 U.S. at 702, 69 S.Ct. at 1467. However, although promising a "walk to the statutes and regulations and some hard thought," he never considers whether there exists *any* statutory authorization for the kind of taking alleged to have occurred here, or whether that authorization—if there is any—would be consistent with the Constitution. Nowhere in the entire dissenting opinion is there an attempt to show that the Secretary of Defense, Secretary of State, or the Chief of the United States Army Corps of Engineers has statutory authority or constitutional power to move troops in on a United States citizen's property anywhere, conduct life threatening military exercises, destroy the existing business enterprise, and thus effectively seize his property—all without notice to the citizen or the filing of any court or administrative action. Although both of these issues were contested before the district court and again on appeal, the dissent is willing to assume, *sub silentio*, the requisite statutory and constitutional authority.

That omission is particularly troublesome given the dissent's blanket assertion that "there is no violation of constitutional rights so long as just compensation is available." (Dissenting Opinion of Scalia, J., at 1551). Apparently the dissent endorses monetary ratification of unconstitutional and unauthorized governmental activities with no opportunity to correct the constitutional breach through the traditional injunctive powers of the courts. Under this approach the government can deprive a citizen of any possession, and the citizen cannot challenge the government's right to do it, but only question how much the citizen is to receive for losing his property.

This cannot be the law. On any type of taking by the government, the citizen can always raise the threshold question, whether successfully or unsuccessfully, of the government's fundamental right to take his property. Then, and then only, if the government establishes its constitutional *right* to seize the property of the citizen, is the citizen relegated to the second question, *i.e.*, how much should the plaintiff be compensated for the property which was taken. The fundamental first question of constitutional right to take cannot be evaded by offering "just compensation."

**96.** Nor may Congress have intended so to tax the public coffers under the Tucker Act for such unauthorized activities. Congress has provided that acquisition of private property is beyond the authority of military officials unless it is expressly permitted by law. "No military department may acquire property not owned by the United States unless the acquisition is expressly authorized by law." 10 U.S.C. § 2676 (1982).

**97.** 741 F.2d 1388 (D.C.Cir., 1984).

States and its officers ... are [not] insulated from suit for injunctive relief by the doctrine of sovereign immunity," despite the asserted availability of a Tucker Act remedy.[98] The court reasoned that 5 U.S.C. § 702 "was intended to waive the sovereign immunity of the United States in suits for injunctive relief." [99] Although the court recognized that 5 U.S.C. § 702 might retain the defense of sovereign immunity when another statute "implicitly forecloses judicial relief," [100] the Tucker Act was deemed not to be such a statute.[101] Although the legislative history, quoted by this court, noted that the Tucker Act did preclude "specific relief" for "government contracts" actions, limitations on the district courts' powers to issue injunctions to redress allegedly illegal governmental conduct infringing core constitutional rights were, by necessary implication, not so limited.[102] The decision in *Dronenburg* controls the case at hand.

Even aside from the issue of whether 5 U.S.C. § 702 waives the defense of sovereign immunity, the Tucker Act's "implicit limitation" on suits for specific relief has never been a complete bar to injunctive remedies. The Supreme Court has never expressly held that an unlawful taking which could not be justly compensated by monetary damages is unredressable due to the bar of sovereign immunity. Cases as ancient and venerable as *United States v. Lee*,[103] suggest precisely the opposite.

That case involved an action for ejectment seeking to redress the allegedly illegal and unauthorized occupation of the plaintiff's property, which had been seized by the Government under pretext of nonpayment of taxes. After the jury returned a verdict that the seizure had been illegal, the Supreme Court refused to hold that the suit was barred by sovereign immunity. Rebuffing the argument that this doctrine was an absolute bar to the ejectment of the defendants, the court stated:

It is not pretended, as the case now stands, that the President had any lawful authority to do this, or that the legislative body could give him any such authority except upon payment of just compensation. The defense stands here solely upon the absolute immunity from judicial inquiry of every one who *asserts* authority from the executive branch of the government, however clear it may be made that the executive possessed no such power. *Not only no such power is given, but it is absolutely prohibited, both to the executive and the legislative, to deprive any one of life, liberty, or property without due process of law, or to take private property without just compensation.*

. . . . .

Shall it be said, in the face of all this, and of the acknowledged right of the judiciary to decide in proper cases, stat-

---

**98.** *Id.* at 1390 (quoting *Schnapper v. Foley*, 667 F.2d 102, 107 (D.C.Cir.1981), *cert. denied*, 455 U.S. 948, 102 S.Ct. 1448, 71 L.Ed.2d 661 (1982)).

**99.** *Id.* at 1390. It is generally accepted that this waiver extends to suits brought under 28 U.S.C. § 1331 (1982), one of the jurisdictional bases asserted in this suit. *See Dronenburg*, at 1391 n. 3 and authorities cited therein.

**100.** *See Dronenburg*, at 1390 (quoting S.Rep. No. 996, 94th Cong., 2d Sess. 7–8 (1976)).

**101.** *See also Megapulse, Inc. v. Lewis*, 672 F.2d 959, 971 (D.C.Cir.1982).

**102.** The Tucker Act confers jurisdiction over claims against the United States "founded ... upon the Constitution, or any Act of Congress, ... or upon any ... contract with the United

States." 28 U.S.C. § 1491 (1982). Just as it might be argued that the plaintiffs in *Dronenburg* and *Megapulse* did not assert traditional contract claims within the scope of § 1491, (*See Megapulse Inc. v. Lewis*, 672 F.2d at 968, 971 (1982)), the case at hand is not one seeking "just compensation" under the fifth amendment or otherwise "founded upon" the Constitution within the ordinary meaning of § 1491. Rather, it asserts that there is no underlying authority for the taking in either the Constitution or statutes of the United States. The claim thus clearly "arises under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331 (1982). *Compare Dronenburg* 741 F.2d 1388 (D.C.Cir. 1984) (asserted violation of constitutional privacy and equal protection rights not a claim subject to exclusive jurisdiction of Claims Court).

**103.** 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171 (1882).

utes which have been passed by both branches of Congress and approved by the President to be unconstitutional, that the courts cannot give a remedy when the citizen has been deprived of his property by force, his estate seized and converted to the use of the government without lawful authority, without process of law, and without compensation, because the President has ordered it and his officers are in possession?

If such be the law of this country, it sanctions a tyranny which has no existence in the monarchies of Europe, nor in any other government which has a just claim to well-regulated liberty and the protection of personal rights.[104]

These principles were reaffirmed subsequently in *Land v. Dollar*,[105] in which the Supreme Court disallowed any reliance on sovereign immunity when "the right to possession or enjoyment of property under general law is in issue, and the defendants claim as officers or agents of the sovereign."[106] As long as the essential nature of the suit would neither deplete the public treasury nor impermissibly interfere with public administration, the Court specifically held that "where [public officials] unlawfully seize or hold a citizen's real property or chattels, recoverable by appropriate action in law or equity, he is not relegated to the Court of Claims to recover a money judgment. The dominant interest of the sovereign is then on the side of the victim who may bring his possessory action to reclaim that which is wrongfully withheld."[107]

Subsequent cases decided by the Supreme Court have interpreted *United States v. Lee* and *Land v. Dollar* to permit an injunction only where there was a claim "that the taking of the property or the injury to it was not the action of the sovereign because unconstitutional or beyond the officer's statutory powers."[108] Yet these cases did not dispute the bedrock principle of *United States v. Lee* that "it is absolutely prohibited ... to deprive any one of life, liberty, or property without due process of law, or to take private property without just compensation."[109] *Larson v. Domestic & Foreign Corp.* relied on *Lee* in holding that sovereign immunity does not bar specific relief "where there is a claim that the holding constitutes an unconstitutional taking of property without just compensation."[110] Thus, the availability of a suit for just compensation will (if the taking was constitutionally authorized and within the scope of the official's authority) quiet contentions that a taking is a violation of the fifth amendment.[111] *United States v. Lee* was distinguishable under this principle, that there was no tribunal where the plaintiff could seek just compensation.[112]

But neither *Larson* nor any case since has overruled *Lee* by holding that injunctive relief against the United States is beyond the power of the courts when just compensation for the seized property could not be obtained in the alternate tribunal. In *Hurley v. Kincaid*,[113] cited with approval in *Larson*, the Supreme Court held that

---

**104.** *Id.* at 219–21, 1 S.Ct. at 259–261 (emphasis added). With reference to tyrannical "monarchies," *see* Dissenting Opinion of Scalia, J., at 1551 n. 1; *compare* I Samuel 8:7–18, 12:17.

**105.** 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1946).

**106.** *Id.* at 737, 67 S.Ct. at 1012.

**107.** *Id.* at 738, 67 S.Ct. at 1012.

**108.** *Larson v. Domestic & Foreign Corp.*, 337 U.S. 682, 698, 69 S.Ct. 1457, 1465, 93 L.Ed. 1628 (1949); *Malone v. Bowdoin*, 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168 (1963).

**109.** 106 U.S. at 220, 1 S.Ct. at 260.

**110.** 337 U.S. at 697, 69 S.Ct. at 1465.

**111.** *Id.* at 697 n. 18, 69 S.Ct. at 1465 n. 18.

**112.** *Malone v. Bowdoin*, 369 U.S. 643, 647, 82 S.Ct. 980, 983, 8 L.Ed.2d 168 (1962); *Larson v. Domestic & Foreign Corp.*, 337 U.S. at 697 n. 17, 69 S.Ct. at 1465 n. 17.

**113.** 285 U.S. 95, 52 S.Ct. 267, 76 L.Ed. 637 (1932).

governmental action taken pursuant to an otherwise constitutionally valid statute by officers acting wrongfully, although within the scope of their authority, could be authorized when the remedy at law was unclear or grossly inadequate: "[A] court of equity acts with caution, and only upon a clear showing that its intervention is necessary in order to prevent an irreparable injury." [114] The Court found that relief inapplicable since a sufficient showing was not made. [115]

 It is clear, therefore, that when the monetary compensation available through the Tucker Act remedy is so inadequate that the plaintiff would not be justly compensated for the seizure of his property by the United States, an injunctive remedy is not barred by sovereign immunity. [116] For example, in *Youngstown Sheet & Tube Co. v. Sawyer*, the Court declined to accept the government's contention that injunctive

relief was unnecessary since a damages remedy was available through the Tucker Act; instead, the Court held that even if such a remedy were available, "seizure and governmental operation of these going businesses were bound to result in many present and future damages of such nature as to be difficult, if not incapable, of measurement." [117] Other decisions since *Larson* assume either explicitly or implicitly that the *adequacy* of the Tucker Act remedy is an issue; and that the gross inadequacy of money damages could justify injunctive relief when money alone would not constitute just compensation. [118]

 From the earliest times, courts in equity have considered an injury to real property to be irremediable at law. [119] The uniqueness of land typically makes damages an inadequate remedy. Equity will not hesitate to enjoin an unconstitutional taking and even a repeated trespass or

**114.** *Id.* at 104 n. 3, 52 S.Ct. at 269 n. 3 (citations omitted).

**115.** *Id.*

**116.** In fashioning equitable remedies, the issue of whether damages will adequately compensate plaintiffs for a claimed unconstitutional seizure of private property by unauthorized government officials is not equivalent to the fifth amendment's provision that the government lawfully may expropriate property for just compensation. The fifth amendment's requirement of just compensation for takings defines the government's lawful powers of eminent domain; it does not embody a remedial principle applicable in equity that monetary damages are fully adequate to redress injuries to real property.

The Court's opinion in *Larson* amply recognizes this principle.

There are limits, of course [to the reluctance of courts to invoke compulsive powers to restrain the Government from affecting disputed property]. *Under our constitutional system, certain rights are protected against governmental action and, if such rights are infringed by the actions of officers of the Government, it is proper that the courts have the power to grant relief against those actions.* But in the absence of a claim of constitutional limitation, the necessity of permitting the Government to carry out its functions unhampered by direct judicial intervention outweighs the possible disadvantage to the citizen in being relegated to the recovery of money damages after the event.

337 U.S. at 704, 69 S.Ct. at 1468–1469 (emphasis added). Thus, a statute may be challenged as unconstitutional, and an injunction issued, when the compensation available under the Tucker Act would not rise to the level of just compensation required by the fifth amendment. Such a claim would fall within *Larson's* exception permitting injunctive relief if "the exercise [of statutory powers] in the particular case ... [is] constitutionally void." *Id.* at 702, 69 S.Ct. at 1467.

**117.** 343 U.S. at 585, 72 S.Ct. at 866.

**118.** *See Ruckelshaus v. Monsanto County,* —— U.S. ——, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) ("[A]n adequate remedy for the taking exists under the Tucker Act"); *Dugan v. Rank,* 372 U.S. 609, 623–24, 83 S.Ct. 999, 1007–1008, 10 L.Ed.2d 15 (1963) (rejecting arguments that damages were inadequate since they could not be reasonably ascertained); *Malone v. Bowdoin,* 369 U.S. 643, 648, 82 S.Ct. 980, 983, 8 L.Ed.2d 168 (1962) (not reaching the issue, since the plaintiff failed to assert that just compensation was unavailable); *cf. Larson v. Domestic & Foreign Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (adequacy of Tucker Act remedy for asserted wrongful retention of coal not questioned, since fungible personalty not ordinarily the subject of extraordinary injunctive relief).

**119.** *See, e.g., Belusko v. Phillips Petroleum Co.,* 198 F.Supp. 140 (S.D.Ill.1961), *aff'd,* 308 F.2d 832 (7th Cir.1962), *cert. denied,* 372 U.S. 930, 83 S.Ct. 874, 9 L.Ed.2d 733 (1963).

other nuisance to land.[120] In the instant case, the plaintiffs have alleged that the occupied land is the only available land in Honduras capable of sustaining their cattle ranch and other business operations, due to the topography and transportation routes of Honduras.[121] Ramirez's claimed loss of a unique parcel of land may prove to be immeasurable in monetary terms and irremediable at law. If the gap between such an injury and the monetary compensation available through a Tucker Act remedy is so great that an unconscionable injustice would be worked, effectively denying just compensation, then injunctive relief can be appropriate.

Moreover, the loss of Ramirez's business operations in Honduras, if proved, may fall within another category of injuries that equity considers irremediable at law. In *Semmes Motors Inc. v. Ford Motor Co.,* Judge Friendly granted equitable relief for the threatened loss of an individual's company, noting that the owner wanted to run his business, not to retire on a damages award.[122] Ramirez alleges that he has devoted more than 20 years of his life to building and personally managing his business in Honduras. The district court might find that the loss of a life's work would not be adequately remediable at law.

Finally, the increased risk to plaintiff Ramirez's personal safety allegedly due to defendants' unconstitutional conduct may not be remediable by damages. Life-threatening conditions and loss of personal security created by constitutional violations are not redressed by payments of money. Depending upon the facts, the district court might properly find that any remedy at law would be inadequate to correct the constitutional violations alleged here.

We find it difficult to believe that a United States citizen would be banished to a damages remedy in the Claims Court if he were the victim of a similar ongoing violation of his constitutional rights within the United States. The contention that the plaintiffs really belong in the Claims Court is an empty argument. Ramirez has a right to be in the district court, where he has a right to ask for injunctive and declaratory relief.

### 2. *Balancing the Equities and Prudential Considerations*

Not only could the district court conclude that monetary relief would be inadequate under facts consistent with the complaint, but the court might also find that a balancing of the equities favors relief. Plaintiffs' complaint states claims for which equitable relief cannot be declared improper on a balancing of the equities and prudential considerations *prior* to any factfinding by the district court. Although evaluation of the propriety of remedies must await factual development of the case on the merits,[123] the plaintiffs' complaint and the related declarations do not support a conclusion that injunctive or declaratory relief are foreclosed.

If the plaintiffs prevailed on the merits of their claims, the equities favoring relief might be quite powerful. Plaintiff Ramirez claims an unconstitutional intrusion onto his private property by military officials of the United States, which threatens the loss of his land, his 20-year-old investment, his labors, and even his life. Plaintiffs' case is not a routine trespass action or a piddling boundary dispute; it is a claim for relief from a deprivation of land, business, and personal safety caused by an *unconstitutional* invasion by officials of

**120.** *See Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *Erhardt v. Boaro,* 113 U.S. 537, 5 S.Ct. 565, 28 L.Ed. 1116 (1885); *Lucy Webb Hayes Nat'l Training School for Deaconesses & Missionaries v. Geoghegan,* 281 F.Supp. 116 (D.D.C. 1967); 6A J. SACKMAN, NICHOLS' THE LAW OF EMINENT DOMAIN § 28.3 (3d ed. 1981).

**121.** *See supra* note 15.

**122.** 429 F.2d 1197 (2d Cir.1970) (Judge Friendly found that monetary relief would not be adequate and that injunctive relief was proper to prevent the loss of a 20-year-old business managed by the owners).

**123.** *See Powell v. McCormack,* 395 U.S. 486, 550, 89 S.Ct. 1944, 1979, 23 L.Ed.2d 491 (1969).

the United States. The federal Judiciary has not hesitated to grant equitable relief to individuals suffering similar injury both at home and abroad due to constitutional violations by government officials.[124]

### a. Location of the Land

The location of the plaintiffs' land in a foreign country does not prevent the district court from granting relief. Courts often properly issue equitable decrees involving property outside the jurisdiction of the court.[125] Where, as here, the court adjudicating the controversy has personal jurisdiction over the defendants, the extraterritorial nature of the property involved in the litigation is no bar to equitable relief. Under such circumstances, courts in equity do not hesitate to order the defendants, who are present before the court, to do or refrain from doing something directly involving foreign property. As the Supreme Court stated in *Phelps v. McDonald*:

> Where the necessary parties are before a court of equity, it is immaterial that the *res* of the controversy, *whether it be real or personal property*, is beyond the territorial jurisdiction of the tribunal. It has the power to compel the defendant to do all things necessary, according to the *lex loci rei sitae*, which he could do

voluntarily, to give full effect to the decree against him.

> Without regard to the situation of the subject-matter, such courts consider the equities between the parties, and decree in personam....[126]

The local action rule of common law as applied to complaints seeking money damages for trespass to land has no bearing on this case.

Second, courts are specially willing to grant equitable relief involving property outside the court's jurisdiction when the law of the court's jurisdiction governs the controversy instead of the law of the situs.[127] Here the plaintiffs' causes of action against the United States officials named as defendants arise under United States laws and the United States Constitution. As such, federal law provides the rules of decision for plaintiffs' claim. If Honduran law becomes relevant to the dispute, it cannot operate of its own force in this controversy but must apply only to the extent the federal law adopts it or deems it relevant. The occasional deference in equity to the courts of the situs state in actions involving trespass brought under the situs state's law is inapposite here.

Third, courts will not hesitate to issue equitable decrees involving foreign land when there is no compelling reason to require that relief be sought in the territo-

---

124. *See, e.g., Kent v. Dulles,* 357 U.S. 116, 129–30, 78 S.Ct. 1113, 1119–1120, 2 L.Ed.2d 1204 (1958); *Reid v. Covert,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). While Judge Scalia's dissent relies principally on trying to characterize this case as a land title dispute, to which Honduran law would apply to Honduran land, at one point he does venture to go further to confront the alleged facts that the actions of United States officials have not only been property taking but property destroying and life threatening, Judge Scalia's answer is: "As for the risk to plaintiff Ramirez's security: That is not a consequence of the taking, but of the plaintiff's refusal to acquiesce in it." (Dissenting Opinion of Scalia, J., at 1564). If this is a fair characterization of the government's position, then the government's argument boils down to: "How dare the citizen's nose get in the way of the

governmental fist?" As long as the plaintiffs' complaint plausibly alleges unconstitutional or unauthorized actions by governmental defendants, we think it ludicrous to suggest that the threat to plaintiff Ramirez's security is of his own making because he insists upon asserting his United States constitutional rights—against governmental actions which have never sought nor received the imprimatur of any court, anywhere.

125. 11 C. Wright & A. Miller, Federal Practice & Procedure §§ 2942–45 (1973). *See* E. Messner, *The Jurisdiction of a Court of Equity Over Persons to Compel the Doing of Acts,* 14 Minn.L.Rev 494, 500 (1930).

126. 99 U.S. (9 Otto) 298, 308, 25 L.Ed. 473 (1879) (emphasis added).

127. *See* sources cited *supra* note 125.

ry of the situs property.[128] It is difficult to conceive of any plausible reason why the United States plaintiffs should be forced to bring their claims in the foreign courts of Honduras. Plaintiff Ramirez, a United States citizen, has alleged violations of his constitutional rights by officers of the United States. A requirement that such a constitutional claim be brought in Honduran courts would be a gross distortion of the doctrine of equitable discretion.

### b. Honduran Law

 It cannot be concluded on the basis of the plaintiffs' complaint that equitable relief would impugn foreign law or determine the legality of the actions, if any, of the Honduran military under Honduran law. An equitable decree would not challenge the sovereignty of Honduras because it would only adjudicate the rights of plaintiffs under United States law vis-a-vis the United States officials named as defendants. Plaintiffs do not request relief against any Honduran actors. Furthermore, according to the plaintiffs' pleadings, there has not been any act by the Honduran state that could be impugned by an equitable decree, since Honduras has not claimed ownership rights to Ramirez's ranch. In addition, the extent to which Honduran military forces are participating in the military training exercises is a controverted fact and cannot be considered in determining whether equitable relief is barred and dismissal is proper at this time. Even if the plaintiffs' set of facts could be interpreted to imply at least some limited degree of complicity by Honduran military officials in the allegedly unconstitutional seizure of plaintiffs' ranch, the mere fact of the defendants' commingling United States with foreign troops or the acquies-

cence of foreign military officers cannot deprive this court of its authority to correct constitutional violations by means of properly tailored equitable relief against *United ed States* officers. Any contention to the contrary is simply not consistent with the doctrine of equitable discretion.[129]

### c. Separation of Powers

 It is not necessary to linger over the long line of cases that permit judicial relief for unlawful or unconstitutional action by officials of the Executive Branch of the government, including relief against unlawful actions taken in the context of foreign and military affairs.[130] As Chief Justice Taney stated in *Mitchell v. Harmony*, the foreign affairs context of Executive action cannot shield unlawful conduct from judicial inquiry. "[A United States officer's] distance from home and the duties in which he is engaged cannot enlarge his power over property of a citizen, nor give to him, in that respect, any authority which he would not, under similar circumstances, possess at home."[131] Those words of the Supreme Court are applicable—squarely, without distinction or modification—to plaintiff Ramirez's case here.

That unlawful and unauthorized military activity is remediable by equitable relief has been reaffirmed by the Court on numerous occasions. In *Gilligan v. Morgan* the Court noted that separation of powers concerns cannot prevent military officers from being accountable for specific unlawful conduct "whether by way of damages or injunctive relief."[132] And in upholding an injunction against the Brigadier General of the Texas National Guard for unlawful interference with private property, the Court stated:

---

**128.** *Id.*

**129.** *See, e.g., United States v. Caltex (Philippines), Inc.,* 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157 (1952) (adjudicating a claim that United States military officials unlawfully destroyed private property in the Philippines).

**130.** *See Reid v. Covert,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); *Youngstown Sheet &*

*Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *Duncan v. Kahanamoku,* 327 U.S. 304, 66 S.Ct. 606, 90 L.Ed. 688 (1946).

**131.** 54 U.S. (13 How.) 115, 133, 14 L.Ed. 75 (1852) (emphasis added).

**132.** 413 U.S. 1, 11–12, 93 S.Ct. 2440, 2446–2447, 37 L.Ed.2d 407 (1973).

Whether or not the injured party is entitled to an injunction will depend upon equitable principles; upon the nature of the right invaded and the adequacy of the remedy at law. If the court finds that the limits of executive authority have been transgressed, and that in view of the character of the injury equitable relief by injunction is essential in order to afford the protection to which the injured party is entitled, it can not be said that the judicial power is fettered because the injury is attributable to a military order.[133]

While *Laird v. Tatum* counsels against continuous judicial monitoring of Executive policymaking, the Court there stated that it *is* the role of the courts within the constitutional scheme to adjudicate and remedy claims of actual injury resulting from specific, unlawful Executive action.[134] Such is the nature of the claim presented here.[135]

Furthermore, the plaintiffs' set of facts do not show that the Executive's conduct of foreign affairs would be impaired by an equitable decree that required the defendants to abide by United States constitutional and statutory requirements. Plaintiffs do not seek to prohibit the Regional Military Training Center from oper-

ating in Honduras. They merely ask the federal court to prevent the United States defendants from running military training operations on *their* property, which has *not* been lawfully expropriated. Carefully tailored equitable relief might correct the unlawful condition without challenging the United States' relations with any Central American country or its military policies in the region. Separation of powers considerations do not fell the plaintiffs' complaint.

### d. Compliance and Monitoring

The suggestion that the enforcement of any equitable decree would present insurmountable problems of compliance and judicial monitoring rests entirely on wild speculation. It must be presumed that the defendants, all officials of the United States government present in Washington, D.C., will obey an order of the district court. Furthermore, there is simply no factual basis in the plaintiffs' complaint for concluding that an equitable decree would involve this court in numerous or even any monitoring problems. Courts do not monitor compliance with decrees by personal, on-site inspections. Even if the alleged violations were occurring in the corridors of the Pentagon instead of in

**133.** *Sterling v. Constantin,* 287 U.S. 378, 403, 53 S.Ct. 190, 197, 77 L.Ed. 375 (1932) (federalism concerns and the context of executive action do not bar relief).

**134.** 408 U.S. 1, 15–16, 92 S.Ct. 2318, 2326–2327, 33 L.Ed.2d 154 (1972).

**135.** It is instructive to compare Judge Scalia's doctrine of equitable discretion with that suggested in the *Youngstown* case. In *Youngstown* the Supreme Court permitted the plaintiffs to attempt to establish an equitable basis for the requested injunction, primarily through a showing that money damages, if available, would not compensate for the injury. 343 U.S. at 584–85, 72 S.Ct. at 865–866; *Id.* at 595–96, 72 S.Ct. at 889–890 (Frankfurter, J., concurring). None of the Justices who found the seizure unconstitutional suggested that an inadequate damage remedy could substitute for injunctive relief if constitutional authority for the taking was not extant. In this case, however, Judge Scalia, in dissent, would deny the plaintiffs even an opportunity to show that damages could not fully compensate for their alleged loss; he merely

assumes, without any factual foundation whatsoever, that any loss which might be proved is compensable. Apparently this does not trouble the dissent because it asserts that money damages are *always* sufficient to remedy an unconstitutional taking, and that, therefore, an "injunction is not available to prevent a taking by the United States"—presumably even one which the United States has no constitutional or statutory authority to make. Dissenting Opinion of Scalia, J., at 1564 (discussing *Larson*).

If this were the law, the Supreme Court had nothing to decide in *Youngstown,* since the authority of the President to make the seizure would have been an irrelevant issue, the only question remaining being the extent of money damages to be paid for the taking. Preferring to ignore what it cannot overrule, the dissent thus takes a position even more extreme than that propounded by the dissenters in *Youngstown* who were willing to assume that the Government "was not immune from judicial restraint and that the plaintiffs are entitled to equitable relief if we find that the ... [taking] is unconstitutional." 343 U.S. at 678, 72 S.Ct. at 934 (Vinson, C.J., dissenting).

Honduras, the district court would not monitor its decree by personally inspecting the affected area. If a dispute arises over compliance with any remedial decree, the parties can introduce evidence in the district court to establish whether a violation in fact has occurred. This is the only method to determine a violation of a decree of which we are aware; it is a method universally used no matter where any acts occur or property is located. It is absurd to suggest on the basis of the plaintiffs' complaint that judicial monitoring of relief would be so problematic that adjudication of the plaintiffs' constitutional claims is barred.[136]

## B. *Declaratory Relief*

 The plaintiffs have also succeeded in stating a claim for declaratory relief sufficient to withstand dismissal under Rule 12(b)(6). The express purpose of the Declaratory Judgment Act was to create a

milder, less coercive form of relief than the injunctive remedy.[137] Although in some contexts, a declaratory judgment may have the same adverse effect on the defendants and the public as injunctive relief,[138] in most situations a declaratory judgment is less intrusive than a specific injunctive order.[139] Such is the case here. In assessing the propriety of declaratory relief, the equities in favor of granting the plaintiffs relief for constitutional violations remain equally strong, while any prudential considerations that may detract from the propriety of injunctive relief on the plaintiffs' asserted facts are even weaker.

A declaration of the plaintiffs' rights could provide the defendants with options for compliance that a specific injunctive order might not. If the district court declared that the defendants' occupation and use of the plaintiffs' property is unconstitutional, the defendants might, depending on

---

**136.** Judge Scalia epitomizes the weakness of the government's position when he sums up his dissenting opinion argument against equitable relief:

 "Any system that would countenance judicial interference in military operations abroad" —are the United States military when they operate abroad *never* subject to the courts at the behest of United States citizens?

 "for a reason that simultaneously impugns the integrity and fairness of a friendly nation" —a point never raised directly or by implication by the plaintiffs here. No accusation has been levied nor redress asked in U.S. courts against the Honduran government or any official thereof. Assuming that a seizure has occurred, even the Honduran government's failure, to date, to make a lawful expropriation and pay due compensation to the plaintiffs could be easily explained as the Honduran government's viewing this whole operation as a United States affair with the United States obligated to compensate its own citizen.

 "at the instance of a plaintiff who has not sought traditional judicial relief in the country where the real estate in question is located"— again, no complaint has been levied by the plaintiff against the Honduran government or any official; further, this is not a piddling land title dispute; and finally, regarding a dispute between a United States citizen and his own government, "traditional judicial relief" has never been in Honduran courts.

 "and who in any event has a claim for money damages in the courts of this country"— existence of monetary damages, if they do exist

in this case, cannot bar equitable relief, as Judges Bork and Scalia have so recently stated. *Dronenburg v. Zech,* 741 F.2d 1388 (D.C.Cir. 1984).

In his elaboration of these points Judge Scalia makes much of the third, saying: "A further obstacle to issuance [of an injunction] is the fact that they have made no effort ... to obtain protection in the ordinary quarter from the trespass of which they complain—the courts of Honduras." Dissenting Opinion of Scalia, J., at 1563. This emphasizes the evasive nature of the defense relied on by the government brief and argument, which Judge Scalia supports. "The trespass of which they complain" comes from the *United States* Army. Relief from this particular trespass, and these particular trespassers, would not ordinarily be found in "the courts of Honduras."

**137.** 28 U.S.C. § 2201 (1982); E. Borchard, Declaratory Judgments 3–15 (2d ed. 1941); 10A C. Wright & A. Miller, Federal Practice & Procedure § 2751 (2d ed. 1983); *See Developments in the Law—Declaratory Judgments,* 62 Harv.L.Rev. 787, 787–90, 874 (1949).

**138.** *See Samuels v. Mackell,* 401 U.S. 66, 69–74, 91 S.Ct. 764, 766–768, 27 L.Ed.2d 688 (1971) (where state criminal prosecution had begun prior to federal suit, injunctive and declaratory relief had same effect and must be judged by the same standards).

**139.** *See* sources cited *supra* note 137.

the violation and the order, choose to seek congressional authorization for their action, or to cause a lawful expropriation of the plaintiffs' property, or to restrict activities to publicly held land, or to settle with the plaintiffs, or to take other appropriate action. That one of the defendants' options might involve compensation to the plaintiffs does not deprive the district court of jurisdiction to declare the rights of the parties.

▬▬▬ Furthermore, even if a declaration by the district court could later be used as the basis for monetary relief, that possibility does not deprive the district court of authority to grant the requested relief.[140] Declaratory relief is improper only if the plaintiffs' action is a mere pretext to avoid the exclusive jurisdiction of the Claims Court.[141] In *Megapulse, Inc. v. Lewis* this court held that declaratory relief may be granted in the district court for unlawful government activities regardless of whether damages might also be available in the Claims Court.[112] Plaintiffs' complaint states a claim within the jurisdiction of the district court that is neither insubstantial nor frivolous. As such the district court must take jurisdiction of the claim.

### C. Relief for the Due Process Claims

Furthermore, it cannot now be concluded that relief would be barred in the district court for any proved violation of the plaintiffs' rights to due process of law. The nature of an appropriate remedy would, of course, turn on the practicabilities of the case. It might be reasonable, depending on the facts, to order the defendants to apprise the plaintiffs of their intentions, as the plaintiffs claim not to know from day to day what activities will take place on their land. Secondly, the peculiarities of

the case might entitle the plaintiffs to a hearing with United States officials at which the plaintiffs could state in an effective way their objections to the occupation and use of their property. A determination of the appropriate relief for the plaintiffs' due process claim must be made initially by the district court.

### VI. ACT OF STATE

We turn now to the last of the defendants' arguments. After prompting by an order of the original panel of this court,[143] the defendants contend that the district court's judgment should be affirmed on the ground that the act of state doctrine compels dismissal of the plaintiffs' complaint. Although the plaintiffs' complaint challenges only the actions of United States officials and seeks relief only against the named United States defendants, the defendants contend that two resolutions of the Honduran government are acts of state which bar relief for the plaintiffs' constitutional claims. Even accepting the veracity of these resolutions, however, they do little more than suggest that Honduras *might* expropriate the plaintiffs' property *at some future date*. These two pieces of paper do not deprive the plaintiffs of the opportunity to prove facts in support of their stated claims.

▬▬▬ The act of state doctrine prevents judicial relief for certain claims that would require the court to pass on the validity of acts of a foreign state. The traditional formulation of the act of state doctrine is in *Underhill v. Hernandez*, decided in 1897:

> Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one

---

140. See *Laguna Hermosa Corp. v. Martin*, 643 F.2d 1376, 1379 (9th Cir.1981) (district court does not lose jurisdiction simply because its declaratory judgment may later become the basis for a monetary judgment).

141. See *Amalgamated Sugar Co. v. Bergland*, 664 F.2d 818, 823–24 (10th Cir.1981).

142. 672 F.2d 959, 966–69 (D.C.Cir.1982).

143. On 28 September 1983 a panel of this court, *sua sponte*, requested supplemental briefs by the parties on the applicability of act of state doctrine to the facts of this case—an issue which had not been raised previously by the parties or the district court.

country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.[144]

In *Banco Nacional de Cuba v. Sabbatino* the Supreme Court reaffirmed the act of state doctrine by refusing to probe the validity of a foreign act.[145] *Sabbatino* held that full legal effect must be given to Cuba's expropriation of Cuban sugar companies owned by United States nationals in a case involving a dispute over the confiscated sugar between a Cuban bank and a United States commodity broker. Separation of powers concerns are the underpinnings of the act of state doctrine; the defense bars adjudication when it appears that relief "would interfere with delicate foreign relations conducted by the political branches." [146]

Since *Sabbatino*, the scope of the act of state doctrine has been narrowed by statute and judicial fiat. The Second Hickenlooper Amendment statutorily reversed the holding of *Sabbatino* by prohibiting the application of the act of state defense to foreign confiscations in violation of international law.[147] In Alfred Dunhill of London, Inc. v. The Republic of Cuba,[148] the Supreme Court held that the interventors (those named to possess and occupy the seized businesses) had failed to prove that their refusal to repay funds constituted an act of state. Four of the Justices (Burger, C.J. and White, Powell and Rehnquist, JJ.) were also of the opinion that the act of state doctrine does not apply to purely commercial acts of a foreign state.

■ The act of state defense requires the court to analyze the nature of the plaintiff's claims and the facts of the foreign act and to determine whether judicial abstention is required in order to avoid interference with the political branches' conduct of foreign relations.[149] A successful act of state defense must rest on a factual showing that an act of state has occurred, coupled with a legal showing that no bar to the doctrine is applicable under the factual circumstances. We consider each in turn.

## A. The Factual Basis for Applying the Act of State Doctrine on this Appeal

■ We cannot consider the act of state doctrine in a factual or procedural vacuum; it must here, as always, be applied to the facts in the procedural posture of the case. When the defense is raised in connection with a motion to dismiss under Rule 12(b)(6), the court must be satisfied that there is no set of facts favorable to the plaintiffs and suggested by the complaint which could fail to establish the occurrence of an act of state. To the extent crucial facts pertaining to the defense are disputed, or not fully developed in a complete record, the reviewing court must be certain that it does not leap to conclusions arguable under the unelaborated pleadings but which could be refuted through the ordinary process of discovery and factfinding in the district court. To do otherwise is to deny the claimant an opportunity to prove his case.

■ Interpreting the resolutions in light of the plaintiffs' set of facts, it cannot be said without qualification that the Honduran government has exercised an act of state which could bar relief. Certainly, the two Honduran resolutions submitted to this court do not fell the plaintiffs' claims prior to factfinding by the district court. The first resolution submitted by the defendants has nothing to do with expropriation

---

**144.** 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897).

**145.** 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964).

**146.** *See First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 775, 92 S.Ct. 1808, 1817, 32 L.Ed.2d 466 (1972) (Powell, J. concurring in the judgment).

**147.** 22 U.S.C. § 2370(e)(2) (1982).

**148.** 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976).

**149.** *See First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 775–76, 92 S.Ct. 1808, 1817, 32 L.Ed.2d 466 (1972) (Powell, J., concurring in the judgment).

of the plaintiffs' land, and the second is merely the first step in a process which may or may not lead to expropriation by the Honduran government. They were issued many months apart. They are totally unrelated.

The resolution of the National Congress of Honduras on 20 June 1983 states that whereas the Government of the Republic of Honduras "did establish a Regional Center for military training" in the Department of Colon and whereas "the operation of the mentioned Regional Center will require the technical services of foreign military instructors," the National Congress decrees "[t]o authorize the admission of military instructors and students, coming from friendly countries." [150] It does not specifically mention the particular site of the RMTC or the plaintiffs' property. The plaintiffs contend that the specific site for the RMTC was neither presented to nor ratified by the Honduran National Congress and that the resolution cannot be read as a Honduran claim of ownership to the plaintiffs' ranch. The plaintiffs contend that the first resolution is simply what it purports to be: "bienvenido," a friendly welcome admitting United States troops into Honduras to train soldiers.

The second resolution submitted by the defendants identifies the plaintiffs' land. The document is a Presidential decree signed by the Secretary of State for National Defense and Public Security, dated 4 November 1983. It states that whereas the Chief of the Armed Forces of Honduras has requested that an order be issued for expropriation of certain property in the Colon Department on which the RMTC is operating, that therefore, the President of the Republic decrees that the property therein described "shall be expropriated under the right of eminent domain on account of public exigency and for the public good," and that "[e]stablished legal procedures shall apply." [151]

The plaintiffs argue that this resolution does not constitute an expropriation of plaintiffs' property under Honduran law. Plaintiffs do not question the validity of the resolution under Honduran or any other law; they simply argue that the resolution does not purport to assert Honduran governmental title to the plaintiffs' property. Plaintiffs contend that, as a matter of Honduran law, the resolution of 4 November merely initiates a process which *may or may not* result in expropriation of the plaintiffs' property in Honduras. In support of this contention, plaintiffs placed in the record in the district court the opinions of several Honduran legal experts stating that an expropriation by the Honduran government is consummated only after certain legal proceedings have been completed, which plaintiffs claim have not yet taken place.[152] These include the payment of compensation prior to the expropriation. However, *no value has been fixed and not one lempira has been paid or even appropriated.* Plaintiffs claim that expropriation by the Honduran government is in fact a remote possibility; Honduras reportedly is reluctant to take the final steps of expropriation because factions in the Honduran military are skeptical about the value to Honduras of a training center used by the United States to train Salvadoran soldiers.[153] According to the plaintiffs, Honduras has not asserted a claim of ownership or possession of the plaintiffs' property and it is highly uncertain whether such a claim will ever be made.[154]

---

**150.** Brief of Appellees, Addendum A.

**151.** Brief of Appellees, Addendum C at c–5 to c–8.

**152.** *See* A. at 98–113.

**153.** Reply Brief of Appellants at 8 n. 2.

**154.** We disagree with the dissent's suggestion that one or more steps in the uncompleted process of expropriation must be accepted as evidence of an accomplished act of state. It is

generally recognized that a conclusive foreign act must be completed before the doctrine is invoked. The doctrine has never been applied when it was uncertain whether a foreign expropriation had been effected. *See, e.g.,* RESTATEMENT (SECOND) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 43 comment a (1965) ("[A]ct of state doctrine ... becomes applicable only *when and if the act has been fully executed."* (emphasis added)). Until it is shown that an officially sanctioned physical seizure has in fact occurred, or that the legal processes of expropriation have

On the basis of the plaintiffs' facts and the two resolutions submitted to this court, we cannot say that Honduras has expropriated or otherwise asserted a claim of ownership to the plaintiffs' property. A determination of whether the Honduran government, as a factual matter, has acted to take the plaintiffs' property must be made in the first instance by the district court on the basis of evidence submitted by the parties.[155] Dismissal of the plaintiffs' complaint on the ground that the act of state defense bars relief cannot be justified on the record at this time.

Sweeping aside the uncertain and unelaborated state of the record on many crucial factual issues, our dissenting colleague Judge Starr would reach out and find whatever facts are necessary to create an act of state sufficient to invoke the doctrine and avoid any further review. This uncharacteristic disregard for the ordinary limitations of appellate adjudication is completely uncalled for under the circumstances. The act of state defense was not raised by any of the parties before the district court. The critical issues of fact which the dissent raises and resolves—the current status of the Honduran government's uncompleted expropriatory gestures, and the extent of Honduran troops' occupation of the ranch—were neither put in issue by the parties nor considered by the district court. There was absolutely no factual development on these issues before the case came to this court. This appeal is not the proper forum to find the facts necessary to settle the controversy.

The theory relied upon by the dissent to find these purported facts is the automatic conversion of the district court's order granting the defendants' motion to dismiss under Rule 12(b)(6) into a grant of summary judgment in favor of the defendants. Although nowhere expressly cited, the justification for this conversion is apparently grounded in Rule 12(b):

> If, on a motion ... to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.[156]

There are numerous reasons why this rule does not support the dissenting suggestion that summary judgment be directed on the act of state issue. The conversion contemplated is one primarily intended to occur at the *trial* level, not on appeal. The quoted language is an amendment to the Federal Rules of Civil Procedure expressly authorizing the previous practice by trial courts of considering extra-pleading matters when ruling on 12(b)(6) motions. It provides a conceptual framework for the trial court to resolve undisputed facts in conjunction with motions to dismiss under Rule 12(b)(6), thus streamlining pretrial proceedings.[157]

The procedural safeguards in the rule also make it clear that the conversion is intended to operate chiefly at the trial level: *all parties* must be given an opportunity to present *all material* made pertinent to the converted motion. It is the district court which takes the motion under consideration; it is the district court which assures that the parties have been notified of the issue at stake; and it is the district court which must guarantee that the parties have a chance to respond fully.[158]

---

been terminated by the foreign government, partial governmental action does not necessarily result in an act of state.

**155.** *See Compania Espanola de Navegacion Maritima v. Navemar*, 303 U.S. 68, 58 S.Ct. 432, 82 L.Ed. 667 (1938) (district court properly took evidence on whether foreign government took possession of a merchant vessel by an act of dominion or control).

**156.** Fed.R.Civ.P. 12(b) (final sentence).

**157.** *See generally* 5 C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE § 1366 (1969).

**158.** Local rules usually recognize the proper role played by the District Court. For example, United States District Court Rules, D.C., provide that on each motion for summary judgment, the

A few decisions recognize the conversion for the first time on appeal, but these cases usually affirm the trial court's consideration of the issue after the trial court admittedly relied on extra-pleading filings without identifying its disposition as a summary judgment grounded in Rule 12(b).[159] In contrast, what the dissent advocates is an appellate conversion of the 12(b)(6) order on one issue (the political question doctrine) into a de novo ruling on an entirely new issue never raised by the parties or the trial court (the act of state doctrine). Rule 12(b) does not expressly authorize such a conversion; it contemplates that the issue decided pursuant to Rule 56 will be the same one submitted to the court for disposition under Rule 12(b)(6). There is no language in the rule suggesting that, once a trial court may have ruled on a 12(b)(6) motion on one issue without rejecting nonpleading materials, an appellate court is free to consider other entirely unrelated factual and legal issues and find the necessary facts under the guise of reviewing a motion for summary judgment.

■ Ordinarily, in reviewing motions for summary judgment, the appellate court considers only those matters presented to the district court, disregarding additional

allegations raised for the first time on appeal.[160] While certain cases may suggest that an appellate court can consider new issues on a converted motion for summary judgment, this has never been permitted when it would contravene the standards set up in Rule 12(b). The Advisory Notes warn that courts must "avoid taking a party by surprise through the conversion of the [12(b)(6)] motion into a motion for summary judgment."[161] To this end, the rule requires courts to give "all parties [a] reasonable opportunity to present all material made pertinent to such a motion."[162] When the parties have not even been notified that an issue will be considered by the court at the only point when they may submit factual affidavits—the trial level— then there is every likelihood that they have been denied the full opportunity to present the applicable facts. Unless the new issue uncovered by the appellate court was one which was clearly framed by the proceedings below so that the parties had a legitimate chance to submit all relevant materials and argue their implications, it is clearly unjust for the appellate court to direct the issuance of summary judgment on a new issue raised *sua sponte* on appeal.[163]

---

movant must file a statement of the material facts and the opposing party shall then file "a concise 'statement of genuine issues' setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated." Rule 1–9(i). Plaintiffs were not afforded these procedural rights.

**159.** *E.g., Irons v. Schuyler,* 465 F.2d 608 (D.C. Cir.), *cert. denied,* 409 U.S. 1076, 93 S.Ct. 682, 34 L.Ed.2d 664 (1972).

**160.** *Tarpley v. Greene,* 684 F.2d 1, 7 (D.C.Cir. 1982); *Frank C. Bailey Enter's v. Cargill, Inc.,* 582 F.2d 333, 334 (5th Cir.1978).

**161.** Fed.R.Civ.P. 12(b), 28 U.S.C.A.

**162.** *Id.*

**163.** *See Sadlowski v. United Steelworkers,* 645 F.2d 1114, 1120 (D.C.Cir.1981), *rev'd on other grounds,* 457 U.S. 102, 102 S.Ct. 2339, 72 L.Ed.2d 707 (1982); *Blackhawk Heating & Plumbing Co.*

*v. Driver,* 433 F.2d 1137 (D.C.Cir.1970); *Ithaca College v. NLRB,* 623 F.2d 224, 229 (2d Cir.), *cert. denied,* 449 U.S. 975, 101 S.Ct. 386, 66 L.Ed.2d 237 (1980); *E.C. Ernst, Inc. v. General Motors Corp.,* 537 F.2d 105, 109 (5th Cir.1976). The cases cited in Judge Starr's dissent permitted a conversion only when the record and the issues *as framed by the parties* squarely raised the dispositive issue. *See Brookens v. United States,* 627 F.2d 494, 497–99 (D.C.Cir.1980) (nonprevailing party had challenged the defendant at the trial court level to prove an admittedly dispositive fact, and subsequent affidavits responded to that challenge); *Gager v. "Bob Seidel,"* 300 F.2d 727, 731 (D.C.Cir.), *cert. denied,* 370 U.S. 959, 82 S.Ct. 1612, 8 L.Ed.2d 825 (1962) (complaint put the scope of defendants' immunity to suit precisely in issue). The suggestion that the court of appeals may indiscriminately "treat the matter as one involving a grant of summary judgment, regardless of the characterization by the district court of its disposition of the matter" (Dissenting Opinion of Starr, J., at 1567 n. 2) has never been the law in this Circuit, and certainly is not after our decision today.

The standard is a high one. In *Fountain v. Filson* [164] the Supreme Court previously admonished this court when it attempted to raise and resolve an entirely new issue by summary judgment on appeal. Although this court ruled that the issue was extant on the record and pleadings, the Supreme Court reversed, since there was no opportunity for the opposing party to contest the applicability of the facts to the legal issues relied upon.

This litigation is in the same posture. The act of state defense—now said to be dispositive—was never under consideration below by the court. Its potential applicability was not even hinted at by the parties. The pleadings themselves certainly did not raise the specter of act of state; the complaint alleges destruction and deprivation by United States defendants, *not* the Honduran government. Thus it cannot be said that the plaintiff must have recognized that the motions filed before the court triggered the act of state defense.

Moreover, the crucial fact now said to resolve the issue of whether an act of state has occurred—the expropriatory decree of the Honduran government—was not issued until after the case was submitted to the first panel on appeal. The parties have had no opportunity to submit factual affidavits on the extent to which the announced expropriation may have been completed. Rushing to judgment based on an incomplete record compiled in anticipation of other unrelated issues can only deprive the plaintiff of a meaningful opportunity to present its case. Rule 12(b) neither contemplates nor authorizes an appellate summary judgment under those circumstances.[165]

Even if it were proper to convert the district court's order into one for summary judgment, a summary judgment is not authorized unless there are no disputed issues of material facts.[166] The Supreme Court has consistently held that in reviewing summary judgments on appeal, all inferences must be made in the light most favorable to the opposing party.[167]

Here, by its conception of dismissal under Rule 56, the dissent has ignored the existence of disputed facts and improperly slanted the factual statements toward the defendants. Only speculation favorable to the defendants allows the conclusion that Honduran troops are now participating in the training activity at all, let alone to such an extent that the Honduran government could be said to have seized the ranch. Only conjecture supportive of the defendants allows the conclusion that the ranch has been or ever will be expropriated by the Honduran government. The dissent's resolution of these unproved, disputed issues of fact flies in the face of the district court's own statement that summary judgment was inappropriate because there were "essential disputes as to the material facts in the case." [168] Summary judgment is clearly impermissible under these circumstances.

While we take no view on the weight or substance of the plaintiffs' factual case as it might be developed, the unique mode of analysis offered by the dissent to dismiss the plaintiffs' complaint under Rule 12(b)(6) is deeply disturbing. It is nothing other than improper factfinding of controverted material issues by an appellate court on review of a district court's dismissal for lack of jurisdiction. As such, it would visit great unfairness on these plaintiffs by depriving them of the substantive and procedural rights to which they are entitled

---

**164.** 336 U.S. 681, 69 S.Ct. 754, 93 L.Ed. 971 (1949).

**165.** Even Judge Tamm, in dissent, agrees that further factual development is required before drawing any legal conclusions on the occurrence of an act of state. *See* Dissenting Opinion of Tamm, J., at 1546 n. 3. Judges Starr and Scalia are alone in their willingness to find the facts necessary to create an act of state.

**166.** Fed.R.Civ.P. 56.

**167.** *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Poller v. Columbia Broadcasting Sys.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Ring v. Schlesinger,* 502 F.2d 479, 490 n. 16 (D.C.Cir.1974).

**168.** Transcript of 26 July 1983, at 11.

when they bring an action in the federal courts.

### B. *Legal Obstacles of the Application of the Act of State Doctrine*

In their haste to find the existence of an act of state barring any further judicial review of the plaintiffs' claim, the appellees and Judge Starr in his dissent fail to confront any of several established limitations on the doctrine which caution against its invocation. Not the least of these restrictions is the so-called First Hickenlooper Amendment, which sets limitations on United States foreign assistance to countries expropriating the property of United States citizens without compensation. Under this statute Congress has directed that "[t]he President shall suspend assistance to the government of any country ... which has ... expropriated or seized ownership or control of property owned by any United States citizen," when the seizing country fails to take appropriate steps to compensate the citizen within six months of the seizure.[169]

If the dissenting opinion of Judge Starr is correct in its factual finding that Honduran troops have seized and occupied the plaintiffs' ranch, then an expropriation or seizure of ownership within the First Hickenlooper Amendment has surely occurred. Because no compensatory steps have since been taken by the Honduran government, under the reasoning advanced by the dis-

sent, the President is currently derelict in his statutory duty to terminate all assistance to the government of Honduras. Consequently, while the United States appellees are no doubt delighted to record Judge Starr's dissent, they are probably appalled at the doctrine on which he has pitched it. By refusing to permit any further factual development in the plaintiffs' suit, the dissent ascribes to the present Administration a willingness to shield its operations abroad by egregious abrogation of statutes specifically designed to protect United States citizens from expropriation such as that purportedly occurring here, a situation found by the dissent to be "manifestly and indisputably present."[170]

We are loathe to recognize any governmental predisposition to such conduct. We prefer to believe that, to the extent the government has information on the past and current state of activities on the plaintiffs' ranch, the government's own analysis would indicate that there has *not* been any seizure by the Honduran government, and therefore the Administration is *not* in flagrant violation of the First Hickenlooper Amendment, where the dissent's analysis puts them. Of course, resolution of the extent of Honduran involvement can only be completed through further proceedings before the district court.

Beyond the First Hickenlooper Amendment, several other potential legal barriers must be resolved before the act of state

---

169. *See* 22 U.S.C. § 2370(e)(1) (1982).

170. Dissenting Opinion of Starr, J., at 1567.
 With all respect to the dissent's professed astonishment, Judge Starr's assertion that "[i]t cannot seriously be argued that a cut-off of financial assistance is required" is answered by the simple, unambiguous, and detailed terms of the statute—and the whole purpose for which the statute was enacted.
 The dissent adverts to no provision which would render the statute inapplicable. It is inconsequential that the land may be "hypertechnical[ly]" owned by the Honduran corporate plaintiffs, since the full statute (not cited in the text *supra* at note 169) prohibits foreign assistance when the corporation whose assets are seized is at least "50 per centum beneficially owned by United States citizens." 22 U.S.C. § 2370(e)(1)(A) (1982). Here, it is undisputed

that the Honduran corporations are 100% beneficially owned by U.S. citizens.
 Neither is it significant that an expropriatory decree may have issued. The statute itself stipulates the time limits for compensatory payment which must be met to avoid the mandate to freeze foreign aid.
 Finally, the dissent answers its own objection that "[t]his is scarcely a Cuba-like retaliatory seizure of American assets": the President himself may waive the strict standards of the Amendment after a determination and certification to Congress that a waiver is important to the national interests of the United States. Dissenting Opinion of Starr, J., at 1573 & n. 8. We would expect that provision to be invoked, rather than ignored, if United States interests would be jeopardized by an aid cutoff.

doctrine may be applied. Analysis of these issues is inevitably affected by the relevant factual circumstances in which the claim is raised. Until the threshold showing has been made of an actual confiscation or expropriation, there is no need to resolve these issues. We pause only to note that the dissenting opinion of Judge Starr fails adequately to explain why several of these exceptions to the act of state doctrine would not apply.

For instance, the doctrine was never intended to apply when an applicable bilateral treaty governs the legal merits of the controversy.[171] As enunciated in *Sabbatino*, the act of state doctrine is principally concerned with minimizing judicial interference in the political branches' conduct of foreign affairs. Improper interference with policymaking by the political branches may occur when there is no codification or consensus on the national interest in United States foreign relations law or in United States treaties with the foreign sovereign state. When, however, the political branches have specified the controlling legal principles in a treaty with the foreign sovereign or when there are generally accepted tenets of international law concerning the foreign act,[172] the danger of improper judicial interference with the Executive's responsibilities for foreign affairs is greatly reduced. In *Sabbatino* the Court was careful to distinguish between judicial adjudication of the validity of a foreign act when there are no standards for adjudication from those cases in which United States treaties or international law provide specific guidance to the Judiciary in a particular area of foreign relations. There the Court stated:

[R]ather than laying down or reaffirming an inflexible and all-encompassing rule in this case, we decide only that the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, *in the absence of a treaty or other unambiguous agreement regarding controlling legal principles ....*[173]

Thus, treaties between the United States and Honduras may provide clear standards for adjudicating the validity of any Honduran act of expropriation. According to documents submitted to this court by the defendants, the "General Treaty of Friendship, Commerce and Consular Rights"[174] between the United States and Honduras requires "the provision of just, adequate and effective compensation in all instances of expropriation of property owned by nationals and companies of the United States."[175] A letter filed with the Court by the defendants from the Honduran Ministry of Economy and Commerce to The Honorable George P. Shultz, Secretary of State, states that the Honduran government believes that the Treaty's requirement of just, adequate and effective compensation applies to any expropriation of Ramirez's property which may be undertaken by the Honduran government.[176] On the facts as now alleged, there has been no Honduran act of expropriation, and the district court has not been required to evaluate the extent of Honduran involvement on the disputed property or to construe the treaty terms in light of the facts. But if the district court were to find that a Honduran expropriation has occurred without payment, calling into being the applicability of this treaty, it appears to us at this stage that a violation of this treaty would pre-

---

**171.** *See Kalamazoo Spice Extraction Co. v. Provisional Military Government of Socialist Ethiopia,* 729 F.2d 422 (6th Cir.1984); *American Int'l Group, Inc. v. Islamic Republic of Iran,* 493 F.Supp. 522 (D.D.C.1980).

**172.** *See Banco National de Cuba v. Sabbatino,* 376 U.S. 398 at 430 n. 34, 84 S.Ct. at 941 n. 34.

**173.** *Id.* at 428, 84 S.Ct. at 940 (emphasis added).

**174.** *See* 45 Stat. 2618, 2619.

**175.** *See* Brief of Appellees, Addendum E at e–2. "Just, adequate, and effective compensation" is the standard of the First Hickenlooper Amendment, *supra,* note 169.

**176.** *See* Brief of Appellees, Addendum E at e–2. Of course it is possible that this fact may be disputed on remand by the defendants.

vent the defendants from raising the act of state defense in this case.[177]

Apparently because it deems these treaty obligations to be no more than a troublesome nuisance, Judge Starr's dissent would never reach this question. Instead, in what can only be characterized as an irony of justice, the dissent goes to great lengths to find that an uncompensated taking has occurred, but then holds that it is *premature* to inquire into whether the treaty obligations or accepted tenets of international law have been violated. Because *no further review* is contemplated, the dissent effectively denies the existence of a treaty exception to the act of state defense. We reject this implication and the concomitant denial of an opportunity to the plaintiffs to argue this point before the trial court on the new facts presumed by the dissent.

This same dissent also fails to deal with the Second Hickenlooper Amendment, which specifically addresses the use of the act of state defense in cases involving a foreign state's confiscation of private property:

177. *See supra* note 172.

178. 22 U.S.C. § 2370(e)(2) (1982).

179. The statute provides that the act of state doctrine may *not* apply if a

country, government agency, or government subdivision fails within a reasonable time (not more than six months after such action ...) to take appropriate steps, which may include arbitration, to discharge its obligations under international law toward such citizen or entity, including speedy compensation for such property in convertible foreign exchange, equivalent to the full value thereof, as required by international law ....

*Id.* § 2370(e)(1).

180. We reject the dissent's suggestion that the word "property" in the statute must invariably be limited to expropriated personal property located in the United States. It is based only on authority which has been overturned in the Supreme Court. *See Banco Nacional de Cuba v. First Nat'l City Bank*, 431 F.2d 394, 399–402 (2d Cir.1970), vacated and remanded, 400 U.S. 1019, 91 S.Ct. 581, 27 L.Ed.2d 630 (1971), aff'd on remand, 442 F.2d 530 (2d Cir.1971), *rev'd on other grounds*, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972); *Compania de Gas de Nuevo Laredo, S.A. v. Entex*, 686 F.2d 322, 327 (5th

[N]o court in the United States shall delcine on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted by any party including a foreign state ... based upon (or traced through) a confiscation or other taking ... by an act of that state in violation of the principles of international law, including the principles of compensation and the other standards set out in this subsection....[178]

*The statutory standards which the foreign state must meet—before a court may apply the act of state doctrine—include speedy compensation equivalent to the full value of the confiscated economic interest.*[179]

An accomplished, uncompensated confiscation of the plaintiffs' ranch by the Honduran government would squarely bring this statute into play, foreclosing any deference based on the act of state doctrine. The dissent prefers to ignore this clear congressional mandate without any serious discussion of its terms.[180]

Cir.1982), cert. denied, 460 U.S. 1041, 103 S.Ct. 1435, 75 L.Ed.2d 794 (1983) (relying solely on *Banco Nacional de Cuba*). By no twist of legal imagination can the Supreme Court's reversal (of the Second Circuit's general holding that the act of state doctrine controlled the case) constitute approval of the reasoning relied on by the court of appeals with respect to the meaning of the Second Hickenlooper Amendment. The statute must be read consistently with congressional intent, and might not apply to every expropriation of foreign property owned by United States citizens. It may be that a primary purpose of the statute was to prevent invocation of the act of state doctrine when property expropriated in a foreign country subsequently makes its way into the United States, but this was not the *sole* situation in which the amendment was to be activated. There was some concern in Congress that the amendment could be read to create a new, expanded right of action to challenge all foreign expropriations in United States courts, even when the traditional basis of jurisdiction—attachable property located in the United States—was not present. Any statement in the legislative history suggesting that the amendment applied only to personal property in the United States was made in response to these fears and indicates merely that no new class of jurisdiction over expropriation cases

Finally, we note that the entire controversy over the act of state doctrine is really something of a red herring. This doctrine accords a presumptive validity to some foreign state acts because of the difficulties which could accompany United States courts' adjudication of the validity of those foreign governmental acts. Yet, at this point of the litigation it is not clear exactly why the legality of *Honduran* involvement in the alleged seizure is at issue. No one has requested the United States courts to "sit in judgment"[181] on the acts of the Honduran government. Clearly, the plaintiff has not attacked the legality of the Honduran government's activities before *this* court. Attempts to achieve redress from the Honduran government may be made in Honduras before Honduran officials. In this court, only the allegedly unlawful excursions of the United States military forces have been challenged. The entire suit could conceivably be resolved with no reference to Honduran governmental involvement. In that situation the act of state doctrine need not be invoked at all.

If, on remand, the legality of an alleged Honduran seizure is raised, we can only surmise that this claim might be part of a defense on the merits by the United States that its activities were lawful under the Constitution and international law since Honduran local law and procedure have been followed.[182] However, we are doubtful that the threshold barrier of the act of state doctrine could properly be joined to such a position on the merits; this would permit a derivative imprimatur of constitutionality to be stamped on the challenged United States activities based on nothing more substantial than the mere presumptive validity extended to a Honduran act of state.[183]

■ The Supreme Court has never applied the act of state doctrine to bar adjudication of constitutional claims by a United States citizen against officials of the *United States* government. While separation of powers concerns may outweigh judicial adjudication in the typical case involving a foreign act of state, the prudential balance may shift decidedly when United States citizens assert constitutional violations by United States officials. A balancing of the roles of the Executive and the Judiciary may produce a different outcome in those cases in which the Judiciary is called upon to curb unconstitutional excesses of *its own* Executive Branch. It is highly questionable whether officials of the Executive are entitled to raise the act of state defense to prevent the Judiciary from exercising its role in the tripartite system of government to remedy injuries to United States citizens caused by unconstitutional activities of the United States Executive Branch. A teaming up with foreign agents cannot exculpate officials of the United States from liability to United States citizens for the

---

was contemplated. *See Foreign Assistance Act: Hearings on H.R. 7750 Before the Committee on Foreign Affairs*, 89th Cong., 1st Sess. 592 (Q. 3), 607–611 (1965) [hereinafter cited as *Hearings*].

Moreover, the broad, unqualified language of the carefully drafted amendment belies the narrow reading offered by the dissent. The sponsors of the amendment referred to it as the "Rule of Law" amendment; they viewed it as authorizing courts to apply established law suits challenging expropriations. Congressional intent to overturn *Sabbatino* was never limited to a single narrow class of cases. The purposes of the amendment include the promotion and protection of United States investment in foreign countries (which characteristically has always principally been land, minerals, and large fixed immovables), and securing the right of a property holder to a court hearing on the merits. See *Hearings, supra* at 607–610. Gutting the amend-

ment by the addition of external language offered by the dissent would be inconsistent with these purposes and we decline to adopt it.

**181.** 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897).

**182.** We cannot be sure that the expropriatory steps of the Honduran government would be raised even to this extent, since the defendants have not revealed the asserted legal justification for their activities. We of course express no view on whether this would be a justifiable defense.

**183.** *Cf. Reid v. Covert*, 354 U.S. 1, 16, 77 S.Ct. 1222, 1230, 1 L.Ed.2d 1148 (1957) ("[N]o agreement with a foreign nation can confer power on ... any ... branch of Government which is free from the restraints of the Constitution.").

*United States* officials' unlawful acts; [184] judicial scrutiny can be appropriate when the alleged perpetrators are officials of the United States government engaged in unconstitutional conduct.[185]

We do not now decide whether the Second Hickenlooper Amendment, accepted tenets of international law, treaties between the United States and Honduras, or other legal obstacles bar application of the act of state doctrine in this case. Such a determination must rest on the applicability of these barriers in light of the facts—if any—found by the district court relative to a purported Honduran act of state. We simply hold the act of state doctrine, never raised in the trial court, cannot obliterate the plaintiffs' claims at this stage of the proceedings.

## VII. CONCLUSION

We will not retreat to the spurious grounds urged by the defendants for this precipitous dismissal of the plaintiffs' validly stated constitutional claims. The Judiciary is fully empowered to vindicate individual rights overridden by specific, unconstitutional military actions. Charges that United States officials are unconstitutionally housing over 1,000 soldiers on a United States citizen's private ranch and running military forays throughout the pastures cannot conscionably be dismissed by this court at the stage of a bare complaint and supporting declarations.[186] We emphatically reject the proposition that the federal courts are closed to these United States plaintiffs from the start.

The Supreme Court has adjudicated similar—and even more controversial—cases implicating the reviewable scope of Executive direction when personal liberty and private property were threatened by the allegedly unconstitutional actions of Executive officials taken during times when this nation's interests were gravely affected by events abroad, events which are now said to isolate the Executive from constitutional adjudication. Often the executive officials vindicate their actions; [187] at times they can not.[188] But until today it has never been doubted that the Judiciary does operate

**184.** *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 704–05, 82 S.Ct. 1404, 1413–1414, 8 L.Ed.2d 777 (1962). *See United States v. Sisal Sales Corp.,* 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1927).

**185.** *See United States v. Hensel,* 699 F.2d 18 (1st Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983) (collaboration with Canadian authorities does not shield United States officials from claims alleging a violation of the fourth amendment by a search and seizure in Canadian waters); *Berlin Democratic Club v. Rumsfeld,* 410 F.Supp. 144 (D.D.C.1976). The overruled and discarded case of *American Banana Co. v. United Fruit Co.,* 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909) (discredited in *United States v. Sisal Sales Corp.,* 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1927), *United States v. Aluminum Co. of Am.,* 148 F.2d 416 (2d Cir.1945) is inapposite for several reasons. The legal issues raised in *American Banana* dealt only with the statutory scope of the Sherman Act, not the reach of the United States Constitution or the extent to which the United States government is bound by the Constitution when operating abroad. Factually, in this case it is alleged that the United States Army, not a foreign government, has seized the property. Moreover, unlike the situation in *American Banana,* the United States defendants' actions may have predated any Honduran act of state by many months. Plaintiffs allege that the United States defendants caused intrusions onto the plaintiffs' ranch as early as May 1983, and the seizure and destruction of the plaintiffs' property is alleged to have continued from that date to the present time. We doubt that any act of the Honduran government expropriating the plaintiffs' property months or even years later could operate to shield the United States defendants from liability for constitutional violations which allegedly occurred prior to the act of the foreign state.

**186.** The spirit of the Nation's historic commitment to protecting private citizens' rights against military excesses is embodied in the third amendment's express prohibition against the quartering of soldiers in private homes. "No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law." U.S. CONST. amend. III.

**187.** *E.g., The Prize Cases,* 67 U.S. (2 Black) 635, 17 L.Ed. 459 (1863).

**188.** *E.g., Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *United States v. Lee,* 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171 (1882).

under a *"special* charter"[189] to help preserve the fundamental rights of this nation's citizens. That charter is commonly known as the United States Constitution. The Constitution draws certain lines beyond which neither the Executive, the Legislature, nor the Judiciary may pass, and it is emphatically the Judiciary's duty to declare, in a justiciable controversy, where those lines are.[190]

The words of the Supreme Court in *United States v. Lee* continue to guide the judicial conscience, and seem singularly apt to the legal defenses asserted by the Government here:

> Looking at the question upon principle, and apart from the authority of adjudged cases, we think it still clearer that this branch of the defense cannot be maintained. It seems to be opposed to all the principles upon which the rights of the citizen, when brought in collision with the acts of the government, must be determined. In such cases there is no safety for the citizen, except in the protection of the judicial tribunals, for rights which have been invaded by the officers of the government, professing to act in its name. There remains to him but the alternative of resistance, which may amount to crime. The position assumed here is that, however clear his rights, no remedy can be afforded to him when it is seen that his opponent is an officer of the United States, claiming to act under its authority; for, as Mr. Chief Justice Marshall says, to examine whether this authority is rightfully assumed is the exercise of jurisdiction, and must lead to the decision of the merits of the question. The objection of the plaintiffs in error necessarily forbids any inquiry into the truth of the assumption that the parties setting up such authority are lawfully possessed of it; for the argument is that the formal suggestion of the existence of such authority forbids any inquiry into the truth of the suggestion.

. . . . .

No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it.

It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives.

Courts of justice are established, not only to decide upon the controverted rights of the citizens as against each other, but also upon rights in controversy between them and the government; and the docket of this court is crowded with controversies of the latter class.

. . . . .

While by the Constitution the judicial department is recognized as one of the three great branches among which all the powers and functions of the government are distributed, it is inherently the weakest of them all.

Dependent as its courts are for the enforcement of their judgments upon officers appointed by the executive and removable at his pleasure, with no patronage and no control of the purse or the sword, their power and influence rest solely upon the public sense of the necessity for the existence of a tribunal to which all may appeal for the assertion and protection of rights guaranteed by the Constitution and by the laws of the land, and on the confidence reposed in the soundness of their decisions and the purity of their motives.

From such a tribunal no well-founded fear can be entertained of injustice to the

---

**189.** Dissenting Opinion of Scalia, J., at 1566.

**190.** *Marbury v. Madison,* 5 U.S. (5 Dall.) 137, 2 L.Ed. 60 (1803).

government, or of a purpose to obstruct or diminish its just authority.[191]

These principles are equally valid today, as Justice Frankfurter recognized in *Youngstown Sheet & Tube Co. v. Sawyer*:

[A] court of equity ought not to issue an injunction, even though a plaintiff otherwise makes out a case for it, if the plaintiff's right to an injunction is overborne by a commanding public interest against it. One need not resort to a large epigrammatic generalization that the evils of industrial dislocation are to be preferred to allowing illegality to go unchecked. *To deny inquiry into the President's power in a case like this, because of the damage to the public interest to be feared from upsetting its exercise by him, would in effect always preclude inquiry into challenged power, which presumably only avowed great public interest brings into action. And so, with the utmost unwillingness, with every desire to avoid judicial inquiry into the powers and duties of the other two branches of the government, I cannot escape consideration of the legality of [the challenged] Executive Order ....*[192]

The plaintiffs are entitled to an opportunity to discover and prove the factual allegations supporting their claims. Over a year has passed since the district court dismissed the complaint and, judging by the parties' submissions to this court, new factual developments continue to occur. Discovery is essential in order to sharpen the legal issues and properly to evaluate the merits of the plaintiffs' claims. Liberal amendments to the pleadings may also be necessary in order to bring the complaint into conformity with the plaintiffs' view of

the facts at the present time. The district court should proceed accordingly.

In light of the district court's treatment of the case on a motion to dismiss, we hold that the case is justiciable; that the United States plaintiffs have standing to bring their constitutional claims; and that the United States plaintiffs have stated a claim for relief. The judgment of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

TAMM, Circuit Judge, dissenting:

Plaintiffs in this case seek to enjoin, or have declared unlawful, the construction and operation of a military training center on their land in Honduras. Because plaintiffs' requested relief requires direct judicial interference with a foreign policy decision by the executive branch, I believe the controversy is nonjusticiable. Accordingly, I would affirm the district judge's dismissal of the action.

## I. FACTS

Plaintiff Ramirez is the owner and operator, through six named corporate plaintiffs, of a large agricultural industrial complex in northern Honduras.[1] The complex consists of a 14,000-acre cattle ranch, a meat and shrimp packing operation, and a fishing fleet. In early 1983, in order to further United States policy in Central America, the Departments of Defense and State decided to construct a Regional Military Training Center (RMTC or Center) in Honduras for training Salvadoran soldiers. Ramirez Declaration, ¶ 15, Appendix (A.) at 19, 26.[2] In May 1983, Ramirez learned that

---

**191.** 106 U.S. at 218–23, 1 S.Ct. at 258–263.

**192.** 343 U.S. at 596, 72 S.Ct. at 890 (Frankfurter, J., concurring) (emphasis added).

**1.** The district court dismissed this case pursuant to FED.R.CIV.P. 12(b)(6). In granting a rule 12(b)(6) dismissal, a court must accept as true all allegations in the complaint and is not permitted to rely on pleadings outside the complaint. I therefore recite only the facts present-

ed in the complaint and the accompanying declarations.

**2.** Although the majority notes newspaper articles suggesting that the Honduran government resisted the effort to locate the facility in Honduras, maj. op. at 1507, other articles suggest that Honduras wanted a training center, Attachment # 2, *N.Y. Times,* Mar. 20, 1983, at A–19, col. —, A. at 16, or at least that the center would not have been built without Honduras's agree-

the training center was to be located on his land. Ramirez Declaration, ¶ 7, A. at 23. In late May, Ramirez met with various United States and Honduran officials to discuss the proposed Center and the question of the ownership of the land. Ramirez Declaration ¶¶ 12–13, A. at 24–26. After one meeting at the Honduran Military Headquarters, Col. Bueso Rosa, the Honduran Army Chief-of-Staff, informed Ramirez that the plaintiffs' land was urgently needed for the military base. *Id.*

In early June, after inspecting the proposed site, Ramirez agreed to allow construction of the Center provided it was restricted to a designated 1500–2000 acre area. Complaint ¶ 11, A. at 8. Subsequently, however, Ramirez was informed that additional land outside the 1500–2000 acre designated area would be needed to complete the Center. Ramirez Declaration ¶ 23, A. at 30; Complaint ¶ 14, A. at 10. Ramirez alleges that the Center has already expanded beyond the designated area and that its operation has jeopardized his business enterprise. Neither Honduras nor the United States has lawfully acquired the property, and plaintiffs have received no compensation for the land.[3] After unsuccessful attempts to resolve the dispute with various United States officials, plaintiffs filed this action against the Secretaries of Defense and State, and the Chief of Engineers for the Army Corps of Engineers.

Plaintiffs allege that the seizure of their land was unconstitutional. Specifically, the complaint asserts that there exists no statutory or constitutional authorization to seize the land and that construction of the RMTC deprived plaintiffs of the use of their land without due process. Plaintiffs further charge that the seizure violated the Law of Nations.

Plaintiffs seek no monetary relief for defendants' alleged unconstitutional actions.[4] Rather, plaintiffs request a declaration that those actions were unconstitutional. More important, plaintiffs seek a court order enjoining the Secretaries of Defense and State, as well as the Chief of Engineers for the Army Corps of Engineers, from constructing and operating the Center on plaintiffs' land.

United States District Court Judge Charles R. Richey dismissed the complaint on the ground that the allegations presented a nonjusticiable political question. *de Arellano v. Weinberger,* 568 F.Supp. 1236 (D.D.C.1983). The court's conclusion was based essentially on three factors: 1) judicial interference could impede our foreign policy because the issues involved are inextricably connected to our government's relations with Honduras; 2) there are no judicially discoverable facts or standards that would enable a court to resolve the issues; and 3) the conduct of foreign affairs is constitutionally committed to the political branches of the government. 568 F.Supp. at 1238–40. Plaintiffs brought this appeal.

Because any judicial action in this case would potentially hinder the executive's exercise of a foreign policy judgment, I agree that the controversy is nonjusticiable. I therefore respectfully dissent from the majority's decision.

## II. DISCUSSION

The critical importance of preserving the proper allocation of power among the three

---

ment. Attachment # 1, *Boston Globe,* Mar. 27, 1983, at 1, col. —, A. at 15.

**3.** The Honduran government has passed two resolutions pertaining to the issue of expropriation. En Banc Brief for Appellees, Addendums A, C. The legal implications of these resolutions have been addressed extensively in the majority's opinion. I agree with the majority's conclusion that we cannot ascribe any legal effect to these resolutions absent further factual development. Since I believe the controversy as

presented in this case is not appropriate for judicial resolution, I see no need to discuss the effect of these Honduran resolutions or to seek further fact-finding to facilitate their interpretation.

**4.** Indeed, plaintiffs could not seek such a remedy in the district court. Exclusive jurisdiction for monetary relief against the United States in excess of $10,000 lies in the Court of Claims under the Tucker Act. 28 U.S.C. §§ 1346, 1491(a) (1982).

branches of government guides my analysis in this case. The conduct of foreign affairs and the proper disposition of military power are, without question, subjects committed to the exclusive authority of the political branches of government. U.S. Const. art. I, § 8; *id.* art. 2, § 2. *Oetjen v. Central Leather Co.,* 246 U.S. 297, 302, 38 S.Ct. 309, 311, 62 L.Ed. 726 (1918) ("[t]he conduct of the foreign relations of our Government is committed by the Constitution to the Executive and Legislative—'the political'—Departments .... "). *See Johnson v. Eisentrager,* 339 U.S. 763, 788–89, 70 S.Ct. 936, 948–949, 94 L.Ed. 1255 (1950); *Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.,* 333 U.S. 103, 113–14, 68 S.Ct. 431, 437–438, 92 L.Ed. 568 (1948); *Luftig v. McNamara,* 373 F.2d 664, 665–66 (D.C.Cir.) (per curiam), *cert. denied,* 387 U.S. 945, 87 S.Ct. 2078, 18 L.Ed.2d 1332 (1967); *Atlee v. Laird,* 347 F.Supp. 689, 704–05 (E.D.Pa.1972) (three-judge court), *aff'd sub nom. mem. Atlee v. Richardson,* 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973). In my view, granting plaintiffs' requested relief will necessarily result in an intolerable judicial intrusion into the conduct of foreign affairs. I therefore conclude that adjudicating this case would be inconsistent with our system of separation of powers. Accordingly, I believe that the controversy presented here is nonjusticiable.

## A

The Supreme Court has acknowledged that cases involving foreign affairs are often nonjusticiable. Such cases frequently turn on standards that defy judicial application, involve the exercise of a discretion demonstrably committed to the executive or legislature, or demand a single-voiced statement of the Government's views. *Baker v. Carr,* 369 U.S. 186, 211, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962). The nonjusticiability of cases involving foreign affairs, however, is "primarily a function of the separation of powers." *Baker,* 369 U.S. at 210, 82 S.Ct. at 706. This fundamental principle, which constitutes the very basis of our system of government, requires courts to refrain from infringing on the powers reserved to the legislative and executive branches of government. Indeed, judicial power exists "only when adjudication is 'consistent with a system of separated powers ....' " *Allen v. Wright,* — U.S. —, —, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (quoting *Flast v. Cohen,* 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968)).

Impermissible judicial encroachment upon the power of the political branches can occur not only from the act of resolving a question whose nature is political, but also from the consequences that flow from judicial action. Indeed, in *Atlee v. Laird,* 347 F.Supp. 689 (E.D.Pa.1972), *aff'd sub nom. mem. Atlee v. Richardson,* 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973), a three-judge district court concluded that the *consequence* of resolving a controversy involving foreign affairs is of paramount concern in determining justiciability. 347 F.Supp. at 702. A court's initial task, therefore, when faced with a case involving foreign affairs, is to scrutinize the claims not only in terms of their historical management by the political branches and their susceptibility to judicial handling, but also in terms *"of the possible consequences of judicial action."* *Baker,* 369 U.S. at 211–12, 82 S.Ct. at 706–707 (emphasis added).[5]

---

**5.** In *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Court was primarily concerned with outlining the characteristics of issues nonjusticiable under the political question doctrine. The political question doctrine, in the strict sense, may pertain only to the nature of the *question* presented, and not to the effect of granting the relief requested. The same separation of powers concerns that give rise to the political question doctrine, however, are implicated where the effect of resolving a dispute infringes on the executive's conduct of foreign policy. *See Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 804 (D.C.Cir.1984) (Bork, J., concurring), *petition for cert. filed,* 52 U.S.L.W. 3922 (U.S. June 14, 1984) (No. 83–2052). Just as a court must refrain from resolving a question whose nature is political, so must it refrain from adjudicating a claim where the relief sought would intrude on the independence of the political branches.

An important element in assessing the consequences of judicial action is, of course, the effect of granting the relief sought. In *Gilligan v. Morgan,* 413 U.S. 1, 5–10, 93 S.Ct. 2440, 2443–2445, 37 L.Ed.2d 407 (1973), for example, the Supreme Court held the controversy at bar nonjusticiable at least in part because the injunctive relief requested intruded into the power committed to the political branches. Similarly, in this case, the intrusive nature of the relief requested leads me to conclude this controversy is nonjusticiable.

### B

I recognize that the complaint here is not styled as a facial challenge to the executive's foreign policy decision to locate a military training center in Honduras. The stated claim alleges only that the United States defendants may not lawfully run a military operation on plaintiffs' land when that land has not been expropriated. As the majority characterizes it, therefore, the case is a simple dispute over land—an issue that is traditionally subject to judicial review. To focus only on the narrow issue immediately presented for review, however, overlooks the serious intrusion on the conduct of foreign policy that will result from granting the requested relief. A complaint need not purport to challenge a fundamental executive branch policy to implicate separation of powers concerns.[6]

Injunctive relief might take two forms in this case. First, the scope of the Regional Military Training Center could be restricted to the designated 1500–2000 acres to which Ramirez originally agreed. Second, the construction and operation of the center on plaintiffs' land could be enjoined.[7] Both of these alternatives would essentially dictate to the executive branch the proper situs or scope of a Central American military training facility and severely restrict the executive's authority to determine the use and disposition of military operations.

A judicial ruling may also hinder the executive's conduct of foreign affairs by detrimentally affecting our relations with Honduras. The plaintiffs' own declarations indicate at least that Honduran officials knew about, and acquiesced in, the construction and operation of the training center. If Hondurans are involved in the challenged activity in any way, even if only to the extent that they have knowledge of United States activities, any injunctive or declaratory relief implicitly questions Honduran sovereignty. The potential for disruption of our relations with Honduras is not altered by the fact that the action is brought only against the United States officials. The court could end up embroiled in sensitive diplomatic matters.

This is not to say, of course, that all claims touching on foreign affairs in which injunctive relief is sought are nonjusticiable. In *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), the Supreme Court affirmed a district court order enjoining the seizure of privately owned domestic steel mills. The President ordered the seizure to avoid a labor strike that he believed would jeopardize national defense during the Korean War. The Court concluded that the seizure of private property to avoid a domestic labor dispute was not authorized as an exercise of the President's military power. 343 U.S. at 587–89, 72 S.Ct. at 866, 867.

---

**6.** In *Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.,* 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948), for example, the Court declined to review an administrative order, approved by the President, regarding assignment of foreign air routes. Although the complaint did not directly question a political judgment, the Court observed that assignment of foreign air routes raised issues concerning the conduct of foreign relations and national defense. Because the complaint indirectly, yet no less intrusively, challenged an executive judgment on foreign affairs, the Court held the order nonreviewable. 333 U.S. at 111–14, 68 S.Ct. at 436–437.

**7.** Plaintiffs assert that they do not seek to enjoin generally the operation of a United States military facility but only the military activities on their land so long as that land has not been lawfully acquired. In either case, however, an injunction would have the same effect: halting the operation of a United States military facility in Central America, at least for a time.

The circumstances in *Youngstown* differ significantly from those in the instant case. Although the seizure in *Youngstown* may have been related to military operations abroad, its primary effect was on domestic, and not foreign, affairs. As Justice Jackson recognized, there is an important distinction between the President's "largely uncontrolled" power to conduct foreign affairs and his more limited power to master domestic affairs, even when those domestic affairs may affect a foreign venture. 343 U.S. at 635–36 n. 2, 642, 644–45, 72 S.Ct. at 870–871 n. 2, 873, 874–875 (Jackson, J., concurring). The Court has long emphasized that the executive's discretion to manage foreign affairs is considerably greater than his power to control domestic matters.

> Not only ... is the federal power over external affairs in origin and essential character different from that over internal affairs, but participation in the exercise of the power is significantly limited. In this vast external realm, with its important, complicated, delicate, and manifold problems, the President alone has the power to speak or listen as a representative of the nation.

*United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319, 57 S.Ct. 216, 220, 81 L.Ed. 255 (1936).

The Court in *Youngstown* was therefore concerned with whether injunctive relief may appropriately issue to restrain the executive's unlawful action with respect to domestic affairs where the domestic problem might have a secondary effect on foreign affairs. *Youngstown* does not imply that judicial action is appropriate where resolution of a controversy will directly impinge on the executive's conduct of foreign affairs.

In this case, the injunctive relief sought would directly limit the executive's discretion in conducting military affairs and diplomatic relations in Honduras. In contrast to the domestic setting of the seizure in *Youngstown*, the dispute here arises out of the operation of a military base, located within the borders of a foreign nation, created to train yet another foreign nation's soldiers. Judicial action here would be tantamount to oversight of the executive's military and diplomatic policy decisions in a foreign country. Separation of powers principles bar such an intrusion by the judiciary and render this controversy nonjusticiable.[8]

## C

This controversy is also nonjusticiable with respect to plaintiffs' request for a declaratory judgment. Declaratory relief could lead to usurpation of Court of Claims jurisdiction and implicates similar concerns to those raised by injunctive relief.

A declaratory judgment can be enforced through a grant of compensatory or injunctive relief. 28 U.S.C. § 2202 (1982). Because separation of powers principles preclude injunctive relief in this case, plaintiffs could seek only money damages for their alleged injury. Such an award would compensate plaintiffs for what is in essence a taking violation. Congress, however, has vested the Court of Claims with exclusive jurisdiction for such claims. To allow the district court to determine the government's liability with respect to a taking

---

**8.** The majority states that there is a "long line" of cases permitting judicial relief for unlawful action by United States officials in the context of military and foreign affairs. Maj. op. at 1530. In determining that the instant case is nonjusticiable, I do not conclude that courts can never adjudicate claims involving the conduct of foreign affairs. *See supra* at 1548–1549. Where, however, the consequence of judicial action intrudes directly upon the executive's ability to exercise discretion in foreign policy matters, the court must stay its hand. Significantly, the cases cited by the majority are either "just compensation" cases, in which the consequences of judicial action in no way impeded the exercise of executive discretion with respect to foreign affairs, *e.g.*, *United States v. Caltex* (Philippines), *Inc.*, 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157 (1952); *Mitchell v. Harmony*, 54 U.S. (13 How.) 115, 14 L.Ed. 75 (1852); or arose in the domestic context, *e.g.*, *Gilligan v. Morgan*, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *Duncan v. Kahanamoku*, 327 U.S. 304, 66 S.Ct. 606, 90 L.Ed. 688 (1946); *Sterling v. Constantin*, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375 (1932).

claim, even in the context of a declaratory judgment, would encroach upon the exclusive jurisdiction of the Court of Claims. It would also have the concomitant effect of judicially expanding the limited jurisdiction of the district courts.[9] *See Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 101 n. 4, 98 S.Ct. 2620, 2645 n. 4, 57 L.Ed.2d 595 (Rehnquist, J., concurring).

Moreover, similar concerns to those that counsel against injunctive relief apply to declaratory relief. Courts have often recognized the importance of our government's speaking with one voice on matters pertaining to foreign affairs. *Baker,* 369 U.S. at 211, 82 S.Ct. at 706. A judgment declaring the executive's construction and operation of the Honduran military center unlawful while leaving open the possibility of further judicial enforcement could inject uncertainty into our foreign affairs in Honduras. The consequence of such an abstract judicial statement on the propriety of our foreign military operations is, of course, impossible to predict. Embarrass-

ment, confusion, and decreased confidence in the United States' capacity to speak with one voice in foreign relations, however, are sufficiently likely to weigh heavily against granting the discretionary declaratory relief sought here.[10]

### III. CONCLUSION

Because the relief requested in this case would require the court to intrude directly on the executive's military and diplomatic affairs in a foreign country, I conclude this controversy is nonjusticiable. A remand for further discovery will lead the court only into the province of the executive. I would therefore affirm the district court's judgment dismissing plaintiffs' case on the pleadings.

SCALIA, Circuit Judge, with whom Circuit Judges BORK and STARR join, dissenting:

In Old Testament days, when judges ruled the people of Israel and led them into battle, a court professing the belief that it

---

9. This point is not undermined by this court's holding in *Megapulse, Inc. v. Lewis,* 672 F.2d 959 (D.C.Cir.1982), a case relied upon by the majority. *Megapulse* properly recognized the importance of "preserving the integrity of the Tucker Act …," *id.* at 967, and noted that a district court has no power to adjudicate an action that in essence falls within the Court of Claims' exclusive jurisdiction.

10. The original panel opinion in this case expressed similar separation of powers concerns with respect to the requested relief. *Ramirez de Arellano v. Weinberger,* 724 F.2d 143 (D.C.Cir. 1983), *vacated,* F.2d (1984). The panel's analysis, however, rested on the traditional discretion of courts to grant or deny injunctive relief depending on the relative equities of the parties' positions. The panel concluded that injunctive relief could not issue because intrusion into foreign affairs coupled with the possibility of impugning foreign law and the problems of monitoring compliance "establish a formidable obstacle which the equities of plaintiffs' case cannot overcome." 724 F.2d at 150.

I cannot agree with the panel's reasoning. The panel's reliance on traditional principles of equity implies that were the plaintiffs' case more compelling, equitable relief might be appropriate. The panel's decision to affirm the dismissal, therefore, was not compelled by sepa-

ration of powers principles but resulted from the court's exercise of its traditional equitable discretion. When there is a danger of a federal court exceeding its limited authority, constitutional principles of separation of powers, not a subjective assessment of the relative equities, should control a court's decision whether to resolve a controversy. *See Vander Jagt v. O'Neill,* 699 F.2d 1166, 1184–85 (D.C.Cir.) (Bork, J., concurring), *cert. denied,* —— U.S. ——, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983).

Although I agree with Judge Scalia that constitutional issues ought to be avoided wherever possible, I believe Judge Scalia's dissent effectively reaches and employs the separation of powers doctrine under the guise of balancing equitable concerns. Scalia, J., dis. op. at 1562–1563 & n. 13. I have chosen the tack presented in this dissent because I believe a forthright application of separation of powers principles precludes a court even from exercising such equitable discretion.

Finally, balancing the equities in this case could require the court to evaluate the necessity and urgency of operating the Center in its current location. Such an evaluation is properly and practically better left to the political branches. I would thus dismiss plaintiffs' claim, not because of its adequate equitable support, but because it would carry the judiciary into matters reserved to the coordinate branches.

could order a halt to a military operation in foreign lands might not have been a startling phenomenon. But in modern times, and in a country where such governmental functions have been committed to elected delegates of the people, such an assertion of jurisdiction is extraordinary.[1] The court's decision today reflects a willingness to extend judicial power into areas where we do not know, and have no way of finding out, what serious harm we may be doing. The case before us could not conceivably warrant such unprecedented action.

## I. THE TUCKER ACT DEPRIVES THIS COURT OF JURISDICTION OVER THE PRESENT SUIT

The majority's decision seems to me destructive of important values of our governmental system primarily because it minimizes fundamental separation-of-powers concerns in making the judgment whether discretionary judicial relief can be provided. The opportunity for that error in judgment would never have been presented, however, if the court did not first ignore a limitation upon our jurisdiction.

Under the Tucker Act, 28 U.S.C. § 1491 (1982), a plaintiff can sue the United States for monetary compensation in the Claims Court for a taking by a government official. Such relief is available only when the government official's actions, whether or not tortious, were authorized. If they are authorized, and the taking is thereby an act of the United States for purposes of the Tucker Act requirement of monetary compensation, it is also an act of the United States for purposes of sovereign immunity—which bars the grant of specific relief against the official of the sort elsewhere provided to achieve judicial review of administrative action.[2] These principles are set forth with the utmost clarity in *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 696–705, 69 S.Ct. 1457, 1464–1469, 93 L.Ed. 1628 (1949). The holding of that case has recently been followed, and the case cited with approval, in *Ruckelshaus v. Monsanto Co.*, —— U.S. ——, 104 S.Ct. 2862, 2880, 81 L.Ed.2d 815 (1984).[3]

The majority "find[s] it difficult to believe that a United States citizen would be banished to a damages remedy in the Claims Court if he were the victim of a similar ongoing violation of his constitutional rights within the United States." Maj. op. at 1528. That difficulty can only be attributed to lack of appreciation that there *is no violation* of constitutional rights so long as just compensation is available, *Larson* and *Monsanto, supra;* and to disregard of Supreme Court precedent as clear as *Malone v. Bowdoin*, 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962), in which

---

**1.** Even the ancient Israelites eventually realized the shortcomings of judicial commanders-in-chief:

> Now appoint for us a king to govern us like all the nations.... [W]e will have a king over us; that we also may be like all the nations, and that our king may govern us, and go out before us, and fight our battles.

I *Samuel* 8:5, 19–20.

**2.** Of course the theory of such judicial review was that the defendant, since allegedly acting *ultra vires*, was not acting as an officer of the United States, so that enjoining him would not be enjoining the sovereign. *See, e.g., United States v. Lee*, 106 U.S. 196, 219–20, 1 S.Ct. 240, 259–260, 27 L.Ed. 171 (1882). In this framework, it is clear how the availability of a Tucker Act remedy—premised upon the agent's acting *intra vires*—would preclude other relief.

The fiction of *ultra vires* was effectively eliminated by a 1976 amendment to the Administrative Procedure Act, which overtly waived sovereign immunity in suits seeking relief other than money damages against federal officers. Pub.L. No. 94–574, § 1, 90 Stat. 2721 (codified at 5 U.S.C. § 702 (1982)). That amendment, however, also provided: "Nothing herein ... confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." As will be discussed more fully below, the legislative history unambiguously confirms that Congress deemed the Tucker Act to be such a statute. *See generally Estate of Watson v. Blumenthal*, 586 F.2d 925, 932–34 (2d Cir.1978).

**3.** *Monsanto*, unlike *Larson*, involved an assertion that the statute under which the Executive acted was unconstitutional rather than an assertion that the Executive was misapplying the law. I think it a full revalidation of *Larson*, however, since there is no basis whatever, either in the Tucker Act or the APA, for drawing a distinction with regard to the waiver of sovereign immunity along such lines.

the plaintiffs' attempt to obtain specific relief against the allegedly wrongful occupation of their land by a Park Service officer was rejected on grounds of sovereign immunity.

The majority's response to this is confusing. Some portions of the opinion appear simply to reject the principles of *Larson* and to revert to those of earlier cases which *Larson* squarely rejected. Thus, the majority expresses dismay at "the dissent's blanket assertion that there is no violation of constitutional rights so long as just compensation is available,' " Maj. op. at 1524 n. 95, *quoting* the preceding paragraph of this opinion. That assertion, however, is not ours but *Larson*'s: "There is no claim that [the action challenged] constituted an unconstitutional taking.... There could not be since the respondent admittedly has a remedy ... in the Court of Claims." 337 U.S. at 703 & n. 27, 69 S.Ct. at 1468 & n. 27. The majority's ensuing protestation that it "cannot be the law" that "the government can deprive a citizen of any possession, and the citizen cannot challenge the government's right to do it, but only question how much the citizen is to receive for losing his property," Maj. op. at 1524 n. 95, is strikingly similar to the view expressed by Justice Douglas, dissenting from the Court's reaffirmation of the *Larson* principles in *Malone v. Bowdoin, supra,* 369 U.S. at 650–51, 82 S.Ct. at 984–985.

Likewise indicative of a repudiation of *Larson* is the majority's repeated reliance upon principles expressed in *United States v. Lee,* 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171 (1882), and *Land v. Dollar,* 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947). As described by the Supreme Court in *Malone, supra,* those two cases represented one line of "seemingly conflicting precedents" which *Larson* "thoroughly reviewed" and between which it made "an informed and carefully considered choice." 369 U.S. at 646 & n. 6, 82 S.Ct. at 983 & n. 6. The choice was: "While not expressly overruling *United States v. Lee* ... the Court in *Larson* limited that decision." 369 U.S. at 647, 82 S.Ct. at 983. By persisting in reliance upon the approach set forth in *Lee* and *Land,* the majority simply disregards expressly superseding Supreme Court authority (*Larson* ) which has been adhered to (*Malone, supra,* and *Dugan v. Rank,* 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963)) in the face of precisely the arguments the majority makes here.

Elsewhere in its opinion, however, the majority takes a different tack. It appears to acknowledge the *Larson* principle that, if the taking is within the officer's powers, the availability of just compensation totally eliminates the possibility of injunction; but seeks to avoid application of that principle by asserting that monetary compensation will not *always* constitute the "just compensation" that the Fifth Amendment requires. "[T]he gross inadequacy of money damages could justify injunctive relief when money alone would not constitute just compensation." Maj. op. at 1527. "If the gap between [the injury claimed by Ramirez] and the monetary compensation available through a Tucker Act remedy is so great that an unconscionable injustice would be worked, effectively denying just compensation, then injunctive relief can be appropriate." *Id.* at 1528. That "money alone [may] not constitute just compensation" for purposes of the Fifth Amendment is a principle of breathtaking novelty. Since it has nothing to do with the authorization for the taking, it would presumably apply even when Congress itself enacted a statute expropriating a particular property or business. When monetary compensation would not constitute "just compensation," the taking could not be effected. There is of course no authority whatever for such a limitation upon the eminent domain power. The majority's quotation from *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 585, 72 S.Ct. 863, 865, 96 L.Ed. 1153 (1952), Maj. op. at 1527, is utterly inapposite, since it dealt *not* with the alleged unconstitutionality of a taking because monetary relief was inadequate, but rather with the inadequacy of a legal remedy. If the majority's new interpretation of the taking clause prevails, one must

hope that the security of the nation never depends upon the government's ability to seize property, such as Mr. Ramirez's ranch is in the majority's view, whose loss "money alone" can never assuage.

Finally, the majority attacks our straightforward application of the *Larson* principles by referring to *Dronenburg v. Zech*, 741 F.2d 1388 (D.C.Cir.1984). The principal relevance of that case to the present issue is that it was decided by a panel that included two of the judges who join in this dissent. The majority contends, in effect, that it is inconsistent to follow *Larson* here while holding in *Dronenburg* (pursuant to clearly binding prior case authority in this circuit) that an injunction against allegedly wrongful discharge from the military is not barred by sovereign immunity. The *Dronenburg* decision as to jurisdiction rested upon the proposition that the waiver of sovereign immunity adopted in the 1976 amendment to the APA, 5 U.S.C. § 702, see note 2, *supra*, was not affected by the availability of a Tucker Act remedy for back pay. The majority concludes from this that *Dronenburg* held that the Tucker Act "was ... not ... such a statute" as comes within § 702's exception withholding the waiver of sovereign immunity where "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," 5 U.S.C. § 702. Maj. op. at 1525. If *Dronenburg* had held this, it would have been plainly wrong. Both the Senate and House Reports on the amendment to § 702 (there was no Conference Report) explicitly refer to the Tucker Act as one of the statutes included within its exception:

> Clause (2) of the third new sentence added to section 702 contains a second proviso concerned with situations in which Congress has consented to suit and the remedy provided is intended to be the exclusive remedy. For example, in the Court of Claims Act, Congress created a damage remedy for contract claims with

jurisdiction limited to the Court of Claims except in suits for less than $10,000.[4] The measure is intended to foreclose specific performance of government contracts. In the terms of the proviso, a statute granting consent to suit, *i.e., the Tucker Act*, "impliedly forbids" relief other than the remedy provided by the Act. Thus, the partial abolition of sovereign immunity brought about by this bill *does not change existing limitations on specific relief,* if any, derived from statutes dealing with such matters as government contracts, as well as patent infringement, tort claims, and tax claims.

H.R.Rep. No. 1656, 94th Cong., 2d Sess. 12–13 (1976), *reprinted in* 1976 U.S.CODE CONG. & AD.NEWS 6121, 6133; S.Rep. No. 996, 94th Cong., 2d Sess. 11–12 (1976) (emphasis added, footnotes omitted). In fact, however, *Dronenburg* did not contradict this legislative history. All it held was that the Tucker Act does not "impliedly forbid" specific relief *with respect to tenure of federal employment.* That proposition was well established when the sovereign immunity amendment to § 702 was adopted; it had been the law at least since *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957). *See Sampson v. Murray,* 415 U.S. 61, 71, 94 S.Ct. 937, 943, 39 L.Ed.2d 166 (1974). But it was also well established when the sovereign immunity amendment was adopted that the Tucker Act *does* forbid suit in "taking" cases, which are fundamentally different from employment tenure cases, "tied to the language, purpose, and self-executing aspects" of the Fifth Amendment, *United States v. Testan,* 424 U.S. 392, 401, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976). When, therefore, the legislative history of the sovereign immunity amendment to § 702 specifically adopted the "existing limitations on specific relief" of the Tucker Act as one of the exceptions to waiver embraced by the proviso, it had the *Larson* line of cases

---

**4.** The reference to the Court of Claims Act is puzzling. Although a footnote to the text indeed refers to the Court of Claims Act of 1855, ch. 122, 10 Stat. 612, that legislation did not do what the sentence says, but merely established a Court of Claims that would recommend private bills to Congress. The reference was probably intended to be to the Tucker Act.

in mind. In acknowledging, in effect, that § 702 adopts *Service v. Dulles, Dronenburg* in no way holds that it does not equally adopt *Larson.*[5]

Since, then, the availability of a Tucker Act remedy does prevent us from giving the relief requested here, and since the point is jurisdictional, our first task must be to determine whether monetary relief for the unlawful acts of which the plaintiffs complain is available in the Claims Court. For reasons which I described at length in my vacated panel opinion and will not trouble to repeat here, I think it is. *See Ramirez de Arellano v. Weinberger,* 724 F.2d 143, 150–53 (D.C.Cir.1983). As suggested earlier, the question whether a government officer was acting sufficiently within his authorized powers to permit a Tucker Act remedy is precisely the same as the question whether he was acting sufficiently within his authorized powers to preclude injunctive relief against him; the two issues must be treated equivalently or some action would fall between the stools. In its approach to this question the majority again disregards *Larson* and reverts to the principles of earlier cases which *Larson* conclusively rejected. Thus, the majority continues to appeal to *Land* as a case "in which the Supreme Court disallowed any reliance on sovereign immunity when 'the right to possession or enjoyment of property under general law is in issue, and the defendants claim as officers or agents of the sovereign.'" Maj. op. at 1526, *quoting Land, supra,* 330 U.S. at 737, 67 S.Ct. at 1012. But *Larson* repudiated that very proposition almost verbatim, denying that "an allegation that the actions of Government officers are wrongful under general law is sufficient to show that they are 'unauthorized.'" 337 U.S. at 701, 69 S.Ct. at 1467.[6] The majority interprets the authorization requirement to mean that there must be "congressional and constitutional grants of power to these defendants to make military acquisitions," to "move troops in on a United States citizen's property," and to "conduct life threatening military exercises." Maj. op. at 1524 & n. 95. *Larson,* however, which involved an alleged refusal by a federal officer to deliver over property that belonged to the plaintiff, simply asked whether there was any limitation on the officer's delegated power to hold property; just as *Malone, supra,*

5. In one respect, it must be acknowledged, *Dronenburg* fell short of perfection: To support its jurisdictional holding it relied, 741 F.2d at 1390–1391, in part upon *Schnapper v. Foley,* 667 F.2d 102, 107 (D.C.Cir.1981), which contains language to the effect that in none of its applications is the Tucker Act a statute that comes within the § 702 exception. In fact, *Schnapper* was even more specific, saying that

> [t]he clarity and force of the legislative history [of the sovereign immunity amendment to § 702] leaves this court with no alternative but to conclude that all questions of the amenability of a federal officer to a suit for injunctive relief must be decided with reference to section 702, not *Larson.*

667 F.2d at 108. The *Schnapper* court appears simply to have overlooked both Reports' explicit reference to the Tucker Act. That is understandable, since the case did not involve the Tucker Act issue, and the entire discussion was dictum. The facts not only did not present any "taking" to which *Larson* could apply; they did not even produce an assertion, or leave room for the possibility of an assertion, that *any* Tucker Act claim would lie. Of course the dictum of *Schnapper* has been explicitly repudiated by the Supreme Court:

> Equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking.

*Ruckelshaus v. Monsanto Co., supra,* 104 S.Ct. at 2880 (footnote omitted), *citing Larson.*

6. In fact, *Larson* expressly overruled *Goltra v. Weeks,* 271 U.S. 536, 46 S.Ct. 613, 70 L.Ed. 1074 (1926), which was one of the cases *Land* cited to support the statement relied upon by the majority, *see Land, supra,* 330 U.S. at 731, 67 S.Ct. at 1009. *Larson, supra,* 337 U.S. at 700–01, 69 S.Ct. at 1466–1467. In place of *Goltra* (and the dicta in *Lee* and *Land* which are from the same line of authority) the Court in *Larson* reaffirmed the contrary principle announced by Justice Holmes in an earlier case which is incompatible with the theory of the majority here: "[T]he question of title was immaterial to the court's jurisdiction. Wrongful the Secretary's conduct might be, but a suit to relieve the wrong by obtaining the vessel would interfere with the sovereign behind its back and hence must fail." *Larson, supra,* 337 U.S. at 700–01, 69 S.Ct. at 1466–1467 (footnote omitted), describing *Goldberg v. Daniels,* 231 U.S. 218, 34 S.Ct. 84, 58 L.Ed. 191 (1913).

simply asked whether there was any limitation upon the Park Service officer's authority to occupy real estate. The mere fact that the holding or the occupation was "a tort," *Larson, supra,* 337 U.S. at 693, 69 S.Ct. at 1463, or " 'illegal' as a matter of general law," *Malone, supra,* 369 U.S. at 647, 82 S.Ct. at 983, and that there was no specific authorization for such "tortious" or "unlawful" action, did not establish the lack of authority necessary to permit injunction. The equivalent here is not whether these defendants are authorized to "make military acquisitions," but whether they are authorized to conduct military training exercises abroad,[7] with no specific

limitation upon trespass or unlawful taking in the process.[8]

Ultimately, however, the majority's response on the Tucker Act authorization issue is not contradiction but elegant agnosticism. That issue "is impossible for this court at this stage of the case to determine," we are told, because the availability of a claim for relief under the Tucker Act "depends upon facts not yet ascertained and the nature of the congressional and constitutional grants of power to these defendants." Maj. op. at 1524. But as to the latter, I have understood it to be precisely the function of this court to deter-

7. The majority opinion asserts that I "never consider[ ] whether there exists *any* statutory authorization for the kind of taking alleged to have occurred here." Maj. op. at 1524 n. 95. I take that criticism to mean that I fail to provide the sort of statutory authorization that will satisfy the majority's distortion of the *Larson* "authorization" requirement discussed above. I shall not do that; but just in case the majority intends, in addition, to contest the obvious point that the Secretary of State, the Secretary of Defense and the Army Corps of Engineers are authorized to conduct military training exercises for troops of friendly foreign nations abroad, I refer to the following provisions:

22 U.S.C. § 2347 (1982) provides:

The President is authorized to furnish, on such terms and conditions consistent with this chapter as the President may determine ..., military education and training to military and related civilian personnel of foreign countries. Such training and education may be provided through—

(1) attendance at military educational and training facilities in the United States (other than Service academies) and abroad....

22 U.S.C.A. § 2311(a) (Supp.1984) provides:

The President is authorized to furnish military assistance, on such terms and conditions as he may determine, to any friendly country or international organization, the assisting of which the President finds will strengthen the security of the United States and promote world peace and which is otherwise eligible to receive such assistance, by—

....

(2) assigning or detailing members of the Armed Forces of the United States and other personnel of the Department of Defense to perform duties of a noncombatant nature....

22 U.S.C. § 2381(a) (1982) provides:

The President may exercise any functions conferred upon him by this chapter through such agency or officer of the United States Government as he shall direct.

Executive Order No. 10973, 26 Fed.Reg. 10,469 (1961), *reprinted as amended in* 3 C.F.R. 318 (1969), delegates authority under these provisions to, among others, the Secretary of State and the Secretary of Defense.

8. Once action within the general scope of the officer's duties is established, it devolves upon the *plaintiff* who asserts that the officer "[is] exceeding his delegated powers ... in occupying the land in question" to "set out in his complaint the statutory limitation on which he relies." *Malone v. Bowdoin, supra,* 369 U.S. at 648 & n. 9, 82 S.Ct. at 984 & n. 9. That was not done here. And even the majority's attempt to supply the deficiency at the appellate stage is unsuccessful. The majority suggests, Maj. op. at 1524 & n. 96, that the requisite limitation may be found in 10 U.S.C. § 2676 (1982) which provides that "[n]o military department may acquire real property not owned by the United States unless the acquisition is expressly authorized by law." This is one of several instances in which the majority's analysis displays a willingness to produce horrendous effects in other areas in order to reach the desired disposition here. If the majority were correct concerning the interpretation of § 2676, the safety net of Tucker Act relief in so-called inverse condemnation actions against the military would be eliminated. *See generally Regional Rail Reorganization Act Cases,* 419 U.S. 102, 125–36, 95 S.Ct. 335, 349–355, 42 L.Ed.2d 320 (1974). Of course the large number of suits imposing Tucker Act liability upon the military despite this statute show that the majority is wrong. *See, e.g., Branning v. United States,* 654 F.2d 88, 228 Ct.Cl. 240 (1981); *Foster v. United States,* 607 F.2d 943, 221 Ct.Cl. 412 (1979). The provision is obviously meant to control the military's use of unrestricted appropriated funds for the acquisition of property, and has nothing to do with a taking of the sort at issue here.

mine the law, and at least when the powers of cabinet-level officers are at issue no more is required to perform that task than a walk to the statutes and regulations and some hard thought. As to the former—the "facts not yet ascertained"—it escapes me what additional necessary facts there might be. The issue is not, of course, whether the facts can be established, but whether, assuming as true the same facts set forth in the initial portion of the majority opinion, a Tucker Act remedy would lie. There is no apparent reason why those facts are inadequate, other than a desire to keep this case alive. Despite the plaintiffs' pro forma attempt to cast their claim as something other than a taking, *e.g.*, a "seizure," Complaint, Count I, *Ramirez de Arellano v. Weinberger*, Civil No. 83-2002 (D.D.C. filed July 13, 1983), there can be no doubt that the occupation of their land for use as a training camp and destruction of its economic utility is a taking. Assuming, as the plaintiffs allege, that this taking has been effected by the cabinet-level officers named as defendants, in order to establish and operate a training base for Salvadoran soldiers, all that remains to be determined for Tucker Act purposes is whether that action was sufficiently authorized by law to justify attributing it to the United States. This may not be a simple question (though I think it is), but its difficulty has nothing to do with a lack of facts.

It is understandable that the plaintiffs in this suit have never contended that monetary relief under the Tucker Act is unavailable. One can sympathize, as well, with the majority's desire to finesse the point; it would surely be unkind to deprive the plaintiffs of the monetary relief to which they are entitled, in order to keep alive the possibility of the equitable relief to which they are not. Since the issue is jurisdic-

tional, however, and since nothing is lacking to decide it, agnosticism will not do. For the reasons set forth above, including the analysis of the conditions for Tucker Act recovery incorporated by reference from the panel opinion, this case should be dismissed for lack of jurisdiction.[9]

## II. SHAREHOLDER PLAINTIFFS HAVE NOT ALLEGED FACTS SUFFICIENT TO ESTABLISH STANDING

Standing is a second jurisdictional obstacle which the majority resolves incorrectly in major respects, making some highly undesirable law in the process. The standing problem here comes from the fact that title to the land allegedly taken by the defendants is in a Honduran corporation. In my view, that corporation has no rights under the United States Constitution with regard to activity taking place in Honduras and therefore cannot bring this lawsuit itself. *See Pauling v. McElroy*, 278 F.2d 252, 254 n. 3 (D.C.Cir.), *cert. denied*, 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960); L. HENKIN, FOREIGN AFFAIRS AND THE CONSTITUTION 267 (1972); *cf. Cardenas v. Smith*, 733 F.2d 909, 916-17 (D.C.Cir.1984) (dictum). In any event, the majority does not resolve that issue. Maj. op. at 1516. Instead it rests standing to sue on two bases. I do not quarrel with one of them, which applies only to plaintiff Ramirez: The complaint and affidavits assert that Ramirez resides on the ranch and has done so for more than twenty years—which, I believe, demonstrates that he has a lawful possessory interest under Honduran law in at least some of the property seized. He thus has a cognizable property interest in that land, which interest, since he is an American citizen, is protected by the Constitution. *See Fuentes v. Shevin*, 407 U.S. 67, 86-87, 92 S.Ct. 1983, 1997-1998, 32 L.Ed.2d 556

9. The district court has Tucker Act jurisdiction over claims for less than $10,000, 28 U.S.C. § 1346(a)(2) (1982), but that jurisdictional limit is exceeded by the acknowledged value of the taking for which the complaint seeks full relief. I would not adopt the alternate course of trans-

ferring the case to the Claims Court under 28 U.S.C.A. § 1631 (Supp.1984) in light of the fact that the plaintiffs have not specifically sought monetary relief and there is no impending time bar that would prevent their refiling in the

(1972).[10] The other ground, however, which applies to both Ramirez and the Puerto Rican corporations, is fundamentally wrong and requires response.[11] The majority holds that Ramirez, who is sole owner of a Puerto Rican corporation, which in turn is co-owner with Ramirez of a second Puerto Rican corporation, which owns a Honduran corporation, which owns three other Honduran corporations, one of which owns the land at issue, and the other two of which own the cattle ranching and shipping businesses conducted on the land, has standing to sue for injury to his interest in the land and business as a shareholder; and that the Puerto Rican corporations have standing on the same basis. Maj. op. at 1518–1519.

The majority properly states that the inquiry concerning standing "must focus on whether the plaintiffs have a cognizable property interest in the assets in Honduras for the purposes of the constitutional violations claimed here." Maj. op. at 1517. It resolves that inquiry as though it is solely a matter of federal law, pointing to instances in which federal courts have found shareholders and other beneficial owners to have a "cognizable property interest," either for standing or other purposes, and then concluding that the plaintiffs here must have one as well. The proper method of inquiry is quite different: " 'Property interests ... are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.' " *Ruckelshaus v. Monsanto Co., supra,* 104 S.Ct. at 2872, *quoting Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 161, 101 S.Ct. 446, 450, 66 L.Ed.2d 358 (1980), *quoting Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Therefore, at least in the absence of a federal statute to the contrary, the appropriate source for determining whether Ramirez and the Puerto Rican corporations' interests in the land are "cognizable property" rights would surely be the law of Honduras where the land is located, where title is in all probability recorded, where the legal owners of the land and businesses are incorporated, where the businesses are being conducted, and where the alleged trespass occurred. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 147, 235, 304 (1971). If Honduras confers upon twice-removed shareholders like

Claims Court after dismissal. *Cf. Eccles v. United States,* 396 F.Supp. 792, 796–97 (D.N.D.1975).

**10.** The majority asserts, Maj. op. at 1519 n. 75, that it is inconsistent to accept the proposition that under Honduran law Ramirez's possession of land with approval of the title-holder (fairly established by the pleadings) gives him a legally cognizable right to preserve that possession against strangers, while not similarly accepting the proposition that under Honduran law Ramirez's ownership of corporate stock gives him a legally cognizable right in the corporation's land. It seems to me that the former proposition is reasonably embraced within the fact that Honduras recognizes private ownership of land and the power of its owner to permit or forbid its use by others—all of which was shown by the uncontested allegations here. Indeed, even without such support the proposition is an extreme example of what the Supreme Court described in *Cuba R.R. v. Crosby,* 222 U.S. 473, 478, 32 S.Ct. 132, 132, 56 L.Ed.2d 274 (1912), in a statement which has been generally criticized, but which, if ever valid, would be valid here:

It may be that in dealing with rudimentary contracts or torts made or committed abroad, such as promises to pay money for goods or services, or battery of the person or conversion of goods, courts would assume a liability to exist if nothing to the contrary appeared.... Such matters are likely to impose an obligation in all civilized countries.

If I am wrong, however, my error is as nothing compared with the majority's holding on the point of shareholder rights—which, if properly based in law, assumes to be Honduran law what is not uniformly accepted (if accepted at all) among the states of this country, much less "in all civilized countries."

**11.** The mind reels backward before the majority's complaint, Maj. op. at 1516 n. 60, that I should not enter upon this discussion since, having agreed that Ramirez has standing as an individual, I have conceded the only issue that need be resolved. That is true. Just as true as the fact that when the *majority* found that Ramirez had standing as an individual, Maj. op. at 1519–1520, it decided the only issue that need be resolved. Apparently, the majority is to be free to set forth unnecessary alternate holdings, to which dissenters, out of regard for judicial restraint and economy, should not reply.

Ramirez and one of the Puerto Rican corporations, or upon a once-removed shareholder like the other Puerto Rican corporation, property interests whose "dimensions are defined" in such fashion as to include the right to prevent an alleged trespass of this sort, then there is standing to bring this suit. If not, then there is no standing.

I do not know enough Honduran law to be able to answer this question, and I suspect the majority does not either. The plaintiffs made no averments and introduced no affidavits on the point; since it is their burden to allege facts sufficient to show standing, and since foreign law is a question of fact, this ground might suffice for dismissal of the shareholder claims. In fairness, however, they were not challenged on the point, and should be given an opportunity to make additional submissions. But that is quite a bit less than merely pronouncing standing, as the majority has incorrectly done.

Even if it *were* the function of the federal courts to create a system of shareholder rights for Fifth Amendment purposes, the system the majority has produced is either a practical disaster or an analytic monstrosity. Nothing in the majority opinion limits shareholder property rights to sole shareholders. The cases upon which the majority purports to rely for its new creation do not support such a limitation, and one of the Puerto Rican corporations in the present case would not have standing if such a limitation applied. Nor is there any suggestion of, or any rational basis for, limiting the new principle to shareholders in foreign corporations (which Ramirez himself is not). Or to the shareholders of corporations which themselves are unable to bring suit—both because that limitation also would come from nowhere and because the majority has explicitly reserved the issue whether the primary corporations in the present case can sue, Maj. op. at 1516. One can look forward, then, to suits against the United States and its officers by individual shareholders whenever in their view due process requirements with regard to corporate property have been ignored. The inconvenience of this regime for the government is exceeded only by its destructiveness to the corporate form itself. It effectively supplants, in Fifth Amendment cases, the general principle of corporate law that only management, or the shareholders by derivative actions with all the accompanying safeguards, may sue regarding injury to corporate assets. *See Cowin v. Bresler,* 741 F.2d 410 at 414–415 (D.C.Cir.1984). That would *pro tanto* eliminate the efficiencies generated by the separation of ownership and control which account for much of the success and popularity of the corporate form. (Of course multiple ownership of any property, when joined with control, raises the cost of entering into any transaction regarding that property.)

As stated earlier, however, the main problem is not that the majority has created an unsatisfactory system of shareholder rights, but that it presumed to create a system of shareholder rights at all. The shareholder's interest in corporate assets should be treated as a property right for constitutional purposes, and he should be able to bring suit to protect it against federal government action affecting its value, exactly to the extent that he is able to bring suit against similar private action *under the domestic law of the place of incorporation.* That law governs the terms of the deal between shareholders and management, and among the shareholders themselves, regarding their rights in corporate assets. It defines the shareholder's rights not only vis-a-vis management and other shareholders, but also vis-a-vis third parties—whether the corporation's contractual partners or tortfeasors. Any other approach makes the consequences of corporate ownership, for the corporation itself, its shareholders, and those who deal with it, unpredictable.[12]

---

12. The majority's impassioned reference to "lost" or "stripped" rights, *see, e.g.,* Maj. op. at 1517 n. 63, disregards the principle that some-

thing cannot be lost until it is first found, and the related maxim that it is impossible to doff what has not been donned. Shareholder rights

The cases the majority cites do not support its opposite conclusion on this point. *Nielsen v. Secretary of Treasury*, 424 F.2d 833, 843 (D.C.Cir.1970), is said to stand for the proposition "that shareholders have a property interest in assets of a corporation," and "that the blocking of a corporation's assets in the United States could constitute a deprivation of the shareholders' property," Maj. op. at 1518. It does no such thing. In the passage referred to, the *Nielsen* court was not considering whether the shareholders had Fifth Amendment property rights in the assets of a corporation, but rather whether, *assuming* they had such rights, a United States government decision to *block* the assets (*i.e.,* to withhold them temporarily but indefinitely), as opposed to a decision to *vest* the assets (*i.e.,* to take them permanently), could amount to a deprivation of property sufficient to trigger application of the due process clause. The court concluded not, 424 F.2d at 839–46, and therefore *did not reach,* and explicitly reserved, the issue whether the shareholders' rights could support a successful suit under the due process clause. *Id.* at 845.

If anything, the *Nielsen* opinion strongly suggested that the shareholders would not have standing, in that it took a strikingly different view from the majority here of the consequences of foreign incorporation and of the Constitution's demands with regard to corporate share ownership. To appreciate that, a brief description of the case is necessary: The Trading with the Enemy Act, 50 U.S.C.App. § 5 (1970), provided that during time of emergency, the President may prohibit the transfer of any property subject to the United States' jurisdiction in which any foreign country or a national thereof has an interest. Pursuant to that statute, the President had blocked funds belonging to a Cuban corporation deposited in a New York bank. Cuban refugees, who owned 750 of the 1000 shares of the corporation and because of their refugee status were not considered nationals of Cuba under the statute and regulations, 31 C.F.R. § 515.302(a) (1969), brought suit to enjoin the blocking as applied to what they claimed was their proportionate share of the assets. They claimed that the blocking deprived them of property without due process of law. 424 F.2d at 835–36. The court responded as follows:

> In effect applicants argue that they are entitled to require the government to disregard the entity of the Cuban corporation, or its interest in the property held in the name of the corporation, and are entitled to have the rules regulating transfer of that property determined by reference to the position of the shareholders.
>
> . . . .
>
> In our view disregard of the corporate entity and national character of the Cuban corporation owning the assets is not required either by the Constitution or by the unblocking statute. . . .
>
> In barest conceptual terms it has long been accepted as at least the general rule that the rights of those investing in a venture organized in corporate form are defined by the law of the place of incorporation, and that stockholders in a corporation organized under the laws of a foreign country submit, to that extent, to their governance by the law of a foreign country. *See* Restatement of Conflict of Laws II, §§ 296–310 (P.O.D. April 22, 1969).
>
> These are not arid conceptions. A world where hopefully there will be increasing cooperation between citizens of different states has more, not less need of doctrines for determining the ground

---

in corporate assets do not exist in the abstract; they are found within a legal framework creating and defining the corporate structure, which is erected by the law of the place of incorporation. The majority writes as though I would hold that no American shareholder in a foreign corporation could have rights in the corporate assets protected by the Constitution. Not so.

Such rights *can* exist *if they are provided for under local law.* Defining the contours of constitutionally cognizable property interests by reference to Honduran law is no more peculiar than doing so by reference to the law of Indiana. *See Mennonite Board of Missions v. Adams,* 462 U.S. 791, ___, 103 S.Ct. 2706, 2711, 77 L.Ed.2d 180 (1983).

rules governing their relationships. The choice of law of the place of incorporation has merit in terms of reasonableness and maximizing common ground of international understanding.

. . . .

To recapitulate, even if our government had unilaterally vested the assets involved in this case, any claims by plaintiff resting on an assertion of illegality would encounter substantial problems, starting with the proposition that our government may well be able to accept the country of incorporation as establishing the nationality of a corporation having assets within our borders without being required to pierce the corporate veil.

*Nielsen v. Secretary of Treasury, supra,* 424 F.2d at 841–42, 845.

The majority likewise distorts *Kaufman v. Societe Internationale pour Participations Industrielles et Commerciales, S.A.,* 343 U.S. 156, 72 S.Ct. 611, 96 L.Ed. 853 (1952). It is quite true, as the majority states, that in that case "the Supreme Court permitted United States shareholders to intervene in a suit seeking recovery of corporate property confiscated by the United States under the Trading with the Enemy Act." Maj. op. at 1518. The reason it did so, however, is that the Trading with the Enemy Act contained a clause "enabl[ing] one not an enemy as defined in § 2 to recover any interest, right, or title which he has in the property vested," which the Court interpreted (quite reasonably) to include a stockholder's interest in corporate assets. 343 U.S. at 160, 72 S.Ct. at 613. The *statute* imposed the requirement quoted by the majority that "when the Government seizes assets of a corporation organized under the laws of a neutral country, the rights of innocent stockholders to an interest in the assets proportionate to their stock holdings must be fully protected." *Id.* at 159–60, 72 S.Ct. at 613, *quoted by* Maj. op. at 1518. That a statute may recognize such a claim in no way implies that it is a "property interest" for purposes of the Fifth Amendment.

*Bangor Punta Operations, Inc. v. Bangor & Aroostook R.R.,* 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974), and *First National City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983), are even less apposite. The majority cites these cases for the proposition that "[t]he Supreme Court has consistently refused to allow mere corporate formalities to dictate whether the suing party in fact has a valid claim and a personal stake in the outcome of the case." Maj. op. at 1519. Instead, what they stand for is that on some occasions (not "consistently"), when an independent source of law indicates that this is the proper course of action, a court will prevent a corporation from pressing a claim against a third party which would inure to the benefit of an individual shareholder who would himself be barred from asserting it. It is something of a leap from this to the conclusion that shareholders have a Fifth Amendment property interest in corporate assets. *First National City Bank* explicitly acknowledges, moreover, that in "issues relating to the *internal* affairs of a corporation," as opposed to "the rights of third parties *external* to the corporation," "[a]s a general matter, the law of the state of incorporation normally [governs]." 103 S.Ct. at 2597.

As for the *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), which the majority claims, Maj. op. at 1518, "implicitly held that the sole shareholder of a corporation has a constitutionally protected property interest in corporate assets": The only shareholder that asserted Fifth Amendment claims arising out of the reorganization was also a creditor of one of the reorganized corporations, and the Court did not pass on which status supported the claim. 419 U.S. at 107 n. 1, 117 n. 12, 95 S.Ct. at 341 n. 1, 345 n. 12; *Connecticut General Insurance Corp. v. United States Ry. Association,* 383 F.Supp. 510, 513 (E.D.Pa. 1974) (lower court opinion).

### III. EQUITABLE PRINCIPLES PRECLUDE THE REQUESTED RELIEF

Having ignored one jurisdictional restraint and distorted another, the majority

proceeds to treat the merits of this case with what seems to me an incomprehensible disregard of traditional principles of equitable discretion, bordering on if not surpassing the constitutional limits established by the principle of separation of powers. The inappropriateness of the relief sought here is so immediately apparent that plaintiffs' claims might well serve to test the validity of existing legal principles rather than vice versa. Any system that would countenance judicial interference in military operations abroad, for a reason that simultaneously impugns the integrity and fairness of a friendly nation, at the instance of a plaintiff who has not sought traditional judicial relief in the country where the real estate in question is located and who in any event has a claim for money damages in the courts of this country—any system that would provide relief of this sort would need to be reexamined. In fact, however, the common sense constraints against the action the majority would entertain already exist.

## A. *Injunction*

Because of its intrusiveness, injunction has always been an extraordinary remedy. Even when directed at private individuals and not (as here) aimed at "stop[ping the Government] in its tracks," *Larson, supra,* 337 U.S. at 704, 69 S.Ct. at 1468, it is to be granted only at the court's discretion. *See Bonaparte v. Camden,* 3 Fed.Cas. 821, 827 (C.C.D.N.J.1830) (No. 1,617); 7 Pt. 2 J. MOORE, J. LUCAS & K. SINCLAIR, MOORE'S FEDERAL PRACTICE ¶ 65.18[3] at 134–41 (2d ed. 1984); C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE § 2942 at 368–70 (1973). The separation of powers problems present here make this virtually a textbook case for refusing such discretionary relief. Two objections in particular seem irresistible.

The most important point is that the plaintiffs are asking for direct court interference with a military operation being conducted abroad. As the majority puts it, "[p]laintiffs [did] not seek to prohibit the Regional Military Training Center from operating in Honduras. They merely ask the federal court to prevent the United States defendants from running military training operations on *their* property, which has *not* been lawfully expropriated." Maj. op. at 1531. In other words, plaintiffs do not ask us to stop the military operation; they merely want us to move it from the site selected by the Defense Department (allegedly) as the most appropriate one. Or perhaps to tell the Defense Department it does not really need all the acreage it claims. While it is acknowledged that the land in question is being used for a training base, we do not know what other military purposes it may be designed to serve. If, for example, it had been the staging area for our recent military operations in Grenada, the injunction sought here could have caused incalculable harm. The majority's apparent belief that the trial court should hold a hearing on exactly how harmful to our foreign and defense policies an injunction would be, Maj. op. at 1528–1529, is absurd. Even assuming that we are competent judges of such matters, which we are not, *cf. Gilligan v. Morgan,* 413 U.S. 1, 10, 93 S.Ct. 2440, 2445, 37 L.Ed.2d 407 (1973); *Rostker v. Goldberg,* 453 U.S. 57, 65–67, 101 S.Ct. 2646, 2651–2653, 69 L.Ed.2d 478 (1981), we cannot expect or require the Commander-in-Chief to take us (much less the plaintiffs) into his confidence regarding the activities now in hand. *See Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.,* 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948). And without such knowledge, the fact is that we have no idea what damage to our national interests the discretionary and extraordinary relief sought here might produce. A proper understanding of equitable principles, informed by respect for the separation of powers, should lead us simply and abruptly to deny such relief.

The other set of difficulties requiring the denial of injunctive relief pertains to the Honduran government's role in setting up and supervising the training camp, and the consequent effect of our decision on the United States' relations with Honduras. As Judge Starr's opinion amply demon-

strates, on the basis of uncontroverted facts it is clear that the Honduran legislature has officially endorsed the establishment of a training camp, that the President of Honduras has signed a decree commencing expropriation of the plaintiffs' land for that purpose, and that Honduran soldiers have been participating in and supervising the conduct of the training camp on plaintiffs' land. Whether or not this suffices to invoke the act of state doctrine, it at least makes clear that the order sought here would have substantial foreign policy consequences. We need no additional factfinding to know that it will undermine Honduran confidence in the ability of the United States to speak and act with a single voice in the region, cast doubt upon the steadfastness of our commitment to our policies, and delegitimize the Honduran authorities' participation in the training activities in the eyes of the Honduran people. *Cf. Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962) (courts should not enter decrees which create the potentiality of embarrassment from multifarious pronouncements by various departments on one question); *Steele v. Bulova Watch Co.,* 344 U.S. 280, 289, 73 S.Ct. 252, 257, 97 L.Ed. 319 (1952) (injunction inappropriate when it would "impugn foreign law"). Additional factfinding on this subject would convert the district court into a foreign policy forum.

The majority is unaffected by these military and foreign policy concerns, whose relevance, of course, ultimately rests upon the inappropriateness of judicial interference in matters that judges know little of, and that are preeminently the business of another Branch. Separation of powers concerns do not bar injunctive relief, the majority asserts, because "the foreign affairs context of Executive action cannot shield unlawful conduct from judicial inquiry." Maj. op. at 1530. This is an utter non sequitur. The ability to decide a case has nothing to do with the propriety of granting an extraordinary and discretionary remedy. The panel opinion which this court vacated rejected the contention that the foreign affairs and military ramifications of this suit rendered it nonjusticiable on the basis of the political question doctrine. *Ramirez de Arellano v. Weinberger, supra,* 724 F.2d at 147. It is quite a different thing, however, to say that inevitable, serious, adverse effects on our defense and foreign policy will not justify the withholding of discretionary and extraordinary relief. Contrary to the majority's view, the Supreme Court has indicated that justiciability concerns, including those related to separation of powers, "shade into those determining whether the complaint states a sound basis for equitable relief" and are relevant for the latter purpose. *O'Shea v. Littleton,* 414 U.S. 488, 499, 94 S.Ct. 669, 677, 38 L.Ed.2d 674 (1974). *See also Allen v. Wright,* — U.S. —, 104 S.Ct. 3315, 3330, 82 L.Ed.2d 556 (1984).

The military and foreign affairs factors discussed above, and the serious incursion upon the powers of another Branch that ignoring them will entail, may well be enough, as Judge Tamm's dissent argues, to render this injunction unconstitutional. I think it unnecessary to reach that constitutional point.[13] It seems to me clear be-

---

**13.** Judge Tamm addresses the constitutional issue because he believes that "reliance on traditional principles of equity implies that were the plaintiffs' case more compelling, equitable relief might be appropriate." Tamm, J., dissent at 1550 n. 10. I think it does not. It only implies that if and when traditional equitable principles would not preclude relief (for example, if a statute were enacted eliminating our discretion in the matter), we would *then* confront the constitutional issue Judge Tamm addresses. It is of course the better practice not to enter upon constitutional considerations needlessly. The approach I take of resolving first the permissibility of relief under traditional doctrines of

equitable discretion is similar to the approach taken by the Supreme Court in *Younger v. Harris,* 401 U.S. 37, 54, 91 S.Ct. 746, 755, 27 L.Ed.2d 669 (1971). There the Court explicitly reserved the question whether a statute barred entry of an injunction, and instead denied it on the basis of equitable factors. There is all the more reason to proceed in this fashion when the issue avoided by proceeding with equitable factors first is a constitutional one.

I think it reasonable to depart from this sound practice in dissenting from the attempt of a majority opinion or a line of cases to *convert* a constitutional doctrine into an equitable discre-

yond all doubt, however, that they are enough to make this injunction an abuse of discretion.

And there are other factors as well. Even if military and foreign affairs complications did not exist, the requested relief would contravene the so-called local action rule, under which courts generally will not enjoin a trespass in another jurisdiction. *Ellenwood v. Marietta Chair Co.*, 158 U.S. 105, 107, 15 S.Ct. 771, 771, 39 L.Ed. 913 (1895). Contrary to the majority's suggestion that the rule represents no more than an "occasional deference in equity to the courts of the situs state," Maj. op. at 1529, it is consistently observed by the great majority of jurisdictions of this nation. Annot., 113 A.L.R. 940 (1938); 42 AM.JUR.2d *Injunctions* § 151 (1969); 92 C.J.S. *Venue* § 38b (1955); RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 87 comment d (1971). Furthermore, even those few courts which have abandoned the local action rule vis-a-vis other states still recognize its validity where land *in a foreign country* is concerned. *See Reasor-Hill Corp. v. Harrison*, 220 Ark. 521, 523, 249 S.W.2d 994, 995–96 (1952). The rule rests in part upon the ancient but still vibrant notion that a nation's control over the land within its borders is the most sovereign of its functions, with which no other nation should interfere, *see* 1 F. WHARTON, CONFLICT OF LAWS § 278 at 636 (3d ed. 1905), and partly upon the more practical consideration that it is difficult to monitor compliance with such decrees in faroff lands. The latter traditional concern, which the majority denigrates, did not stem from the mistaken belief that "[c]ourts ... monitor compliance with decrees by personal, on-site inspections," Maj. op. at 1531, but rather from recognition that the chief witnesses will be abroad, beyond compulsory service, and even if willing to testify will be severely inconvenienced in doing so before a foreign court.

The majority points out that "[c]ourts often properly issue equitable decrees involving property outside the jurisdiction of the court." Maj. op. at 1529. That is true in respects not pertinent here—notably, where the property involved is personalty (which was the case in *Phelps v. McDonald*, 99 U.S. (9 Otto) 298, 25 L.Ed. 473 (1879), *quoted by* the majority, Maj. op. at 1529). Even when realty is involved, certain equitable decrees will issue as a matter of course, *e.g.*, decrees requiring execution of a deed, which can be done, of course, in the state where the decree is rendered, regardless of where the land is found. But when it comes to enjoining a trespass in another jurisdiction, the great weight of authority, like the great weight of reason, supports the local action rule.

A further obstacle to issuance of the extraordinary remedy plaintiffs seek is the fact that they have made no effort, and have expressed their intent to make none, to obtain protection in the ordinary quarter from the trespass of which they complain— the courts of Honduras. July 14, 1983 Tr. at 52, *Ramirez de Arellano v. Weinberger*, Civil No. 83–2002 (D.D.C.). I find it remarkable that these plaintiffs, four of which are Honduran corporations and the rest of which have voluntarily chosen to profit from the resources of Honduras by conducting ranching and shrimp packing operations there through Honduran corporations, should take initial appeal to the courts of this country with regard to a dispute concerning Honduran ·land. *See generally Alcoa S.S. Co. v. M/V Nordic Regent*, 654 F.2d 147, 158–59 (2d Cir.1980) (en banc). The only thing more remarkable is that this court, *though not constrained to act*, should be willing to enter an injunc-

---

tion. If in the present case, for example, the majority were to find that a foreign corporation *had* standing to sue for a violation of the due process clause abroad, but that the foreign character of a corporation justifies the denial of equitable relief, I would not feel constrained to avoid the constitutional issue by going along on the equitable ground. That was the situation prompting Judge Bork's concurrence in *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1182–85 (D.C.Cir.), *cert. denied*, — U.S. ——, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983), *cited in* Tamm dissent at 1550 n. 10, with which I have elsewhere expressed my basic agreement, *see Moore v. United States House of Representatives*, 733 F.2d 946, 956–65 (D.C.Cir.1984) (Scalia, J., concurring).

tive decree with regard to the possession and use of foreign land, and to intrude, with unforeseen and unforeseeable consequences, upon presidential control of military and foreign affairs, on behalf of plaintiffs who request this action as their first rather than last resort.

In my view, the above factors alone are more than enough to sink the plaintiffs' case. The majority opinion, however, loads on additional ballast. It asserts the continuing availability of injunctive relief even if, in addition to all the foregoing, the plaintiffs can obtain monetary compensation in the courts of this country. *See* Maj. op. at 1524. This is truly a startling assertion. To quote the same passage from an opinion of Justice Frankfurter relied upon by the majority opinion, Maj. op. at 1523 n. 90:

> Familiar as [the] remedy [of injunction] is, it remains an extraordinary remedy.... A plaintiff is not entitled to an injunction if money damages would fairly compensate him for any wrong he may have suffered.

*Youngstown Sheet & Tube Co. v. Sawyer, supra,* 343 U.S. at 595, 72 S.Ct. at 889–890 (Frankfurter, J., concurring).

The majority suggests that this principle does not apply here because land is considered unique at common law; because plaintiff Ramirez would be losing his business, which is his life's work and would also be considered unique at common law; and because the presence of the camp on his property is a threat to his personal security. Maj. op. at 1527–1528. The first two considerations may be sufficient to justify specific relief against private individuals, but not against the government. The grant of the power of eminent domain to the national government, and the *Larson* corollary, discussed *supra*, pages 1550–1551, that injunction is not available to prevent a taking by the United States—both of which apply to takings of land and businesses—clearly establish the principle that monetary compensation is the constitutionally prescribed accommodation between individual rights and collective needs. As for the risk to plaintiff Ramirez's security:

That is not a consequence of the taking, but of the plaintiff's refusal to acquiesce in it. It is hard to believe that all governmental condemnation of property can be avoided by the simple expedient of refusing to abandon it.

The majority's reliance upon *Youngstown Sheet & Tube Co. v. Sawyer, supra,* to demonstrate the propriety of equitable relief is surely misplaced. To begin with, that was not a case where the normal remedy of monetary relief was available. In granting the injunction against the President's seizure of the steel mills, the Court not only did not assume that a suit for compensation would lie, but strongly implied the contrary, 343 U.S. at 585, 72 S.Ct. at 865. Since the President had repeatedly sought from Congress, and been denied, the power to seize the steel mills if a labor dispute arose during an emergency, it is most unlikely that the "authority" requirement for compensation could have been met. Moreover, even if monetary relief were available in *Youngstown*, it takes no high degree of legal skill to observe the following distinguishing features pertaining to the propriety of an injunction: (1) that taking over the operation of steel manufacturing plants is a good deal less military (and hence less archetypically presidential) in character than conducting military training operations in and for the troops of militarily threatened allies; (2) that the foreign affairs component of seizing domestic steel mills is nil; and (3) that it is a good deal easier for a United States federal court to evaluate compliance with an injunction running to Youngstown, Ohio, than to the Municipality of Trujillo, Department of Colon, Honduras. In truth, *Youngstown's* only relevance to this case is to establish that it is not *always* impermissible to enjoin Executive action assertedly taken for military reasons—a proposition no one contests.

## B. *Declaratory Judgment*

The majority claims that even if an injunction is inappropriate or unavailable, the district court might properly be able to

grant the other relief plaintiffs have requested, a declaratory judgment. Maj. op. at 1532–1533. I disagree.

A declaratory judgment, like an injunction, is a discretionary remedy. *Brillhart v. Excess Insurance Co.*, 316 U.S. 491, 494–95, 62 S.Ct. 1173, 1175–1176, 86 L.Ed. 1620 (1942). Where it would have the same negative effects as an injunction, it should likewise be withheld. *See Samuels v. Mackell*, 401 U.S. 66, 69–74, 91 S.Ct. 764, 766–768, 27 L.Ed.2d 688 (1971); *Great Lakes Co. v. Huffman*, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943). Since it must be assumed that officers of the Executive Branch will honor their oath to uphold the laws of the United States—without which assumption a declaratory judgment would always be a political statement rather than a judicial act—once a court takes it upon itself to pronounce that the actions challenged here are unlawful *all* of the adverse effects of injunction discussed above ensue. As the Supreme Court noted in *Samuels v. Mackell, supra,* either the defendants will feel bound by the declaratory judgment, in which case it would be open to the same objections as an injunction, or they will not, in which case it will " 'serve[ ] no useful purpose as a final determination of rights.' " 401 U.S. at 72, 91 S.Ct. at 768, *quoting Public Service Commission v. Wycoff Co.*, 344 U.S. 237, 247, 73 S.Ct. 236, 242, 97 L.Ed. 291 (1952). The only element of my earlier analysis of equitable discretion affected by the use of declaratory order in place of injunction is one of the two grounds for the local action rule: the court would not have to oversee compliance with its order abroad (though it would still be inappropriately pronouncing upon the permissible use of another sovereign's territory).

The Supreme Court has been especially careful to avoid letting declaratory judgments serve as substitute mechanisms for injunction as a means of usurping state functions. *See Samuels v. Mackell, supra; Great Lakes Co. v. Huffman, supra.* In my view, the same high degree of scrutiny must be applied when the issue is the main objection to injunction here: usurping the functions of another Branch.

The majority states that a declaration of rights "could provide the defendants with options for compliance that a specific injunctive order might not," Maj. op. at 1532. The options the majority suggests are "to seek congressional authorization for their action, or to cause a lawful expropriation of the plaintiffs' property, or to restrict activities to publicly held land, or to settle with the plaintiffs, or to take other appropriate action." *Id.* I examine these briefly in turn:

1. "To seek congressional authorization for their action." Does the majority really mean that all an Executive officer must do in order to comply with the law is to seek amendment of the law while he continues to break it? Surely the Secretary of Defense would be obliged, in light of the declaratory order the majority proposes, to halt operations on the plaintiffs' lands while he seeks congressional action. Which is precisely what he could do under an injunction.

2. "To cause a lawful expropriation of the plaintiffs' property." The same objection applies. In addition, since the word "expropriation" implies not merely a taking of the land's use such as has allegedly occurred here, but acquisition of legal title, the majority evidently envisions our "causing" the government of Honduras to expropriate. The mere expression of the suggestion demonstrates why judges should not meddle in diplomacy.

3. "To restrict activities to publicly held land." It is incomprehensible how this differs at all from what would be required to comply with the injunction plaintiffs seek.

4. "Other appropriate action." Since this is not specified, it is difficult to refute it in detail, but in light of the nature of the alternatives that *have* been specified I think it safe to reject this residual category on the principle of *noscitur a sociis.*

\* \* \* \* \* \*

The majority's disregard of jurisdictional obstacles and overriding of equitable con-

straints are both prompted, it would appear, by an inflated notion of the function of this court, which produces stirring rhetoric but poor constitutional law. The problem is best exemplified by one of the majority's responses to the act of state issue raised by Judge Starr—the novel suggestion that that doctrine may have no application in suits against the United States because "[a] balancing of the roles of the Executive and the Judiciary may produce a different outcome in those cases in which the Judiciary is called upon to curb unconstitutional excesses of *its own* Executive Branch." Maj. op. at 1542. If applied in that context, the majority fears, the doctrine might "prevent the Judiciary from exercising its role in the tripartite system of government to remedy injuries to United States citizens caused by unconstitutional activities of the United States Executive Branch." *Id.* The judiciary, in other words, has some *special* charter to keep the Executive in line, beyond its responsibility to protect individuals against unlawful private action. Thus, judicial power is at its zenith rather than its nadir when its assistance is sought against the President and his officers instead of private persons. This complete inversion of constitutional doctrine appears not only here but in other opinions of this court, which perceive a similar special mission to keep the Congress in line, *see, e.g., Moore v. United States House of Representatives,* 733 F.2d 946 (D.C.Cir.1984); *id.* at 963–64 (Scalia, J., concurring). Whereas John Marshall was prepared to issue a writ against the Secretary of State *despite* the latter's high public office, *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 170–71, 2 L.Ed. 60 (1803), this court is especially willing to enjoin the Secretary of Defense *because of* that status. To a court imbued with such a philosophy, it is small wonder that concepts such as equitable restraint on the basis of interference with military and foreign affairs, and the act of state doctrine, have little meaning. Marshall was right and the majority is wrong. I dissent.

STARR, Circuit Judge, with whom SCALIA, Circuit Judge, joins, dissenting:

In my view the act of state doctrine forecloses this action, and I would therefore affirm the District Court's dismissal on that ground.[1] The majority concludes otherwise only by its insistence that a completed expropriation provides the exclusive manner by which actions of the Honduran government would rise to the level of an "act of state," an unsupportably narrow view of the substance and purpose of that doctrine. The majority's cavalier treatment of the foreign policy implications of further litigation in this matter invites the very intrusion into foreign affairs and affront to a foreign government which the act of state doctrine was designed to prevent. I therefore dissent.

The act of state doctrine, first articulated in *Underhill v. Hernandez,* 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897), rests on the proposition that United States courts "will not sit in judgment on the acts of the government of another [country] done within its own territory." The Supreme Court's decision in *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 428, 84 S.Ct. 923, 940, 11 L.Ed.2d 804 (1964), sets forth a useful description of the doctrine as particularly applicable to the present dispute:

> [T]he Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law.

The act of state doctrine was developed to serve important considerations of separation of powers. The *Sabbatino* Court explained that the " 'constitutional' underpinnings" of the doctrine

---

1. I also concur in Judge Scalia's careful analysis of the insurmountable obstacles to the plaintiffs' suit posed by the Tucker Act, principles of shareholder standing, and well-settled standards of equitable relief.

arise[ ] out of the basic relationships between branches of the government in a system of separation of powers. It concerns the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations. The doctrine ... expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere.

*Id.* at 423, 84 S.Ct. at 938.

The majority's principal step in avoiding these weighty considerations is to ignore

the Honduran government's official involvement in the construction and operation on plaintiffs' land of the Regional Military Training Center (RMTC). As I will now seek to demonstrate, official Honduran involvement in the activities of which appellants complain is manifestly and indisputably present. First, the plaintiffs' own filings[2] clearly demonstrate Honduran involvement:

> I and my men have observed military activities carried out almost every day in the Taya Crique and the Los Presos sections. Green Berets, and Honduran and Salvadoran soldiers enter and leave by car and on foot, loaded with military equipment.

2. This case comes to us from the District Court's order granting defendants' motion to dismiss pursuant to FED.R.CIV.P. 12(b)(6). The procedural posture of the case, however, does not restrict this court to consideration of only those facts alleged in the pleadings filed in the District Court. This is because defendants' motion, styled in the alternative as one for dismissal or summary judgment, was converted into a motion for summary judgment by the actions of the parties and the District Court. Specifically, the parties' filing of materials in addition to the pleadings, and the District Court's decision to accept and consider the proffered materials, worked this conversion under Rule 12(b)(6), according to well-established principles. *Brookens v. United States,* 627 F.2d 494, 499 (D.C.Cir. 1980); *Irons v. Schuyler,* 465 F.2d 608, 613 (D.C. Cir.1972); *Gager v. "Bob Seidel",* 300 F.2d 727, 731 (D.C.Cir.1962). The effect of this conversion is that, on appeal, this court may treat the matter as one involving a grant of summary judgment, regardless of the characterization by the District Court of its disposition of the matter, and may proceed to consider extra-pleading materials in determining whether summary judgment was appropriate. *Id.* I have, therefore, canvassed "[t]he record as a whole," *Gager, supra,* 300 F.2d at 731, in determining that no genuine issue of material fact exists as to the applicability of the act of state doctrine to this case, and that the District Court's dismissal should be affirmed.

The majority's position, Maj. Op. at 1536–1538, that the procedural posture of the case precludes invocation of the act of state doctrine is, in my view, a classic red herring. This argument begins with the majority bemoaning the fact that the doctrine "was not raised by any of the parties before the district court" and claiming that unfairness would be visited on

plaintiffs by any consideration, at this stage, of Honduran acts of state. Second, the majority argues that the absence of "factual development" before the District Court disables this court from "find[ing] the facts necessary to settle the controversy." *Id.* at 1536.

Neither branch of this argument will wash. As to the "procedural unfairness" claim, it is inconceivable that, given the location of the property at issue and the presence of Honduran troops, plaintiffs have not known from the outset that the act of state doctrine presents a serious barrier to their lawsuit. Indeed, the consummate skill with which their complaint was drawn, artfully avoiding the role of the Honduran government, strongly evidences plaintiffs' clear understanding of this issue. Further, the original panel ordered the briefing of this issue, and plaintiffs have since responded both before the panel and the entire court *en banc.* Plaintiffs have clearly not been " 'tak[en] ... by surprise,' " Maj. Op. at 1537 (quoting Advisory Committee note to Rule 12), with respect to the importance of the act of state doctrine. For the majority now to say that consideration of the act of state here would constitute a "[r]ush[ ] to judgment" "depriv[ing] the plaintiff of a meaningful opportunity to present its case," Maj. Op. at 1538, verges on the whimsical. More fundamentally, for reasons discussed *infra* at 1569–1572, I can imagine no "factual development" of this case by the plaintiffs which could transform the physical occupation of the land, and the statements of the Honduran government's intention formally to expropriate that land, into something less than an act of state. That is, the majority's refusal to affirm dismissal of this case merely allows plaintiffs to go forward with their futile attempts to minimize and otherwise discredit the Honduran government's pivotal role in the creation of the RMTC.

Declaration of Nestor Castro, Joint Appendix (J.A.) 92.

> Almost daily during the past three weeks, I, my family and other workers have seen American soldiers (Green Berets), and Salvadoran and Honduran soldiers enter the section of Taya Crique, that is located on the other side of the highway, right across from my house. They enter in groups of various sizes, sometimes of up to 70 or 100 soldiers.

Declaration of Cesar Reyes, J.A. 94.

> I have asked United States and *Honduran Military Officials in charge of the Regional Military Training Center* to Escort my workers into the fields ....

Third Supplemental Declaration of Temistocles Ramirez de Arellano, J.A. 116 (emphasis added).

There is no contention that these Honduran troops are acting *ultra vires* or marauding onto plaintiffs' land without sanction from responsible Honduran officials. But we need not engage in idle speculation as to whether the presence of Honduran troops on this part of Honduran soil is an act of the sovereign. For the Government of Honduras has spoken clearly in this respect at the highest levels of its Executive and Legislative branches, as reflected in two official documents.

The first is a decree of the Honduran National Congress, adopted on June 23, 1983. This decree, *reprinted in* Appellees' Brief at a–3, a–1 (English translation), states that "the Republic of Honduras did establish a Regional Center for military training, located in the jurisdiction of the Municipality of Trujillo, Department of Co-

lon" with the goal of "the overall improvement of the Honduran Armed Forces and the technical training of military elements, both national as well as natives of friendly countries." As a result of the need for "the technical services of foreign military instructors" in the operation of the installation, the National Congress "authorize[d] the admission [into Honduras] of military instructors and students, coming from friendly countries." The Assembly's resolution thus plainly and unmistakably indicates that the RMTC is extant; that the RMTC was established not by mutinous troops but by "the Republic of Honduras"; and that the Center is carrying out functions that are indisputably sovereign in nature—the training and improvement of the Honduran Armed Forces and those of other friendly countries. Now it is true that this Resolution does not speak the language of real estate lawyers and property surveyors. No metes and bounds are identified. In a flight of utter fancy, it might be argued that the dotting of "i's" and crossing of "t's" reminiscent of old-fashioned code pleading requires us to consider the theoretical possibility that the Center of which plaintiffs complain is somehow at the wrong location—that the Honduran government's official sanctioning of the Center does not indisputably run to the appellants' land.

But surely that extraordinary requirement is fully satisfied, even to the Doubting Thomases seized only of a copy of the Federal Rules, by the second official document of the Honduran government. That document is a decree of the president of Honduras, issued November 4, 1983.[3] *Re-*

---

**3.** "[J]udicial notice of a document evidencing an act of state" is a procedure sanctioned by the RESTATEMENT (REVISED) OF FOREIGN RELATIONS LAW § 428 comment g ("Form and proof of an act of state") (Tent. Draft No. 4, 1983). It is clear that this court may take judicial notice for the first time of the contents of the Honduran government documents, as translated by the U.S. Department of State. *See* 21 C. Wright & K. Graham, FEDERAL PRACTICE AND PROCEDURE § 5110 at 527 (1977) ("The appellate court may, of course, take judicial notice on its own motion."). *Accord, Green v. Warden, U.S. Penitentiary,* 699 F.2d 364, 369 (7th Cir.), *cert. denied,* 461 U.S.

960, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983); *State Fair of Texas v. U.S. Consumer Product Safety Commission,* 650 F.2d 1324, 1328 (5th Cir.), *vacated as moot,* 454 U.S. 1026, 102 S.Ct. 560, 70 L.Ed.2d 470 (1981); *Bryant v. Carleson,* 444 F.2d 353, 357 (9th Cir.), *cert. denied,* 404 U.S. 967, 92 S.Ct. 344, 30 L.Ed.2d 287 (1971).

Under the rule that a court may consider "matters of general public record" in disposing of a motion to dismiss, judicial notice of this document is proper even if my analysis of the procedural posture of this case, *supra* note 2, is rejected. *Phillips v. Bureau of Prisons,* 591 F.2d 966, 969 (D.C.Cir.1979). *See also District of*

*printed in* Appellees' Brief at c–2, c–5 (English translation). This decree by its terms formally commenced the expropriation of plaintiffs' land, identified by metes and bounds to eliminate any doubt whatever, "on which the [Regional Military Training Center] was established and is now operating." The decree explains in no uncertain terms the Honduran national interest in and control over that facility:

The above-mentioned Regional Military Training Center ... an activity of the Armed Forces of Honduras, performs the obvious, very important, and direct function of providing national security for the State, inasmuch as its purpose is to perform the duty of the Armed Forces to defend the Republic's territorial integrity and sovereignty in order to maintain peace.

These official documents, to put it as gently as possible, evidence formal acts taken by the Honduran government which, standing alone, constitute an act of state.[4] What is more, if official acts of the Legislative and Executive powers of Honduras are blithely to be ignored, the physical occupation of plaintiffs' property also constitutes an act of state on the facts presented here.[5]

---

*Columbia v. Moxley,* 471 F.Supp. 777, 779 (D.D.C.1979). The State Department translation of the decree of the president of Honduras merits treatment as a matter of public record.

4. In *Alfred Dunhill of London, Inc. v. Cuba,* 425 U.S. 682, 695, 96 S.Ct. 1854, 1861, 48 L.Ed.2d 301 (1976), the Supreme Court specifically mentioned "statute[s], decree[s], order[s], or resolution[s]" of a sovereign as establishing an act of state. (In *Dunhill,* counsel for Cuba failed to offer any such evidence that "Cuba had repudiated its obligations in general or any class thereof or that it had as a sovereign matter *determined to confiscate*" the contested sums. *Id.*) *Accord,* Restatement (Revised), *supra* note 3, § 428 Reporters' Note 3 ("Act of state defined").

5. See Restatement (Revised), *supra* note 3, § 428 comment g (act of state doctrine "possibly [applicable] to physical acts such as occupation of an estate by the state's armed forces in application of state policy"). The occupation in this case, in conjunction with the commencement of formal expropriation proceedings, clearly rises to the level of a sovereign act.

A governmental "taking" without prior formalities (or compensation) has a clear analogue

The acts of state plainly evident here are grounded in the "primeval interest" of a sovereign state to "resolv[e] all disputes over use or right to use of real property within its own domain." *Asociacion de Reclamantes v. United Mexican States,* 735 F.2d 1517, 1521 (D.C.Cir.1984). Surely the occupation of land by a sovereign government within its own territory for military purposes should satisfy the most ardent skeptic as falling within the ambit of the act of state doctrine.

The majority, however, after "[i]nterpreting the resolutions in light of the plaintiffs' set of facts" concludes that it cannot say "without qualification that the Honduran government has exercised an act of state which could bar relief." Maj.Op. at 1534. The key to the majority's devaluation of these documents is apparently that the official actions to date of the Honduran government do not amount to a completed expropriation of or other passage of title to the disputed property. *Id.* at 1535–1536. Thus, "[o]n the basis of the plaintiffs' facts and the two resolutions submitted to this court," the majority

cannot say that Honduras has *expropriated or otherwise asserted a claim of*

---

in United States law. *See Kirby Forest Indus., Inc. v. United States,* — U.S. —, —, 104 S.Ct. 2187, 2191, 81 L.Ed.2d 1 (1984):

[T]he United States is capable of acquiring privately owned land summarily, by physically entering into possession and ousting the owner. In such a case, the owner has a right to bring an "inverse condemnation" suit to recover the value of the land on the date of the intrusion by the Government.

(Citations omitted).

It surely cannot seriously be maintained that Mr. Ramirez disputes the official involvement of Honduran governmental authorities. In addition to the declarations discussed previously in the text, appellants candidly admitted such Honduran involvement in their supplemental brief filed in this court on October 11, 1983. Here is what appellants themselves say on the subject:

Defendants ... are currently involved in operating and expanding the RMTC *in collaboration with the Honduran Armed Forces.*

*Reprinted in* Appellants' Brief *En Banc,* Appendix B, at 4 (emphasis added). See also *id.* at 8, n. 2: "plaintiffs' view [is] that the RMTC is *primarily* an activity of the United States, not Honduras." (Emphasis added.)

*ownership* to the plaintiffs' property. A determination of whether the Honduran government, as a factual matter, has *acted to take* the plaintiffs' property must be made in the first instance by the district court on the basis of evidence submitted by the parties. Dismissal of the plaintiffs' complaint on the ground that the act of state defense bars relief cannot be justified on the record at this time.

*Id.* at 1536 (emphasis added) (footnote omitted).

This analysis, with all respect, misses the mark. The majority, it seems to me, has conveniently confused the concept of a "taking" of property with the formal expropriation procedures used to compensate the property owner and to effect a formal transfer of title to the state. But that will not do. Not a single fact or scrap of information beyond that alleged in the plaintiffs' own complaint and supporting declarations and those contained in the Honduran governmental decrees is necessary to establish the fact of a "taking" by the Honduran government. It is the question whether a taking has occurred, rather than whether the expropriation process has been completed, which is relevant to a proper analysis under the act of state doctrine.

That there is nothing talismanic about formal or informal procedures employed by a sovereign government to seize property within its boundaries is made clear by the definition of "taking" set forth in the RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW (1965):

> Conduct attributable to a state that is intended to, and does, effectively deprive an alien of substantially all the benefit of his interest in property, constitutes a taking of the property, within the meaning of § 185 [of the RESTATEMENT (SECOND), which defines "wrongful" takings of alien property], *even though the state does not deprive him of his entire legal interest in the property.*

*Id.* § 192 (emphasis added).[6]

Applying the common-sense definition of "taking" which has developed in international law, it is abundantly clear that plaintiffs have alleged facts, which we must accept as true at this stage of the litigation, which describe a taking of their property. It is equally clear that this taking was an act of state by the Honduran government.[7]

---

6. Tentative Draft No. 3 of the RESTATEMENT (REVISED) OF FOREIGN RELATIONS LAW (1982) similarly adopts a functional analysis of "takings" of alien property, rather than focusing on the formalities followed by the foreign government. *See id.* §§ 711–712.

 The majority's attempt to deal with this analysis, Maj. Op. at 1535 n. 154, is, in a word, misleading. Section 43 of the RESTATEMENT (SECOND), *supra,* on which the majority relies, deals only with actions of a foreign state "with respect to a thing located, or an interest localized, outside of its territory." It thus has no applicability whatever to this case.

7. The case law makes clear that a taking of property, including a "wrongful taking," constitutes an act of state. Indeed, the development of the doctrine from *Sabbatino* to the present day has largely been the result of litigation over Cuban nationalizations of alien property for which no compensation was ever paid. The nationalization decree at issue in *Sabbatino* contained provisions for compensation which were described by the Second Circuit as "illusory" and "little more than a travesty." *Banco Nacional de Cuba v. Sabbatino,* 307 F.2d 845, 862 (2d Cir.1962). The seizure of foreign banking assets, which eventually led to the Supreme Court's decision in *First National City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972), contained compensation procedures which the federal district court deemed "fictitious." 270 F.Supp. 1004, 1010 (S.D.N.Y.1967). *Accord, Banco Nacional de Cuba v. Chase Manhattan Bank,* 658 F.2d 875, 878 (2d Cir.1981) (parties to related litigation stipulated that no compensatory payments were ever made), *rev'd on other grounds sub nom. First National City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983). Finally, the seizure of cigar manufacturing assets which led to the decision in *Dunhill, supra,* was described by the district court in language directly relevant to the case at bar:

 > The [seizures], *in practical effect,* were complete confiscations. The owners were ousted without their consent from all properties and excluded from any participation in the businesses. Their rights to any receipts or profits were eliminated and *no compensation was provided.*

 *Menendez v. Faber, Coe & Gregg, Inc.,* 345 F.Supp. 527, 532 (S.D.N.Y.1972).

As to the first point, the only reasonable reading of plaintiffs' complaint is that it alleges a taking. The gravamen of the complaint is that the United States defendants have "deprive[d] plaintiffs of their right to enjoy and use their property." Complaint ¶ 10, J.A. 8. Count I of the complaint seeks relief from the "[s]eizure, [d]estruction and [d]eprivation of [p]laintiffs' [u]se and [e]njoyment of [p]roperty," and Count II similarly speaks to the allegedly wrongful "depriv[ation] ... of the use and enjoyment of [the] property." Complaint ¶¶ 15–17, J.A. 10–11. This, then, quite plainly sounds in taking.

Once a taking of foreign property has been *alleged*, the issue becomes, of course, whether a taking in fact *occurred* and, if so, what entity effected the taking. In this case, the majority skirts this inquiry by focusing exclusively on the issue whether a formal expropriation proceeding has been completed. But this exercise in formalism is unwarranted. In its haste to blend "expropriation" with "taking," the majority dismisses the two Honduran governmental decrees as mere "pieces of paper," Maj.Op. at 1533, and ignores the critical passage in the Honduran presidential decree, *reprinted in* Appellees' Brief at c–2, c–5 (English translation), including the unequivocal statement that the RMTC is *"an activity*

*of the Armed Forces of Honduras."* Appellees' Brief at c–7 (emphasis added).

It is hard to conceive of another manner in which the Honduran government could have more clearly asserted that the operation of the RMTC constitutes a sovereign act of that government, or indicated its estimation of the RMTC's importance to that nation's sovereign interests. I am simply at a loss to understand how the majority, with these documents properly before them, can conclude that "[d]ismissal of the plaintiffs' complaint ... cannot be justified on the record at this time." Maj.Op. at 1536.

It is no answer to say that plaintiffs have named only the United States officials as defendants, and thus have not brought Honduran actions into the line of litigation. Such a reading of the complaint would require the court to ignore the inescapable inference that the Honduran government as sovereign, must, at a minimum, have acquiesced in the taking of plaintiffs' property. But we are not limited to the inexorable inferences from plaintiffs' complaint and declarations, for we have the two decrees of the Honduran government to establish official and active Honduran involvement in the creation and operation of the RMTC.

Regardless of the extent of United States participation in the RMTC,[8] the as-

---

8. The cases cited by the majority for the proposition that the United States not be allowed to use the doctrine to shield improper collaboration with foreign governments, Maj. Op. at 1542–1543 nn. 183–85, do not contain relevant discussions of the act of state doctrine and are in any event distinguishable on several grounds.

The only cases cited by the majority which addressed improper acts by United States officials abroad in conjunction with foreign officials are *Berlin Democratic Club v. Rumsfeld,* 410 F.Supp. 144 (D.D.C.1976), and *United States v. Hensel,* 699 F.2d 18 (1st Cir.1983). In relevant part, *Berlin Democratic Club* involved electronic surveillance of United States citizens in West Germany by agents of the West German government; *Hensel* involved the search of a marijuana-laden boat by Canadian policemen. The actions of the foreign agents in both cases were intertwined with actions of United States agents to the extent that the so-called "joint venture" doctrine was implicated. This doctrine has been invoked in the past to challenge

illegal searches and other violations of civil liberties by foreign officials, acting on the requests of United States officials. Before explaining why the doctrine seems to me inapplicable to the present action, I note that the decisions relied on by the majority do not represent the breaking of any new ground in the "joint venture" doctrine directly applicable to the present case.

It is also noteworthy that neither *Berlin Democratic Club* nor *Hensel* contain any analysis of the act of state doctrine. This seems to me consistent with the different factual situations presented by the typical "joint venture" case—an illegal search or other infringement of civil liberties—and the facts of the Honduran seizure of plaintiffs' ranch. In the first place, this case clearly involves foreign relations considerations of a vastly more important dimension than did the cases cited by the majority. Secondly, Honduras' seizure of land within its borders, even if, as the majority argues, it is beneficially owned by an American citizen, is an act specifically

sertion by Honduras' president as to Honduran control of the RMTC, and the commencement of formal expropriation proceedings, establish for me beyond cavil that Honduran acts of state have resulted in the taking of the disputed property, and that United States courts are in no position to adjudicate the propriety of this taking. The majority's discussion of the fact that at this stage of the expropriation process compensation has not yet been paid or title passed is, in a word, irrelevant to the determination of whether an act of state has occurred.

Because the majority does not view these uncontroverted facts as justifying invocation of the act of state doctrine, it purports to "take no view on the weight or substance of the plaintiffs' factual case as it might be developed." Maj.Op. at 1538. Nonetheless, the majority, committed to the idea that the current record will not support invocation of the act of state doctrine, is drawn inexorably to the position that there is a need for further inquiry into the "extent" of Honduran participation in the taking and continued occupation of plaintiffs' land. Thus, the majority states that Honduran troops may not now be "participating in the training activity at all, *let alone to such an extent that the Honduran government could be said to have seized the ranch." Id.* (emphasis added).

Assuming that the majority does not wish to suggest that the United States simply invaded Honduras, its invitation to the parties to plumb the timing of and relative responsibilities for the establishment of the RMTC is a flagrant affront to the sovereignty of Honduras. Attempts by the parties to find "facts" with respect to these "issues" would, in effect, question Honduran autonomy and raise the specter of a United States court declaring the

government of an allied nation so subject to U.S. "manipulation" as to be incapable of independent sovereign acts worthy of deference under the act of state doctrine. The unavoidable tenor of such an argument is suggested by appellants' reference to the impropriety of U.S. officials "manipulating foreign officials abroad," Appellants' Reply Brief at 18, and their reference to an article in the *New York Times* which quoted an unnamed Honduran official's criticism of " 'great' pressure from American officials" in constructing the RMTC. *Id.* at 8 n. 2. Thus, the majority's speculation, Maj.Op. at 1542, that "[t]he entire suit could conceivably be resolved with no reference to Honduran governmental involvement" is no more than wishful thinking.

Judicial consideration of these arguments obviously would threaten embarrassment to the United States and its allies in a volatile and strategically important area of this hemisphere. This danger is compounded by the irony that the majority applies an unprecedentedly narrow reading of the act of state doctrine—a doctrine which, as noted above, grew up around the nationalization of U.S. assets by unfriendly foreign governments—to bring into question the sovereignty of a friendly foreign state. Surely the separation of powers concerns informing the doctrine counsel at least equal consideration of the acts of friendly nations, where the foreign policy aims of the United States are, if anything, put at greater risk by judicial meddling in international affairs.

The majority goes to some lengths, Maj.Op. at 1539–1543, to suggest that "the Second Hickenlooper Amendment, accepted tenets of international law, treaties between the United States and Honduras, or other legal obstacles" could "bar application of the act of state doctrine in this

---

permitted under international law, provided reasonable compensation procedures are followed. Similarly, if this seizure had been committed within the United States by agents of the United States government, it is clear, abstracting from the standing questions ably discussed by Judge Scalia, that plaintiffs would be entitled to bring an inverse condemnation action, but no

more. In other words, the fact that this action deals with rights to land in a foreign country, seized by that country's government, rather than with the protection of core civil liberties implicated in the cases cited by the majority, renders the "joint venture" analysis urged by the majority singularly inapplicable.

case." *Id.* at 1543. These speculations seem to me completely unfounded.

The first perceived "legal obstacle" addressed by the majority is the so-called First Hickenlooper Amendment. This statute is wholly inapposite here. Indeed, the inclusion of this argument in the majority opinion is nothing short of astonishing. In reaching out for any and every conceivable obstacle to the application of the act of state doctrine, the majority opines that an "expropriation" by Honduran authorities without compensation will result in a legal requirement under the strictures of the First Hickenlooper Amendment that the President immediately cut off foreign assistance to Honduras. In the words of one of the great cases of yesteryear, this proposition is utterly "too extravagant to be maintained." It surely cannot seriously be argued that a cut-off of financial assistance is required where, as here, *the president of a sovereign country closely allied to the United States in a difficult and sensitive region of the world has solemnly signed a formal decree expressly providing that a formal expropriation pursuant to procedures provided by Honduran law is to go forward.* This is scarcely a Cuba-like retaliatory seizure of American assets. And surely the majority does not mean to suggest that in the splendid isolation of the United States Courthouse we perceive south of our borders a situation which would require a cut-off of U.S. financial assistance unless we allow this litigation to proceed. Even to suggest such a proposition eloquently manifests a single-minded willingness to tread with abandon in the most delicate areas of foreign relations.[9] Finally, one must recognize that the majority's analysis, if adopted, would have no

effect whatever on the propriety of recognizing the act of state doctrine in this case.

Turning to the Second Hickenlooper Amendment, the only courts which have addressed the question have decided that it applies only to cases in which a party asserts that "specific property located in the United States" was the intended target of a confiscation by a foreign state in violation of international law. RESTATEMENT (REVISED), *supra,* § 429. This interpretation of the statute was first advanced by the Second Circuit in *Banco Nacional de Cuba v. First National City Bank,* 431 F.2d 394, 399–402 (2d Cir.1970). The subsequent Supreme Court decision in *First National City Bank, supra,* 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972), reversed the appellate court on other grounds; none of the four opinions addressed the construction of the Hickenlooper Amendment. As the RESTATEMENT (REVISED) notes:

> Since disagreement by the Supreme Court with the Court of Appeals on interpretation of the [Hickenlooper] [A]mendment would have made all of the other points irrelevant, it seems that the Supreme Court agreed with the Court of Appeals' interpretation ... that only property directly related to an expropriation and *found in the United States* can bring the second Hickenlooper Amendment into play, whether by way of claim or counterclaim.

*Id.* § 429 Reporters' Note 4 (emphasis added). The Second Circuit has recently had occasion to stand by its earlier interpretation of the Second Hickenlooper Amendment. *Banco Nacional de Cuba v. Chase Manhattan Bank, supra,* 658 F.2d at 882 n. 10. The Fifth Circuit adopted this reading of the statute in *Compania de Gas de*

---

**9.** In its parade of horribles the majority also overlooks the President's authority to waive application of the First Hickenlooper Amendment's sanctions. *See* 22 U.S.C. § 2370(e)(1) (1982).

The majority is likewise off base in arguing that the expropriation decree issued by Honduras' Chief Executive is irrelevant to the issue of legality *vel non* under the First Hickenlooper Amendment. To the contrary, the very act of issuing the decree evidences an act of state

solemnly undertaken by the Honduran government and *at the same time the undisputed terms of that decree evidence that government's undertaking the appropriate steps to effect compensation.* It is the taking of such steps aimed at speedy compensation that is required under the express terms of the First Hickenlooper Amedmont. 22 U.S.C. § 2370(e)(1). *See also* the discussion *infra* at p. 1512. The majority errs in suggesting otherwise.

*Nuevo Laredo, S.A. v. Entex,* 686 F.2d 322, 327 (5th Cir.1982), *cert. denied,* 460 U.S. 1041, 103 S.Ct. 1435, 75 L.Ed.2d 794 (1983). Since the disputed property in this case is real property situated quite permanently in Honduras, the Second Hickenlooper Amendment can have no application here.

The majority's invocation of the so-called "treaty exception" to *Sabbatino,* as well as the possibility of a violation of international law, reduces in effect to a single concern. This is because the requirements of the 1928 Treaty of Friendship between the United States and Honduras, and the standards under international law, are substantially the same. Under the treaty, Honduras is required to render "just compensation" upon the expropriation of property owned by U.S. nationals; under U.S. recognized principles of international law, "an alien whose property is expropriated is entitled to 'prompt, adequate and effective' compensation." *Chase Manhattan Bank, supra,* 658 F.2d at 888 (discussing the origin of the so-called "Hull Doctrine"). *See also* RESTATEMENT (SECOND), *supra,* § 185 Reporters' Note 1.

In light of the uncontroverted fact that the Honduran government has taken the first steps, under Honduran law, toward expropriation of and compensation for the disputed property, there is at this time no basis for an argument that the Honduran government is in violation either of its treaty obligations or accepted tenets of the international law of expropriation. I do not accept the majority's reading of this dissent as precluding future legal action by plaintiffs should the compensation paid them by the Honduran government run afoul of that government's treaty obligations. Without deciding the merits of this hypothetical case, I find it quite easy to say that this as yet unripe claim would not be precluded if our decision as to declaratory and injunctive relief were to come out against the plaintiffs.

The majority's imagined barriers to the recognition of the Honduran acts of state are thus without substance. This court can and should recognize these sovereign acts and dismiss this lawsuit.

The great tragedy of the majority's opinion is that it takes no note of the very real dangers to U.S. foreign policy posed by this court's decision. I respectfully but emphatically dissent.

